## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No: _____

| | |
|---|---|
| GOLDEN UNICORN ENTERPRISES, INC.; and BIG DOG BOOKS, LLC, *on behalf of themselves and all those similarly situated*, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| vs. | )<br>) |
| AUDIBLE, Inc., | )<br>) |
| Defendant. | )<br>) |

**COMPLAINT**

**(Class Action)**

**(Jury Trial Demanded)**

Plaintiffs Golden Unicorn Enterprises, Inc., and Big Dog Books, LLC, by and through their undersigned counsel and on behalf of themselves and all those similarly situated, complain of Defendant Audible, Inc. ("Audible"), as follows. Plaintiffs, by way of this Class Action Complaint (the "Action") make these allegations on information and belief except as to the actions of Plaintiffs, which are based on Plaintiffs' own knowledge.

## INTRODUCTION

1.     This Action seeks to recover royalty[1] payments owed to Plaintiffs and class members for audio distribution rights in their works (hereinafter, the "Works") that Defendant

---

[1] In this Complaint, "royalty" refers to payments that were contractually due and/or paid to self-published authors and copyright holders based on actual or purported revenue realized by Defendant Audible. In some contexts, "royalties" denotes residual payments made to an author or initial copyright registrant by a party to whom copyrights have been sold or otherwise assigned. The use of the word "royalty" in this Complaint is not intended to imply that any Plaintiff or Class member sold or otherwise assigned any copyrights to Audible; rather, the Authors licensed to Audible only the rights to distribute recordings of the Authors' Works.

Audible systemically withheld from thousands of authors, in bad faith, and in violation of its contracts with those authors.

2.       Audible is a distributor of audio recordings ("Audiobooks") of over 200,000 novels and nonfiction books that are written by thousands of authors. Audible has maintained a secret system of accounting for distribution of the Audiobooks that results in authors and/or copyright holders (collectively, the "Authors") being paid far less than 25% to 40% of the value of the Audiobooks it distributes, the percentages for which they contracted. This central feature of this accounting subterfuge is that Audible provides its customers and subscribers with far more Audiobooks than are reflected in the terms that it reveals publicly and the numbers it reveals to Authors. This course of behavior breaches the terms of the contracts between Audible and the Authors, as explained in greater detail below, unjustly enriches Audible, and breaches the duty of good faith and fair dealing that a party to any contract owes to its counterparty.

3.       The gap between the value of the actual Audiobook distributions and the value on which Audible calculated royalties was revealed to Authors on or around October 19, 2020, by a glitch in the software that Audible used to report sales and royalty numbers to authors. Without this chance occurrence, Authors would still be in the dark.

## JURISDICTION AND VENUE

4.       Plaintiffs and Defendant are domiciled in different states.

5.       On information and belief, the members of Plaintiffs' proposed Class number in the thousands and include residents of every state or nearly every state in the United States.

6.       The matter in controversy in this Action exceeds $5,000,000, exclusive of interest and costs.

7.      The contracts to which Plaintiffs and Defendant are parties provide that any dispute between the parties be adjudicated by a court or courts located in the County of New York, New York State. Similarly, the respective contract(s) to which Defendant and each member of the proposed Class are parties provided that any dispute between the parties be adjudicated by a court or courts located in the County of New York, New York State.

8.      By their own terms, these contracts are governed by New York State law.

9.      Through the venue and choice-of-law provisions of these contracts, Defendant and all Class members have submitted to the jurisdiction of the courts of New York State and to all federal courts located there.

10.     Through these contracts and pursuant to 28 U.S.C. § 1332(d), venue is proper in this Court, and this Court has jurisdiction over the subject matter of this action.

11.     To the extent any of Plaintiffs' and the Class's legal claims under the law of any state are not deemed subject to the contracts' venue and choice-of-law provisions, this Court may nonetheless exercise pendent jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy.

## PARTIES

### A.  Plaintiffs

12.     Plaintiff Golden Unicorn Enterprises, Inc. ("Golden Unicorn"), is a Colorado corporation with its principal place of business located in Parker, Douglas County, Colorado. Plaintiff Golden Unicorn Enterprises, Inc., is thus a citizen of Colorado. Plaintiff Golden Unicorn Enterprises asserts both individual and representative claims.

13.     Jan M. Bonthu is the sole shareholder of Golden Unicorn. For all purposes relevant to this lawsuit, Bonthu writes under the pseudonym or pen name "J.S. Scott".

14.    Bonthu is the author of approximately forty novels. These include the "Billionaire's Obsession" series and several other romance series.

15.    Defendant Audible has distributed approximately twenty-two of Bonthu's self-published Works in Audiobook form, directly and/or in partnership with Audible's affiliated companies, since February 2014. Substantially all of these books were distributed pursuant to agreements between Audible and Plaintiff Golden Unicorn.

