**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GOLDEN UNICORN ENTERPRISES, Inc.; and BIG DOG BOOKS, LLC, *on behalf of themselves and all those similarly situated*,

                    Plaintiffs,

vs.

AUDIBLE, Inc.

                    Defendant.

Case No: 1:21-CV-07059-JMF

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CERTIFICATION OF CLASS AND APPOINTMENT OF CLASS COUNSEL**

i

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ..................................................... 2

LEGAL STANDARDS ........................................................................................ 8

ARGUMENT ....................................................................................................... 9

  I.  Plaintiffs' Proposed Class Meets the Requirements of Rule 23(a). ............................... 9

    a.   The proposed class is so numerous that joinder of all members is impracticable. .......... 9

    b.   There are questions of both law and fact common to the proposed class. ...................... 9

    c.   Plaintiffs' claims are typical of class members' claims. ................................................ 11

    d.   Plaintiffs and their counsel will adequately represent and protect class members' interests. ............................................................................................................................ 12

    e.   Members of the proposed class can be readily identified and ascertained.................... 14

  II. Issues of Law and Fact that are Common Among Class Members Predominate over Individual Issues of Law and Fact.................................................................................... 15

  III.  The Class Vehicle is a Superior Method of Adjudicating these Claims ........................... 18

CONCLUSION..................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 394 (E.D.N.Y. 2022) …………………..  8–9

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ……..……………………………… 16

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) ………………   9, 16

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) ………….  12

*Buffington v. Progressive Advanced Ins. Co.*, 342 F.R.D. 66 (S.D.N.Y. 2022) ………………..   9

*Chalmers v. City of New York*, 20-cv-3389-AT, 2022 WL 4330119
     (S.D.N.Y. Sept. 19, 2022) ………………………………………………………………  8

*Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110 (S.D.N.Y. 2015) …………………  8

*Fleisher v. Phoenix Life Ins. Co.*, 11-cv-8405-CM, 2013 WL 12224042 ………………… 16–17

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ………….……………………………  8, 12

*Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35 (W.D.N.Y. 2018) ………..……… 15

*Hanks v. Lincoln Life & Annuity Co. of New York*, 330 F.R.D. 374 (S.D.N.Y. 2019) … 10–12, 17

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
     338 F.R.D. 205 (S.D.N.Y. 2021) …………………………..…………………………   12

*In re Cablevision Consumer Litig.*, 10-cv-4992-JS-AKT, 2014 WL 1330546 (E.D.N.Y. 2014)  10

*In re Kind LLC "Healthy & All Natural" Litig.*, 337 F.R.D. 581 (S.D.N.Y. 2021) ……………   9

*In re Petrobras Secs.*, 862 F.3d 250 (2d Cir. 2017) ………...……………………..……………   14

*Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128 (2d Cir. 2015) …………..………………   9–10

*Mazzei v. Money Store*, 829 F.3d 260 (2d Cir. 2016) ………………..……………………… 11

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ………………………………..………   8

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993) ………………......…………………..……..   9

*Seijas v. Republic of Argentina*, 606 F.3d 53 (2d Cir. 2010) ………..…………………………  18

*Sykes v. Mel S. Harris and Assoc. LLC*, 780 F.3d 70 (2d Cir. 2015) …………………..……… 16

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) …….……….…………………… 8–9

*Watson v. Manhattan Luxury Automobiles, Inc.*, 20-cv-4572-LGS, 2022 WL 4586407,
  at \*8 (S.D.N.Y. Sept. 29, 2022) ……………………………………………….…… 14

**Statutes and Court Rules**

Fᴇᴅ R. Cɪᴠ. P., Rᴜʟᴇ 23 ……………………….….….…………………….… *passim*

**Other Sources**

1 Nᴇᴡʙᴇʀɢ ᴀɴᴅ Rᴜʙᴇɴsᴛᴇɪɴ ᴏɴ Cʟᴀss Aᴄᴛɪᴏɴs (6th ed.) …………………………… 11

Plaintiffs Golden Unicorn Enterprises, Inc. ("GUE"), and Big Dog Books, LLC ("BDB"), respectfully submit this Memorandum of Law in support of their Motion for Certification of Class and Appointment of Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure; Local Rule 7.1; Rule 4 of the Court's Individual Rules and Practices; and Orders of this Court, ECF Nos. 36, 39, and 109.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This is a straightforward case arising from breach of uniform adhesion contracts between ███████████ of authors and Defendant Audible, Inc. ("Audible"). At issue are Audible's clawbacks of royalties from authors in violation of its contracts with them and in breach of its covenant to honor them in good faith and with fair dealing. Unbeknownst to authors, Audible was retaking royalties from them when customers returned audiobooks. Audible concealed this practice until a glitch in its financial reporting exposed the scheme in October 2020. Authors subsequently learned that Audible's active promotion of a 365-day, "no questions asked" return policy to its customers extinguished the writers' royalties on returned books. In other words, customers could obtain an audiobook, listen to it, and then return it for any reason within 365 days. The author would then be debited for the royalty due, without the author's knowledge.