16.    Plaintiff Big Dog Books, LLC ("Big Dog Books"), is a North Carolina limited-liability company with its principal place of business located in Raleigh, Wake County, North Carolina. Elizabeth Leone Noble is the sole member and sole manager. Elizabeth Leone Noble is a citizen and resident of Raleigh, Wake County, North Carolina. Plaintiff Big Dog Books is thus a citizen of North Carolina. Plaintiff Big Dog Books asserts both individual and representative claims.

17.    For all purposes relevant to this lawsuit, Noble writes and has written under the pseudonyms or pen names "Sawyer Bennett" and "S. Bennett".

18.    Noble has authored more than eighty novels. These include the "Cold Fury" series, several other romance series, and several works of general fiction.

19.    Directly and/or in partnership with affiliated companies, Defendant Audible has distributed approximately forty-three of Noble's self-published titles in Audiobook form pursuant to the Contract since Audible began to distribute Audiobooks of self-published Works in or around 2011. All of these forty-three books were distributed pursuant to agreements between Audible and Plaintiff Big Dog Books.

20.    Plaintiffs and other Class members are authors and other copyright holders (collectively, "Authors") who granted Audible audio distribution rights in exchange for "royalty"

payments, which per contract are to be calculated as percentages of Audible's revenue from Audiobooks that are actually distributed to customers, net of contractually specified amounts for items such as taxes, promotional discounts, and returns of Audiobooks.

**B. Defendant**

21.    Defendant Audible is a Delaware corporation. Its principal place of business is at One Washington Place, Newark, Essex County, New Jersey 07102. Audible is therefore a citizen of Delaware and New Jersey.

22.    Defendant Audible owns and operates an online platform, www.acx.com ("ACX"), to which Authors can upload Audiobooks that they have produced or whose production they have separately arranged. As an alternative, ACX allows Authors to upload their Works in text form to facilitate narration and production by producers who use the ACX platform.

23.    Audible is a wholly owned subsidiary of Amazon.com, Inc. ("Amazon"), the giant online retail and media company, having been acquired for approximately $300,000,000 in March 2008. While Amazon does not report financial data for its Audible unit, Amazon as a whole reported $21.3 billion in net income on net sales of $386 billion in fiscal and calendar 2020. It reported book value – assets net of liabilities – of $114.8 billion as of June 30, 2021. Amazon's market value approached $1.7 trillion as of August 13, 2021, based on 506,440,520 outstanding shares and a closing share price of $3,293.97.

**FACTS**

I.    **The Audiobook Business.**

24.    Books and other written works have been recorded for listeners for nearly a century. Many of the original users were blind, and they depended on the recordings as their only means of consuming written literature. Such recordings gained broader popularity in the 1980s as "books on

tape" – cassette tapes – and in the 1990s were delivered by compact disc. These mediums, of course, were tangible and, while they could be copied, such a process was cumbersome.

25.    The market for audio versions of fiction and non-fiction alike began to grow much more swiftly in the 2000s with the advent of portable media players such as Apple's iPod. At this point, the recordings were audio files that a customer could swiftly and easily download from the websites of Audible and similar companies and then easily transfer from one device to another.

26.    The market for Audiobooks and similar recordings has exploded since around 2010 as mobile telephones have become more sophisticated and gained storage capacity. "Smartphones" are mobile phones that accommodate software programs, also known as "applications" or "apps", with all of the features of 2000s-era portable media players and additional, newer features. More than 80% of Americans have smartphones. Revenue from Audiobooks and similar recordings grew to an estimated $1 billion in the United States and $3 billion worldwide in 2020.

27.    Audible's Audiobooks account for as much as 90% of sales for recordings of some genres, and Audible is the dominant distributor for virtually every genre aimed at consumers.

28.    Audible boasts that its customers and subscribers downloaded "nearly 4 billion hours of content" in 2019 and that it has "millions" of listeners.

29.    Audible's Audiobooks include both novels and non-fiction Works.

30.    Audible sells Audiobooks singly – "*à la carte*" – at list prices of $15 to $35.

31.    Audible determines the *à la carte* price for each book. Authors have no control over the price. Audible also allows discounts from the *à la carte* price to Audible subscribers, members of Amazon's "Prime" program, and certain other buyers. Authors have no control over these discounts.