While the members of the class number in the ███████████, they are easily identifiable. Specifically, they all licensed audio rights to their works to Audible via a common online platform operated by Audible, the Audiobook Creation Exchange ("ACX"), that collected their names, addresses, and other identifying information. All of that information resides in Audible's databases. The class members are bound together by a common harm. Audible distributed their works in recorded form ("Audiobooks") to its customers and paid them (or credited them in preparation to pay) "royalties," common percentages of the sales of those Audiobooks. Then, in

violation of the contract and its covenant to deal with the rightsholders in good faith and fairly, Audible clawed back the royalties for which the rightsholders contracted each time a customer/member returned an Audiobook. These breaches and their harm are uniform and predominate across the class. The class members' damages can be calculated through a common method using data that Audible has already calculated on aggregate bases. The Court should therefore certify this class.

Plaintiffs also seek approval of their attorneys as Class Counsel. These attorneys have extensive experience in a range of class litigation.[1] The Court should therefore appoint the undersigned attorneys and their co-counsel as counsel for the class.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are two small business entities, each owned by a romance novelist. Plaintiff GUE is owned by novelist Jan Bonthu (pen name J.S. Scott).[2] Plaintiff BDB is owned by novelist Elizabeth Noble (pen name Sawyer Bennett).[3] As holders of the rights to Ms. Bonthu's and Ms. Noble's novels, GUE and BDB have licensed to Audible the rights to distribute audio versions of dozens of their novels since 2013 and 2014, respectively.[4]

Plaintiffs and other members of the proposed class own or control rights to novels, non-fiction books, and other, shorter works recorded in audio form ("Audiobooks"). Most members of the proposed class are self-published authors and small business entities owned by authors, though they may also include small numbers of other rightsholders (all, "Authors"). All of the Authors provided the content of their works to Audible through ACX, an online portal that Audible created

---

[1] See Exh. A (Decl. of Gary Jackson with CV); Exh. B (Decl. of Mitchell Breit with CV of Milberg, Coleman, Bryson, Phillips, Grossman, LLP).
[2] Exh. C (Rule 30(b)(6) Dep. of GUE via Jan Bonthu, 30:14–25, July 20, 2022 ("GUE Dep.")).
[3] Exh. D (Rule 30(b)(6) Dep. of BDB via Elizabeth Noble 17:11–16, July 22, 2022 ("BDB Dep.")).
[4] Exh. D, 32:13–15; Exh. C, 45:10–46:2.

in or around 2011.[5] Through ACX, each Plaintiff and each class member entered into a written contract that has remained substantially unchanged since 2011 ("the Contract").[6] The Contract was initially an "Audiobook License and Distribution Agreement" ("ALDA") with two exhibits.[7] One of the two exhibits to the initial ALDA laid out "royalty" payment terms and procedures for Audiobooks to which Audible was granted exclusive distribution rights.[8] The second exhibit to the initial ALDA provided "royalty" payment terms and procedures for Audiobooks to which Audible was granted non-exclusive distribution rights.[9] Audible later separated each of these two exhibits into a freestanding document separate from the ALDA, but each newly freestanding document still contained the same royalty calculations and continued to be referenced in successive iterations of the ALDA and together continued to constitute the Contract.[10]

Audible generates revenue from the sale of individual Audiobooks and from monthly and annual subscription fees from members.[11] A plan with a $14.95 monthly charge allows a subscriber to obtain one Audiobook each month; a plan with a $22.95 monthly charge allows a subscriber to obtain two.[12]

As used in the Contract with each Author, "royalty" refers to a percentage of Audible's "net sales receipts" from each Audiobook that Audible distributed. For an a la carte sale, "net sales