32.    Via e-mails and via messages that appear in the course of online purchases via its website, Audible aggressively encourages *à la carte* buyers and visitors to its website to become members, subscribers whose credit cards are charged monthly. Through most of the time period described in this Complaint, Audible has offered two monthly plans: a "gold" plan and a "platinum" plan.[2] Audible's "gold" plan costs $14.95 per month and affords a subscriber one "Credit" per month that can be redeemed for permanent access to one Audiobook. Audible's "platinum" plan costs $22.95 monthly and allows permanent access to two Audiobooks using two credits. Both plans have been and remain available at comparable per-Credit prices on an annual basis.

## II.    Authors And Their Roles In The Audiobook Business.

33.    Audible was founded in 1995. Until approximately 2011, Audible worked exclusively with publishing houses that owned the underlying rights to the books whose recordings it distributed.

34.    Class members are Authors who sell their self-published Works in written form through a variety of channels or, in some instances including those of Plaintiffs Golden Unicorn and Big Dog Books, closely held business entities controlled by those authors which registered the copyrights or to which those authors assigned or licensed the copyrights. In exchange for percentage-based royalty payments, these Authors license audio distribution rights in the Works to Audible, allowing Audible and its affiliated companies to sell and distribute the recordings of

---

[2] Audible now refers to each of these two plans as "premium plus" plans. The terms of the plans are unchanged. This Complaint refers to the "gold" and "platinum" plans for the sake of readability and consistency. Separately, Audible now offers a lower-priced "plus" plan that includes access to recordings of authors' writings only as long as a subscriber continues to subscribe; the rights to such writings are purchased from the authors by Audible and are not subject to the Contract (defined below).

the Works, which are voiced by narrators. Both in Audible's sales and marketing materials and in

in contractual documents, Audible refers to these recordings as "Audiobooks".

35.     Audible began to work with self-publishing Authors in this way in or around 2011.

36.     Audible pitches to Authors of self-published books its "unique and robust royalty

model. Depending on the distribution rights granted to Audible, authors, publishers, and other

Rights Holders, as well as narrators, studio professionals, and other Producers can earn royalties

of up to 40%."[3]

37.     At their own expense, Authors hire narrators and have Audiobooks produced from

the original manuscripts.

38.     In some instances, Authors do this through ACX to facilitate narration and

production of an Audiobook. An Author and producer and/or narrator may agree to a single up-

front payment or payment in the form of a share, typically one-half, of the Author's royalties.

39.     In other instances, Authors arrange their own narrators and produce the Audiobooks

by other means according to Audible's standards. In such an instance, the Author must pay any

fees charged by the narrator and/or producer under separate contractual arrangements with the

narrator and/or producer.

40.     Choosing one of these modes of producing the Audiobook over the other modes,

however, does not alter the percentage share of royalties that Audible is obligated to pay under a

contractual document that Audible titles "Audiobook License and Distribution Agreement"

("Contract") (Ex. A). Nor does this choice alter the basis on which that percentage share is

calculated under the Contract. *See* Exs. A, B, C, and D.

---

[3] ACX | EARN MONEY WITH AUDIOBOOKS, https://www.acx.com/help/earn-money-with-audiobooks/200487100 (last viewed Aug. 17, 2021).

41.     The contractual terms governing Audible's royalty payments are embodied in the Contract, which incorporates one of two royalty schedules, one for "exclusive" distribution" and one for "non-exclusive" distribution. Aside from this variation and other minor variations described below, the terms are substantially the same in the Contract with each Author: all are calculated on the basis of a sales figure that Audible misrepresents to every Author, obscuring the extent to which it nets out returns and exchanges by its customers and subscribers.

42.     An individual Author is not able to negotiate the terms and definitions that apply to royalty payments nor any other terms of the Contract. The Contract is a contract of adhesion drafted by Audible and presented to potential Author counterparties on a take-it-or-leave-it basis.

43.     Audible's Contract with each Author provides that royalty payments are to be calculated after "returns" and certain other items are netted out.

44.     The Contract and other contractual documents incorporated into it by reference do not explicitly define the term "returns", but the term "return" in the context of consumer goods is typically understood to mean that a product is returned for a refund because the product was defective or the buyer was otherwise dissatisfied. The term does not encompass an exchange and is especially inappropriate where a customer exchanges a product after receiving any appreciable benefit from it.

45.     Authors reasonably believed that the Contract's use of the term "returns" was in the sense described above, and Audible knew that the Authors held this reasonable belief.

46.     Audible's regular presentation of sales numbers to authors appeared to be consistent with this understanding of the term "return".

47.     Importantly, the Contract did not and do not provide for royalties to be calculated as percentages of sales net of "exchanges".