---

[5] BUSINESSWIRE.COM, AUDIBLE LAUNCHES THE AUDIOBOOK CREATION EXCHANGE (ACX)", May 12, 2011, https://www.businesswire.com/news/home/20110512005432/en/Audible-Launches-the-Audiobook-Creation-Exchange-ACX; *see also* Exh. E (Audible_00000248, form contract for ACX taking effect July 12, 2010).
[6] Exh. C, 65:25–69:5; Exh. D, 43:23–44:10; Exh. F (Dep. of Lisa Kuhne 49:6–50:7).
[7] *See* Exh. G (Audible_00000143).
[8] *Id.*
[9] *Id.*
[10] As an example, Audible updated all three on March 26, 2020. The License and Distribution Agreement is Exhibit H, the payment terms for exclusively distributed Audiobooks are laid out in Exhibit I, and the payment terms for non-exclusively distributed Audiobooks are set out in Exhibit J.
[11] Exh. K (Rule 30(b)(6) Dep. of Defendant Audible via Diana Dapito ("Dapito Dep.") 144:4–146:9); Exh. L (Dep. of Ryan Eland 22:22–29:20).
[12] Exh. L, 28:20–23).

receipts" is defined as the a la carte sales price "less any cash incentives, promotional discounts, sales or use taxes, excise taxes, value-added taxes, duties, and returns." "Net sales receipts" has been the same for the distribution of an Audiobook to a subscriber paying Audible a monthly fee access, except that Audible has multiplied the a la carte price by a fraction called the "Audible Listener Allocation Factor ("ALAF")," typically 52%, to obtain the figure to which it applied the royalty percentage.[13]

Throughout the class period, Audible has applied a 25% royalty rate to the "net sales receipts" figure for an Audiobook that it distributed on a non-exclusive basis. Whether for a la carte sale or distribution to a subscriber, Audible applied a 40% royalty rate to the "net sales receipts" figure for any Audiobook that it distributed on an exclusive basis.[14]  For each of the two arrangements, Audible tracks both the gross sales numbers for each Audiobook and, where applicable, each exchange, to arrive at the "net sales receipts" figure.[15]

---

[13] Exhs. I, J; *see* Exh. M (Dep. of Victor Emenuga, Audible Sr. Dir. of Royalty Reporting and Analysis) 35:18−38:22.

[14] Authors who elected exclusive distribution could arrange narration and production through ACX, with the narrator/producer receiving a 20% royalty rate − half of the 40% − in lieu of a standard up-front payment. Exh. HH (Audible_00000058). For Audiobooks first licensed to Audible and distributed through ACX before March 2014, non-exclusive distribution of a title has carried royalty percentages escalating from 25% to 70% as sales of the title increased from 0 to 22,501 units. For Audiobooks first licensed to Audible and distributed through ACX before March 2014, exclusive distribution of a title has carried royalty percentages that escalated from 50% to 90% as sales of the title increased from 0 to 22,501 units. As with later-contracted Audiobooks, the Author of an exclusively distributed Audiobook could opt to arrange narration and production through ACX and split the share of the royalty evenly with the narrator/producer.

Most importantly for present purposes, however, ***none*** of these variations among the Contracts—whether in royalty rates, or exclusivity of distribution—affected the predominating questions presented in this action: whether Authors reasonably interpreted "returns" to be limited to instances where a consumer could not, or did not, have an opportunity to enjoy the fruits of the Authors' labor.

[15] *See* Exh. N (portions of Audible_00001222, "account manager statement" for BDB); Exh. O (Rule 30(b)(6) Dep. of Def. Audible via Scott Bartel ("Bartel Dep.") 40:19−42:5). For each citation to a transcript, Plaintiffs are providing excerpted pages along with the cover page from the respective transcript. Plaintiffs will provide any full transcripts that the Court requests.

Among other language common to all versions of the Contract, the definition of "net sales receipts" remained constant: a monetary amount "less any cash incentives, promotional discounts, sales or use taxes, excise taxes, value-added taxes, duties, and returns."[16] This language persisted through all versions of the Contract. The term of the license period was seven years, followed by year-to-year renewal, meaning that contracts that took effect in 2011 extended well past August 20, 2015, the beginning of the class period proposed for this action.

"Returns" has not been defined in any version of the Contract, but the term is established by standard practices in the digital publishing industry, and the standard for allowing returns limits them to transactions where the content is technically defective and incapable of being consumed or where the consumer returns or exchanges it shortly after receipt, typically because of an ordering mistake. Expert opinion supports this view.[17]

In 2011 or 2012, around the same time as Audible launched ACX, it began allowing its members to exchange their purchased Audiobooks for any reason.[18] Audible has referred to this policy as "Easy Exchanges," the "Great Listen Guarantee" and "GLG."[19]

Plaintiffs contend that Audible has breached the Contract every time it allowed a customer to exchange one of its Audiobooks for a refund, a credit, or a different Audiobook, because these exchanges (1) were not for technical defects or accidental purchases, (2) were for as long as 365 days after the initial distribution, and (3) resulted in Audible either canceling the royalty to be paid to the Author or deducting it from the Author's next royalty payment.[20] Audible recorded its