48.     The Contract varies in only four points, none of which affect the uniform misrepresentation to each Author of Audible's sales figures:

    a) First, as noted above, some Audiobooks include the input of a narrator and/or producer who was arranged through ACX and whose compensation is a contractually agreed share, typically 50%, of the Author's royalties.

    b) Second, an Author who grants Audible "exclusive" rights to distribute Audiobooks of a Work is due 40% of the revenue attributable to the Audiobooks Audible distributes. Audible defines this "exclusive" distribution as referring to distribution directly from Audible, through other platforms operated by Amazon, and through comparable services run by the tech giant Apple, Inc. ("Apple") under an agreement or agreements between Apple and Audible and/or Amazon. *See* Ex. B. In contrast, an Author who grants Audible "non-exclusive" rights to distribute an Audiobook of a Work is due only 25% of the revenue attributable to Audible's revenue attributable to that Audiobook. *See* Ex. C. In this instance, the Author is free to make and distribute recordings of the Work through other channels. Despite the differing rates, the Contract provides for each of the two rates to be calculated on the same sales figure.

    c) Third, the sales figure to which the royalty percentage applied varied slightly, according to whether an Audiobook was distributed to a customer as an *à la carte* sale or to a subscriber in exchange for a Credit. For Audiobooks distributed in exchange for a Credit, Audible determined the sales figure according to its calculation of a metric that it called the Audible Listener Allocation Factor by the *à la carte* price of the Audiobook.

    d) Fourth, the version of the Contract for Audiobooks that Audible began to distribute in the first few years of its program for self-published Authors provided that an Author's percentage of royalties on a given Audiobook began at 50% and escalated with the number of copies of that Audiobook that Audible distributed. *See* Ex. D.

49.     Importantly, the royalty percentages and other variations were applied to the *à la carte* price or a figure that was based on the *à la carte* price. Thus, the amount contractually owed to each Author can be calculated based on the *à la carte* price at the time of the distribution, whether it was distributed in exchange for an *à la carte* payment or in exchange for a Credit, depending on the book's exclusive or non-exclusive distribution arrangement, and depending on

whether the Audiobook distribution was made subject to the escalating set of percentages. These factors can be determined from Audible's internal records.

50.     Under one typical arrangement, the Author of an Audiobook licensed non-exclusively to Audible received a 25% royalty payment for each sale or distribution of the associated Audiobook. Where the distribution of an Audiobook was made to an Audible subscriber in exchange for a credit, and not as an *à la carte* sale, the 25% was calculated in relation to the monthly subscriber fee rather than on a gross sales price.

51.     For example, where an Audible subscriber paid $14.99 a month in membership fees and used her one monthly credit to obtain an Audiobook of "Dax (Arizona Vengeance Book #4)" by Elizabeth Leone Noble a.k.a. Sawyer Bennett, Plaintiff Big Dog Books was due to be paid approximately $3.75.

52.     Each Author with one or more Audiobooks distributed by Defendant Audible received a monthly report showing the number of each Audiobook sold, Audible's revenue from those sales, and the royalty being paid to the Author based on the applicable percentage and the stated revenue figure.

53.     These reports did not provide the Authors with the number of Audiobooks of a given Work that were distributed to Audible's customers and subscribers before exchanges were subtracted, nor the revenue associated with that number. That number was the proper number to which the 25% or 40% royalty rate should have been applied.

54.     Authors were also able to access an online dashboard through the ACX portal. This portal typically provided the net sales number for the month-to-date for any given Audiobook based on a Work by that Author. However, the dashboard did not track cumulative numbers or dollar values of gross sales or royalties, nor the numbers or values of either the exchanges or the

contractually allowable deductions; it tracked only tracked the difference between the gross distributions and the gross deductions; in other words, the net numbers of sales and corresponding royalties. If it was theoretically possible for an Author to monitor this dashboard twenty-four hours a day for thirty days straight in order to determine these figures more precisely, no Author appears to have done so before October 2020, and Audible gave Authors no notice that they should be doing so in order to determine whether it was improperly withholding royalty payments.

III.    **Audible Underpays Its Authors Based On Numbers Of Net Audiobooks Sold That It Undercounted And Falsely Reported To Authors**

55.    In or around 2016, Audible created a policy that allowed customers and subscribers to exchange an Audiobook as long as 365 days after obtaining access to it. Given the primarily digital nature of the Audiobook business, this exchange in practical terms meant that the customer or subscriber lost access to the Audiobook. The customer or subscriber then received access to a different Audiobook. Audible called this policy its "Easy Exchange Policy" and its "Great Listen Guarantee".

56.    Audible knew that its "Great Listen Guarantee" encouraged customers and subscribers to treat the service as a public library, with practically unlimited access to Audiobooks regardless of the putatively finite number of monthly Credits available on a given subscription plan. All of Audible's subscribers and customers are able to listen to the entirety of an Audiobook within 365 days and obtain a different Audiobook at no cost. A typical "gold" plan member can complete a single Audiobook within half a month, exchange it, and obtain a second Audiobook to consume within the second half of the month.