---

[16] Exh. I (at Audible_00000017).
[17] Exh. P (Substantive portion of Rpt. of Pls.' Expert Witness Thad McIlroy ("McIlroy Rpt.")) 13.
[18] Exh. Q (RYAN ELAND AND KERRI WAGNER, UBIQUITOUS GLG, OCT. 2, 2018); Exh. L (Dep. of Ryan Eland) 95:4–97:1; Exh. K (Dapito Dep. 57:14–59:13).
[19] Exh. Q; Exh. L, 95:4–97:1); Exh. K (Dapito Dep. 57:14–59:13, 67:6–68:4).
[20] Exh. O, 25:22–26:3; Exh. K, 204:12–18.

calculation for the Author's reversed royalty on each title in a document it calls the "account manager statement" for the respective Author.[21]

The numbers are consequential. Audible's rate of returns/exchanges was ▮▮▮▮▮ of its total sales until 2019.[22] For most of 2019, the rate fluctuated between ▮▮▮▮▮▮▮[23] Between December 2019 and February 2020, the rate of returns/exchanges rose to ▮▮▮.[24] This amounted to approximately ▮▮▮▮▮▮ *per month* in early 2020.[25] From August 20, 2015, through December 31, 2021, Audible reversed ▮▮▮▮▮▮▮ of royalties as a result of returns/exchanges.[26]

Notably, Plaintiffs and Class Members were unaware of these clawbacks, let alone their magnitude. Each Author's ACX dashboard, an overview page in her ACX portal, which was updated roughly once per day, showed "total sales units" without disclosing that this was a net number calculated by subtracting the number of units returned/exchanged from the gross number of units initially distributed.[27] Similarly, each author's monthly royalty statement showed only the net number of each title sold, the corresponding revenue to Audible, and the corresponding royalty paid to the Author.[28]

---

[21] Exh. O, 40:19–42:5; *see* Exh. N; *see also* Exh. K, 97:10 ("We've always tracked returns…").

[22] Exh. R (E-mail of Michael Metzger to Audible and Amazon personnel, Feb. 21, 2020), at Audible_00000629; Ex. S (AUDIBLE, INC., EASY EXCHANGES – POLICY REFORMATION, APR. 20, 2020, at Audible_00000806, tables showing monthly exchanges numbers ("GLG units") and rate ("GLG rate") for 2019 and early 2020)).

[23] Exh. R, E-mail of Mac Kher to Audible personnel, Feb. 20, 2020, at Audible_00000628; Exh. S, at Audible_00000806.

[24] Exh. R (E-mail of Michael Metzger to Audible and Amazon personnel, Feb. 25, 2020, at Audible_00000628).

[25] Exh. S, at Audible_00000806.

[26] Exh. T (Substantive portion of Report of Pls.' Expert Joseph Egan) ¶¶ 48–49; Exh. U (Audible_00001220, showing full-year figures for 2016, 2017, 2018, 2019, 2020, and 2021); Exh. V (Audible_00007772, showing figures from August 20, 2015, through December, 31, 2015); Exh. W (Dep. of Josias Caminero, ACX Royalty Analyst, 88:6–89:19). To the extent these figures include amounts for narrators/producers, those amounts can be disaggregated on a large scale without resort to any subjective determinations. Exh. T ¶¶ 54–55.

[27] *See* Exh. X (Audible_00000460, views of ACX Author dashboard before a change in late March 2021 and after the change).

[28] *See* Exh. Y (GUE_00000177, GUE royalty statement for April 2017).

Under the Easy Exchanges policy, Audible encouraged its members to exchange Audiobooks for different Audiobooks, even after consuming them in whole or in part.[29] Plaintiffs contend that this course of behavior – and Audible's concealment of numbers of returns and exchanges – support Plaintiffs' and the proposed class's claims for breach of the covenant of good faith and fair dealing.[30] Plaintiffs and other members of the proposed Class were unaware of the dynamic until October 2020, when a glitch in Audible's sales-tallying software delayed reporting of exchanges data for twenty days and then suddenly caused them to be reflected the span of a few hours ("the Glitch").[31] Following widespread public outrage from Authors, Audible stopped clawing back royalties in instances where Audiobooks were returned or exchanged eight to 365 days after purchase.[32] This amounted to a tacit admission of the contractual violations. Many Authors remain outraged, and Plaintiffs contend that clawbacks during the remaining seven-day window also constitute violations.