57.    In such a situation, only the Author of the second Audiobook received the benefit of a royalty payment.  If a customer wanted an exchange, they simply exchanged the book from the first Author with Audible and got their credit back, which meant that the credit payment given

to the first Author when the customer downloaded the second Audiobook was raked back from the first Author's royalties and sales.

58.    Moreover, many Audible members churned through up to ten times the Audiobooks to which they were putatively entitled, without making any additional payment that would have translated into royalty payments to Authors.

59.    At no time nor in any manner did Audible inform its Authors that it was actively inviting customers and subscribers to consume and exchange unlimited numbers of Audiobooks.

60.    Authors who have attempted rough calculations now believe that most of them received between 50% and 85% of the royalty payments they would have received if not for Audible's calculated concealment. No Author can know the exact number without the benefit of discovery, though, because Audible never informed any Author of the gross number of her Audiobooks it distributed in any period, nor of Audible's revenue on which that Author's royalties should have been calculated.

61.    In this regard, Audible has been standing in a position of trust and confidence vis-à-vis the Authors and should therefore be considered a fiduciary with respect to the funds it held and was obligated to calculate per the terms of the Contract and then distribute to each Author.

62.    Audible almost certainly has already calculated these gross numbers for each Audiobook, however. Even if Audible has not done so, it could easily do so.

63.    Either way, only Audible has been keenly aware of the dynamic, the persistent discrepancy between gross sales and sales net of these exchanges, for approximately six years.

64.    Indeed, Defendant Audible has long considered this dynamic to be economically advantageous. The practically unlimited availability of Audiobooks allowed Audible to register more subscribers and charge greater subscription fees than it otherwise might have been able to

do. This is especially important to Defendant Audible because the bulk of its revenue comes from monthly subscription fees rather than from *à la carte* sales. Audible's policy of unlimited exchanges creates a benefit both for itself and its subscribers and customers; yet Audible has been compensating the source of this bounty – Plaintiffs and the proposed Class – as if Audible's subscribers were accessing finite numbers of Audiobooks, ostensibly one or two per month in most instances.

65.    Audible's senior managers discussed whether to provide Authors with the numbers of gross distributions and the numbers of gross returns and exchanges but decided against doing so because they knew that full disclosure would result in less profit for Audible.

66.    While Audible and its subscribers and customers share this bonanza of free intellectual property, Authors have been systemically shorted, by 15% to 50% in most instances.

67.    Audible actively encouraged its subscribers to exchange Audiobooks via private messages without making this fact known to Authors. In a variety of situations, including situations where a subscriber had completed an Audiobook, Audible sent the subscriber an e-mail or other message to suggest that the subscriber exchange it for a different Audiobook.

68.    Audible was able to target messages in this manner because of the digital nature of the service and its delivery by "streaming" over the Internet.

69.    This same ability allowed Audible to monitor when a subscriber completed an Audiobook, yet Audible did not use this knowledge to prevent the exchange or charge the subscriber for the second or subsequent Audiobook. Nor did Audible use this knowledge to bar itself from reversing royalty payments it initially made to the Author of the first or prior Audiobook.

IV.    **The Authors Discover The Massive Breach Of Contract And Audible's Bad Faith.**

70.    Authors began to suspect Audible's scheme in fall 2020 as some among them, doubts about the (net) numbers of Audiobook sales they had been receiving in monthly reports.

71.    The dam burst on or around October 19, 2020. From September 25, 2020, to October 18, 2020, a glitch in the software that powered the ACX Author dashboards failed to subtract returns and exchanges from the net sales figures that Authors were seeing when reviewing their dashboards. Another way of saying this is that there was no "failure," but rather a twenty-three day period when Audible was inadvertently telling its Authors the truth—giving them the true, gross numbers of Audiobooks that it was distributing to its subscribers and customers and allowing them to finally calculate the royalty payments for which they had contracted. At the end of this twenty-three-day slip-of-the-tongue, though, Audible suddenly subtracted twenty-three days of returns and exchanges from the Authors' net numbers. The scheme that had not been apparent when perpetrated in hours-long or day-long increments, periods during which returns and exchanges could not be estimated in relation to concurrent gross sales, was suddenly obvious to thousands of Authors checking their dashboards.