Plaintiffs filed the Complaint in this action on August 20, 2021.[33] Plaintiffs claim breach of contract and breach of the covenant of good faith and fair dealing on behalf of themselves and the class.[34] Plaintiffs now move for certification of a nationwide Class defined as:

> All persons who entered into the Contract that licensed audio distribution rights to Audible, who owned verbal content that was distributed in audio form through ACX, and whose royalty payments were reduced by Audible based on returns or exchanges of the respective Audiobooks between August 20, 2015, and the date of the entry of the order certifying the class, excluding Audible, any entity in which Audible has an ownership interest or a controlling interest, any agents, employees, officers and/or directors of Audible and its representatives, heirs, successors, and/or assigns.

---

[29] Exh. L, 188:15–197:19; Exh. Z (Audible customer-service agent allowing customer to exchange nine titles after finishing them).

[30] Compl. ¶¶ 62–69, 101–08.

[31] Ex. AA (Audible_00001092, e-mail from Razwan Karamat Ali to senior Audible managers, Nov. 24, 2020); Exh. BB (Audible_00001337, e-mail from Scott Jacobi to ACX personnel, November 8, 2020)

[32] Ex. AA (Audible_00001092, e-mail from Razwan Karamat Ali to senior Audible managers, Nov. 24, 2020);

[33] ECF No. 1.

[34] *Id.* at ¶¶ 93–108.

## LEGAL STANDARDS

Class litigation, as authorized by Rule 23, is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). A class action permits would-be plaintiffs to pool claims which could not be litigated individually in an economical fashion and affords such plaintiffs a day in court that they would not otherwise have. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). Class relief is particularly appropriate "when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano*, 442 U.S. at 701).

Class certification is proper if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). The proponent of a plaintiff class for damages must furthermore show that common issues of law or fact predominate over individual issues and that the class vehicle is superior to other methods of adjudication. FED. R. CIV. P. 23(b)(3). Finally, class members must be "ascertainable". *Chalmers v. City of New York*, 20-cv-3389-AT, 2022 WL 4330119, at *12 (S.D.N.Y. Sept. 19, 2022).

The proponent of a class must establish each requirement by preponderance of the evidence. *Chalmers*, 2022 WL 4330119, at *12. Rules governing their admissibility are applied insofar as they are relevant to the decision on class certification. *See Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 114 (S.D.N.Y. 2015); *Allegra v. Luxottica Retail N. Am.*, 341

F.R.D. 373, 394 (E.D.N.Y. 2022). A case's merits "may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## ARGUMENT

### I.     Plaintiffs' Proposed Class Meets the Requirements of Rule 23(a).

#### a.  The proposed class is so numerous that joinder of all members is impracticable.

The "impracticable" provision of Rule 23(a)(1) does not require that joinder be "impossible." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). "A presumption of numerosity arises when there are forty or more members of the putative class." *Buffington v. Progressive Advanced Ins. Co.*, 342 F.R.D. 66, 70 (S.D.N.Y. 2022) (citing *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). "[A] precise enumeration or identification of class members is not required." *In re Kind LLC "Healthy & All Natural" Litig.*, 337 F.R.D. 581, 594 (S.D.N.Y. 2021) (citing *Robidoux*, 987 F.2d at 935).

The proposed Class easily satisfies Rule 23(a)'s numerosity requirement. It contains not forty members, but ▮▮▮▮▮▮▮▮. Exh. O, 42:6–11 (estimating ▮▮▮ ACX Authors worldwide); Exh. CC, at Audible_00001360 (scripted messaging for responding to potential complaints from an estimated ▮▮▮ rightsholders as of November 2020).

#### b.  There are questions of both law and fact common to the proposed Class.

Rule 23(a)(2) requires that class members' claims share a "common contention … of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. "Where the same conduct or practice by the same defendant gives rise to

the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). "Claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action." *Hanks v. Lincoln Life & Annuity Co. of New York*, 330 F.R.D. 374, 380 (S.D.N.Y. 2019) (quoting *Fleisher v. Phoenix Life Ins. Co.*, 11-cv-8405-CM, 2013 WL 12224042, at *3 (S.D.N.Y. July 12, 2013)); (*see also In re Cablevision Consumer Litig.*, 10-cv-4992-JS-AKT, 2014 WL 1330546, at *6 (E.D.N.Y. 2014) ("[N]umerous courts have held that claims arising out of form contracts are particularly appropriate for class certification.").

The proposed Class easily satisfies the commonality requirement, because Plaintiffs and Class members are all rightsholders who were (under)paid pursuant to Audible's misconstruction of a contractual provision that remained identical throughout the class period.