72.    More than 12,000 other Authors expressed their concerns in writing to Audible's management in November 2020. Their communications to Audible outlined the scheme above in much the same manner as this Complaint has outlined it. The Authors demanded (1) a full accounting of the gross number of each Audiobook distributed, that is, not net of the exchanges, (2) reconciliations of the amounts paid and the amounts that were contractually due, (3) payment of the royalties that were contractually due to be paid based on the gross numbers, net of amounts already paid, and (4) reduction of the 365-day window to two days, or some other time that would

allow a subscriber to sample an Audiobook rather than consume it in a manner that would deprive the Author of the royalty payment for which she had contracted.

73.    Audible responded by way of a blog post on its website on November 24, 2020. Audible pledged to begin paying royalties on Audiobooks returned after seven days, as Authors had believed until recently that it had been doing all along. In the blog post, Audible also agreed to begin including gross sales numbers and numbers of exchanges in its reports to Authors, as well as the net numbers that it had been providing without making fully clear that they had been net numbers. To date, upon information and belief, Audible has not fulfilled these promises.

74.    Plaintiff Bonthu contacted Otto Leinsdorf, the director of content for ACX, on or around February 16, 2021, and demanded the gross numbers of sales, returns, and exchanges of Audiobooks for each of her Works. No representative of Audible has responded by providing the numbers to Plaintiff Bonthu.

75.    Other Authors have made similar demands of the Audible agents with whom they were in regular contact.

76.    Audible has not provided historical numbers for gross sales or gross exchanges to any of the Authors.

77.    Audible has provided Authors with token bonuses, putatively as expressions of its appreciation for their work, but these amount to miniscule fractions of the improperly withheld royalty payments that correspond to the exchanged Audiobooks.

78.    Finally, Audible has introduced the concept of "qualified returns" into its calculations of Authors' royalties. A "qualified return" occurs when an Audible customer or subscriber exchanges an Audiobook within seven days of its initial distribution to that customer or subscriber. Audible continues to deduct such so-called "qualified returns" from the basis on

which Authors' royalties are calculated. Audible has told Authors that it no longer deducts sales figures from corresponding to Audiobooks that were exchanged between the eighth day and the three-hundred and sixty-fifth day after purchase, but Audible has not provided figures to them to substantiate this assertion.

79.     Since introducing the concept of "qualified returns", Audible has not altered any of the corresponding royalty-related language in the Contract (along with incorporated contractual documents) that it enters into with its Authors. This change in policy therefore amounts to a tacit admission that its payments were out of compliance with the language of the contractual documents that Audible itself drafted.

## CLASS ALLEGATIONS

80.     Plaintiffs bring this class action pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

81.     Plaintiffs propose a Plaintiff Class defined as:

> All persons who entered into the Contract, who since the inception of Audible's "easy exchange" or "Great Listen Guarantee" program distributed Works through ACX or comparable platform, and whose royalty payments were calculated based on net sales figures that reflected deductions of Audiobooks that were exchanged by Audible customers and/or subscribers for other Audiobooks.

82.     **Numerosity**: Defendant Audible has sold Audiobooks by tens or even hundreds of thousands of self-published authors. Audible uses a single Contract that applies to all authors, and royalty rates of 25% and 40% of net sales (as explained above) that apply to all the authors that contract with Audible. While the exact number and identities of Class members are unknown at this time and can be ascertained only through appropriate discovery, it is clear that the Class is so large as to render joinder of all such authors impracticable.

83.     Excluded from the proposed Class are Defendant Audible, any entity in which Defendant has an ownership interest or a controlling interest, and any agents, employees, officers and/or directors of Defendant and its representatives, heirs, successors, and/or assigns.

84.     Also excluded from the proposed Class are publishing companies that purchased rights to one or more Authors' writings, that did not use the ACX platform, and that contracted with Audible for distribution of audio versions of those writings on terms other than those described above.

85.     **Existence and predominance of common questions of law and fact**: Questions of law and fact are common to all Class members, and these questions predominate over any questions affecting only individual members of the Class. These common and predominating questions include:

a)  Whether Defendant Audible breached the Contract with Class members by underreporting the numbers of their books that it sold;

b)  Whether Defendant Audible breached the covenant of good faith and fair dealing applicable to its Contract with Class members by underreporting the numbers of their books that it sold;

c)  The formula Audible was contractually obligated to use for distributing royalty payments to authors, based on the revenue derived from sales of Audiobooks and subscriber fees -from customers who received the respective authors' Audiobooks, net of contractually valid deductions;

d)  The formula that Defendant Audible actually used for distributing royalty payments to authors, which reflected numbers net of returned and exchanged Audiobooks that were not properly disclosed to Class members;

e)  Whether and to what extent Defendant Audible misrepresented its method of calculating and paying royalties to Class members;

f)  Whether and to what extent Defendant Audible concealed from Authors the gross numbers of Audiobooks that it distributed to its members and customers; and

g) Whether and to what extent Defendant Audible was unjustly enriched at the Authors' expense by its "Great Listen Guarantee" policy.