First, Plaintiffs and Class members share common issues of fact. The Contract provides for royalties to be calculated as a percentage of Audible's sales receipts "less any cash incentives, promotional discounts, sales or use taxes, excise taxes, value-added taxes, duties, and returns." *E.g.,* Exhs. K, M, GG (setting out royalty rates for exclusive distribution for agreements entered after February 10, 2012; March 26, 2020; and April 30, 2021)); Exh. O, 51:17–55:22); *see also* Compl. ¶ 43, ECF No. 1; Ans. ¶ 43, ECF No. 37. The adhesion Contract was and remains uniform across all ACX Authors. Ex. O, 30:1–21. Audible has acknowledged that "[t]here aren't unique negotiations needed for each contract." *Id.* at 30:20–21.

Audible has uniformly reduced the amounts of royalties paid to the Authors based on Audiobooks that were returned or exchanged for <u>any reason within 365 days of purchase</u>. Exh. K, 204:12–18: Exh. O, 25:22–26:3); *see also* Exh. Z (Audible customer-service agent allowing

customer to exchange nine titles after completing them); Exh. L, 58:5–63:10 (acknowledging that Audible customer-service agent allowed customer to exchange the titles)).

Second, Plaintiffs and Class members share common issues of law. Primarily, Audible's exchanges/returns practice violates the Contract as to every Audiobook that was returned or exchanged for any reason within 365 days of purchase. *See* Compl. ¶¶ 44–46, 57–58; Exh. P, 13–20, 27. This is because the digital publishing industry standard is not to allow returns except in very limited circumstances. *Id.* at 15. In other words, the digital publishing industry standard is not to reduce royalties or other percentage-based payments to a rightsholder except in very limited circumstances. "[I]t would be unreasonable to expect that an author would understand that their royalties would be net of these returns." *Id.* at 19. These issues, which are raised in Mr. McIlroy's report and elsewhere in Audible's internal documents, are the same for each and every class member. *See id.*

### c. Plaintiffs' claims are typical of Class members' claims.

The typicality requirement of Rule 23(a)(3) is satisfied if "the disputed issue[s] of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016). The "typicality" requirement is narrowly focused on the interests of the proposed representative(s) to ensure that they "are in fact aligned with those of the absent class members." 1 Newberg and Rubenstein on Class Actions § 3:31 (6th ed.). A proposed class representative shows that she is "typical" if she shows that the defendant's alleged manner of violating a form contract was the same for her as it was for the absent class members. *Hanks*, 330 F.R.D. at 380.

Plaintiffs entered into the Contract described above just as all other Class members did. Exhs. C, D, F. Plaintiffs were paid royalties at rates of 40% and 25%, depending on exclusivity status, just as other Authors were, and were docked royalties for Audiobooks that Audible

customers returned. *See* Exh. N (showing royalties to Plaintiff BDB and negative amounts for royalties deducted for returns); Exh. DD (portions of Audible_00001224, showing royalties to Plaintiff GUE and negative amounts for royalties deducted for returns).

### d. Plaintiffs and their counsel will adequately represent and protect Class members' interests.

"[A]dequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation". *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." *Hanks*, 330 F.R.D. at 381. Commonality, typicality, and adequacy "tend to merge, with commonality and typicality serving as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158, n. 13.

"[A]dequacy is satisfied unless 'plaintiff's interests are antagonistic to the interest of other members of the class.'" *Hanks*, 330 F.R.D. at 381 (quoting *Sykes v. Mel S. Harris and Assoc. LLC*, 780 F.3d 70, 90 (2d Cir. 2015)). A named plaintiff must not be "subject to unique defenses which threaten to become the focus of the litigation." *Baffa*, 222 F.3d at 59.

Particularly in complex litigation, "named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel." *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212–13 (S.D.N.Y. 2021) (quoting *Baffa*, 222 F.3d at 61–62). A proposed representative's "lack of

knowledge should not be disqualifying unless it demonstrates that the representative is truly 'unwilling or unable to pursue the litigation on behalf of the class.'" *Id.* at 62.

Here, Plaintiffs have demonstrated extraordinary commitment and unquestionable adequacy through sixteen months of litigation. They have regularly assisted counsel in investigation and prosecution of the claims since spring 2021. For eleven months, they have responded to wave after wave of Audible's discovery requests. They and their employees have been deposed.

Plaintiffs' sworn testimony shows that they understand both the nature of their legal claims and the impact of Audible's behavior on the self-publishing industry as a whole. It also shows that they are motivated not only for their own benefit, but for that of other current and future self-published authors. Exh. C, 274:21–275:4, Exh. D, 196:25–197:24. As discussed above, their legal claims and their factual status as ACX users are typical of the Class. Defendant Audible has not pointed to any conflict of interest between either Plaintiff and any member of the proposed Class. In short, Plaintiffs are eminently adequate representatives for the Class.