86.    **Typicality**: Plaintiffs' claims are typical of Class members' claims, as all such claims arise out of the same discrepancy between (1) the method by which Audible was contractually required to calculate royalty payments to Class members and (2) the method by which Audible actually calculated royalty payments to Class members. Plaintiffs and all Class members have suffered a common injury arising out of Defendant Audible's common course of conduct.

87.    **Adequacy of Class Representatives**: Plaintiffs' sole and controlling owners are businesswomen who understand basic accounting principles well enough to understand that Defendant Audible underpaid them significantly. As such, Plaintiffs will vigorously pursue and prosecute their legal claims against Defendant Audible. The named Plaintiffs have no interest that would dissuade them from pursuing this case vigorously.

88.    **Adequacy of Class Counsel**: Plaintiffs' counsel will fairly and adequately protect the Class's interests and will vigorously prosecute the claims of the Class. Plaintiffs' counsel are experienced in handling class claims and have the resources, time, and ability to pursue the Class's legal claims. Plaintiffs' counsel have no interest that would dissuade them from pursuing this case vigorously.

89.    **Superiority**: A class action is superior to other available methods for a fair and efficient adjudication of this controversy because individual joinder of all Class members is impracticable. Given the expenses and burden of individual litigation, few or no Class members would be able to obtain meaningful relief. The interests of judicial economy favor adjudication of the Class members' legal claims on a class basis rather than on an individual basis.

90.    **Risk of inconsistent or varying adjudications**: This action should be maintained as a class action because the maintenance of separate actions by individual members of the Class would create risks of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendant, as the party opposing the classes; and (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of claims of other Class members not parties to the adjudication or would substantially impair or impede their ability to protect their interests. Furthermore, Defendant, as the party expected to oppose the Class, has acted and refused to act on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

91.    **Ascertainability**: The proposed Class definition is objectively clear such that will be administratively feasible for the Court and any settlement or claims administrator to ascertain whether a person is a Class member. Identifying Class members will be a manageable process that will require minimal individualized factual inquiry. The identities of Class members will be readily ascertained by reference to objective criteria that will be readily identifiable in records in the possession of Defendant Audible and/or of the Class members themselves.

92.    Class certification is also appropriate pursuant to Rule 23(b)(2) because as alleged above the prerequisites of Rule 23(a) have been met and because Audible's conduct applies generally to the class as a whole, making injunctive relief appropriate. For example, no class member has yet received a proper, complete accounting of the gross sales figures and gross exchange figures underlying Authors' royalty calculations pursuant to the Contract, either before or after the November 2020 written demand discussed in ¶ 72.

## CAUSES OF ACTION

### COUNT I:
### Breach of Contract

93.    Plaintiffs hereby incorporate all of the foregoing paragraphs and further allege as follows:

94.    Plaintiffs and Class members licensed to Audible the rights to distribute recordings of their Works, pursuant to the written Contract.

95.    As consideration, Audible agreed to pay 25% or 40% (depending on exclusivity provisions) of revenue that Audible realized through marketing and distribution of those Works as "Audiobooks", net of contractually allowable items such as taxes and promotions.

96.    These mutual exchanges of promises were valid and binding contracts.

97.    For approximately six years, Audible distributed the Audiobooks the audio rights for which Class members had licensed to Audible. Audible collected substantial revenue and earned substantial profit on these distributions. This revenue derived both (1) from membership fees paid by subscribers who redeemed Credits for Audiobooks and repeatedly exchanged Audiobooks for different Audiobooks and (2) from *à la carte* sales of Audiobooks, many of which were exchanged for different Audiobooks.

98.    Audible paid Plaintiffs and Class members 25% or 40% (depending on exclusivity provisions) of the revenue, net of the exchanges, that Audible realized through marketing and distribution of those Audiobooks.

99.    Audible's underpayments based on its own intentional miscalculations represent breaches of its Contract with each and every Class member.

100.    For each and every Class member, these amounts were measurably less than they would have been if Audible based royalty payments on the numbers net of contractually specified

items such as taxes, promotions, and legitimate "returns" as that turn is commonly understood in trade and commerce. These differences represent damages caused by Audible's repeated breaches of its contracts with Plaintiffs and Class members.

## COUNT II:
## Breach of the Covenant of Good Faith and Fair Dealing

101.    Plaintiffs hereby incorporate all of the foregoing paragraphs and further allege as follows:

102.    Each Plaintiff and each Class member entered into one or more valid contracts with Defendant Audible.

103.    Inherent in each contract was a covenant of good faith and fair dealing based on each party's reasonable expectation that the other party would not act in a way that would deny the other party the benefits for which that other party contracted.