A proposed class representative must be represented by counsel who are "qualified, experienced and generally able to conduct the litigation." *Buffington*, 342 F.R.D. at 72 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

Plaintiffs' counsel here have demonstrated their qualification and ability by litigating this case vigorously for sixteen months, with voluminous discovery and extensive motion practice, including multiple discovery motions and two motions to dismiss. Counsel's experience in complex litigation further highlights their adequacy. The undersigned counsel and their firms have represented plaintiffs in numerous consumer and economic class actions involving breaches of contracts, unfair and deceptive trade practices, consumer- and debtor-protection statutes, and

violations of securities laws and regulations. Messrs. Jackson and Breit have represented

plaintiffs in a wide variety of complex litigation. See Exhs. A, B.

> ### e.   Members of the proposed class can be readily identified and ascertained.

The Second Circuit recognizes an implied requirement that a class must be ascertainable:

"The ascertainability requirement, as defined in this Circuit, asks district courts to consider

whether a proposed class is defined using objective criteria that establish a membership with

definite boundaries. This modest threshold requirement will only preclude certification if a

proposed class definition is indeterminate in some fundamental way." *In re Petrobras Secs.*, 862

F.3d 250, 269 (2d Cir. 2017). The "administrative feasibility" of identifying class members,

required in certain circuits, has been expressly rejected by the Second Circuit. *Id*. at 265. The

proponent of a class need not identify any putative class members, but merely show that they can

be identified at a later stage. *Watson v. Manhattan Luxury Automobiles, Inc.*, 20-cv-4572-LGS,

2022 WL 4586407, at *8 (S.D.N.Y. Sept. 29, 2022) (citing *In re Petrobras Secs.*, 862 F.3d at

266 n.16).

The proposed Class is defined by objective criteria: ACX authors whose royalty incomes

were reduced by exchanges.  The Class is easily identifiable because it comprises only persons

that have entered into a version of the written Contract with Defendant. *See, e.g.,* Exh. H

(Audiobook License and Distribution Agreement v. 2.7, March 26, 2020); *see also* Exh. I

(explaining corresponding payment terms for exclusive distribution contracts); Exh. J (showing

payment terms for non-exclusive distribution contracts, which are identical except for percentage

amount). Moreover, Defendant tracks each exchanged Audiobook, and tracks the reduction in

royalties due to exchanges. *See* Exh. N (portion of "account manager statement" for BDB); Exh.

O, 40:19–42:5; *see also* Exh. O, 97:10).

Indeed, following the software Glitch, Audible began reporting these previously secret tallies of returns to ACX authors on their monthly sales reports, *see* Exh. EE (page from GUE_00000193, showing separate lines for negative (reversed) sales and positive sales of novel "Blake" by Jan Bonthu a.k.a. J.S. Scott), and on the "dashboards" in their online ACX author portals, which were updated continuously, *see* Exh. X (showing mockup of layout introduced on March 31, 2021, alongside prior layout); Exh. FF (Audible_00000456, e-mail explaining differences and launch of new dashboard). Audible furthermore tracks the addresses of ACX authors, which allows the Court and the parties to determine if a particular author is a U.S. resident and thus a member of this nationwide Class. *See, e.g.,* Exh. GG (showing ACX author profile page for Elizabeth Noble a.k.a. Sawyer Bennett).

Where a class can be identified by a defendant's own records, the ascertainability requirement has been met. S*ee Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35 (W.D.N.Y. 2018) (finding ascertainability established where "Defendants likely maintain records identifying those individuals from whom they sought to collect on any purported debt and, likewise, to whom they sent the allegedly unlawful form collection letter.")

## II.   Issues of Law and Fact that are Common among Class members Predominate over Individual Issues of Law and Fact.

A class satisfies Rule 23(b)(3) if the district court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Factors potentially relevant to these findings include (A) class members' interests in individually controlling the prosecution of separate actions; (B) the extent and nature of any existing litigation involving the same controversy as that of the putative class representative; (C) the relative desirability of concentrating the litigation of the

claims in the particular forum; and (D) the likely difficulties in managing a class action. *Id.* Both requirements support class treatment of a set of claims "in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting ADV. COMM. NOTES, 28 U.S.C. App., 39 F.R.D. 69, 103)).