104.    For each Plaintiff and each Class member, one such reasonable expectation was Audible's implied promise to provide sales figures that faithfully and accurately reflected the actual, gross numbers of Audiobooks of each Work for which that Author had licensed Audible to distribute in recorded form.

105.    Yet Audible breached the covenant of good faith and fair dealing by reporting sales figures that obscured the enormous numbers of "returns" that Audible encouraged and allowed.

106.    For each Plaintiff and each Class member, one such reasonable expectation was Audible's implied promise that it would not surreptitiously reduce the payment of royalties by mis-applying the "net of … returns" provision and obfuscating its bad-faith conduct through opaque and deficient accounting.

107.    Yet Audible breached the covenant of good faith and fair dealing by working in an active yet surreptitious manner to monetize that Author's Work(s) in a way that reduced the payment of royalties based on that Work or those Works.

108.    Defendant Audible's breaches of the covenant of good faith and fair dealing damaged each Class member to the extent that Audible failed to pay royalties on Works that it distributed but then allowed to be exchanged.

**COUNT III:**
**<u>Unjust Enrichment</u>**
**<u>(alternative claim)</u>**

109.    Plaintiffs hereby incorporate all of the foregoing paragraphs and further allege as follows:

110.    Defendant Audible was unjustly enriched at the expense of Plaintiffs and each Class member in that Defendant Audible actively encouraged to return Audiobooks in exchange for other Audiobooks for which Defendant Audible did not directly collect revenue.

111.    Defendant Audible profited from this dynamic because the dynamic allowed Audible to charge more for subscriptions than it otherwise would charge and because it drew more subscribers to Audible.

112.    Yet this profit came at the expense of Class members who were not aware of the dynamic, nor that Audible actively encouraged it as a subterfuge to avoid paying royalty fees on the exchanged Audiobooks.

113.    The long-running subterfuge – followed by Audible's swift, albeit half-hearted attempt to mollify Authors in fall 2020 – evidences Audible's understanding that it had created an unjust dynamic and that it had enriched itself at the Authors' expense.

114.    The inequity of Audible's conduct was also reflected in its long-running and intentional practice of providing Authors only with net sales figures of each Work, without

showing Authors either (1) the numbers and revenue from gross distributions of the Audiobooks based on the Authors' respective Works or (2) the numbers and revenue that each Author lost as a result of the Audiobooks that customers and subscribers returned. Audible's senior managers discussed whether to provide Authors with the numbers of gross distributions and returns but decided against doing so because they knew that full disclosure would mean lost profits.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs respectfully pray for the following relief for themselves and all other persons similarly situated:

1. A trial by jury on all contested issues of fact;

2. An accounting that shows (a) Audible's actual payments to each Author for each Work, (b) the calculation for each such payment, including the gross number of Audiobooks of each Work that were distributed, the number of Audiobooks of that Work that Audible subscribers exchanged for other Works, the number of Audiobooks of that Work to which Audible applied the Audible Listener Allocation Factor, and the calculations that Audible used to produce the corresponding Audible Listener Allocation Factor; and (3) the amount that would have been paid if Audible applied the Audible Listener Allocation Factor to the gross number of Audiobooks distributed instead of the number net of exchanges;

3. Compensatory damages from Defendant in an amount to be determined at trial;

4. Disgorgement and restitution of Audible's profits from Audible's wrongful conduct;

5. A permanent injunction that prevents Defendant Audible from deducting exchanges of Audiobooks from the basis on which Audible pays royalties under the current version of the Contract and past versions of the Contract;

6.     Reasonable attorneys' fees and litigation expenses from Defendant;

7.     Costs of court and interest as allowed by law;

8.     Such other and further relief as the Court may deem just and proper.

This the 20th day of August 2021.

**LAW OFFICES OF JAMES SCOTT FARRIN**

By:     */s/ Gary W. Jackson*
        Gary W. Jackson (N.Y. Bar No. 2013779)
                (N.C. Bar No. 13976)
        Chris Bagley* (N.C. Bar No. 50567)
        280 S. Mangum Street, Suite 400
        Durham, North Carolina 27701
        Telephone: (919) 226-1913
        Facsimile: (984) 227-6962
        gjackson@farrin.com

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**

By:     */s/ Mitchell Breit*
        Daniel Bryson*
        Mitchell Breit
        Andrei V. Rado
        Blake Hunter Yagman*
        100 Garden City Plaza, Suite 500
        Garden City, New York 11530
        Telephone: (212) 594-5300
        Facsimile: (212) 868-1229
        dbryson@milberg.com
        mbreit@milberg.com
        arado@milberg.com
        byagman@milberg.com

        *Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*