A plaintiff seeking class certification "must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole ... predominate over those issues that are subject only to individualized proof." *In re Initial Pub. Offering Secs. Litig.*, 243 F.R.D. 79, 86 (S.D.N.Y. 2007) (quoting *Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d. Cir. 2001). "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459. The "predominance" requirement is met where variations among putative class members do not require extensive individualized proof, even if some individualized proof is necessary. *Sykes*, 780 F.3d at 87–89. Variations in class members' damages do not preclude certification. *Id.* at 88. Nor would the existence of individualized defenses preclude certification, provided that those defenses do not predominate. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 572 (S.D.N.Y. 2018) (citing *Visa Check Litig.*, 280 F.3d at 138).

"There is widespread agreement that certification under Rule 23(b)(3) is warranted for claims that involve contracts that, like here, contain the same or essentially the same terms." *Fleisher*, 2013 WL 12224042, at *13. "An overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action." *Id.* (quoting *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37 (E.D.N.Y. 2008)). A proposed class meets the

"predominance" inquiry where identical contract language is at issue, even if it is contained in multiple contracts that may vary in other ways, and if there are no individualized issues with respect to the defendant's conduct with respect to members of the class. *Hanks*, 330 F.R.D. at 382. Where a defendant resists class certification based on a form contract's ambiguity, variations in extrinsic evidence among class members are not deemed to predominate over the language of the common contract(s). *Id.*

As discussed above, the Contract provides for royalties to be calculated as a percentage of Audible's sales receipts "less any cash incentives, promotional discounts, sales or use taxes, excise taxes, value-added taxes, duties, and returns" *for every Class member*. *See e.g.,* Exh. O, ("There aren't unique negotiations needed for each contract.")

Plaintiffs and the members of the proposed Class are each entitled to damages from Audible for the same reason: because Audible improperly lowered their royalty payments by netting out exchanges and returns in violation of the Contract and in breach of its covenant of good faith and fair dealing.

Calculation of each Author's damages is a mechanical process. Exh. T ¶¶ 47–57 Exh. O, 25:22–26:3. As discussed above, Audible's exchanges/returns practice violates the Contract as to every Audiobook that was returned or exchanged. *See, e.g,* Exh. P, 13–20, 27. Authors' claims are therefore "particularly appropriate for class action." *Fleisher*, 2013 WL 12224042, at *13.

### III.      The Class Vehicle is a Superior Method of Adjudicating these Identical Claims.

A class action is a superior mode of adjudication where an individual plaintiff's costs and efforts would overwhelm her potential recovery, serving as a deterrent to litigation. *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).

Here, Plaintiff BDB sustained damages of $43,929 through 2021, as calculated by Plaintiffs' damages expert. *See* Exh. T. Plaintiff GUE sustained damages of $38,701. *Id.* These damages fall short of justifying litigation solely on their behalf. Moreover, most other Class members are much smaller-scale Authors whose damages fall <u>far</u> short, and few or none could be expected to pursue litigation individually. Indeed, counsel's investigations have identified no other pending lawsuits over the same subject-matter, and Audible did not identify any such litigation in response to a discovery request from Plaintiffs. The apparent absence of any competing class or individual claims suggests that Class Members would not receive *any* recovery if the proposed Class is not certified. *See* Fed. R. Civ. P., Rule 23(b)(3)(B).

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that the Court grant their Motion to Certify the Proposed Class.

This the 21st day of December 2022.

**LAW OFFICES OF JAMES SCOTT FARRIN**

By:      */s/ Gary W. Jackson*
        Gary W. Jackson (N.Y. Bar No. 2013779)
        Chris Bagley (Admitted *pro hac vice*)
        555 S. Mangum Street, Suite 800
        Durham, North Carolina 27701
        Telephone: (919) 226-1913
        Facsimile: (984) 227-6962
        gjackson@farrin.com
        cbagley@farrin.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

By:      */s/ Mitchell Breit*
        Mitchell Breit (N.Y. Bar No. 2337954)
        Andrei V. Rado (N.Y. Bar No. 3047289)
        Leland Belew (Admitted *pro hac vice*)
        405 East 50th Street
        New York, New York 10022
        Telephone: (212) 594-5300
        mbreit@milberg.com
        arado@milberg.com
        lbelew@milberg.com

*Attorneys for Plaintiffs*

19

## <u>CERTIFICATE OF SERVICE</u>

      I, Gary W. Jackson, certify that I filed the foregoing document with the Court's Electronic Case Filing ("ECF") system on December 21, 2022. This filing via ECF automatically generates a Notice of Electronic Filing ("NEF"), which constitutes proof of service of the filed document upon all registered users. Service has thus been accomplished through by NEF for all parties and counsel who are registered users of the Court's ECF system.

      This the 21st day of December 2022.

                                    */s/ Gary W. Jackson*
                                      Gary W. Jackson