**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GOLDEN UNICORN ENTERPRISES, INC. and
BIG DOG BOOKS, LLC, *on behalf of themselves and all those similarly situated*,

Plaintiffs,

v.

AUDIBLE, INC.,

Defendant.

Case No.  1:21-cv-07059-JMF

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT AUDIBLE, INC.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**PAGE**

BACKGROUND ...................................................................................................2

    I.     The ACX Service And ACX Agreement .................................................2

    II.    Audible's Return Policy .........................................................................3

    III.   The Plaintiffs .........................................................................................5

         A.     Golden Unicorn Enterprises, Inc.............................................5

         B.     Big Dog Books, LLC .................................................................6

ARGUMENT ........................................................................................................8

    I.     Plaintiffs' Breach Of Contract Claim Should Be Dismissed. ..................8

    II.    Plaintiffs' Implied Covenant Claim Should Be Dismissed....................11

         A.     Plaintiffs' Implied Covenant Claim Is Duplicative. ..................12

         B.     The Challenged Conduct Is Expressly Permitted Under The Contract. ....13

    III.   Plaintiffs' Claims Are Barred By Waiver, The Statute of Limitations, And Laches. ........................................................................................16

         A.     Plaintiffs Waived Their Claims. ...............................................17

         B.     Plaintiffs' Claims Are Barred By The Statute Of Limitations.................18

         C.     Plaintiffs' Equitable Claims (If Any) Are Barred By Laches...................18

    IV.   Plaintiffs Cannot Prove Damages. ........................................................19

         A.     Plaintiffs Did Not Comply With Their Discovery Obligations. ...............20

         B.     Plaintiffs Have Not Advanced A Competent Or Viable Damages Theory. ..........................................................................................24

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*24/7 Recs., Inc. v. Sony Music Ent., Inc.*,
  566 F. Supp. 2d 305 (S.D.N.Y. 2008)...................................................................23

*Accent Delight Int'l Ltd. v. Sotheby's & Sotheby's Inc.*,
  No. 18-CV-9011 (JMF), 2021 WL 2418225 (S.D.N.Y. June 14, 2021) .........................24, 25

*Agence Fr. Presse v. Morel*,
  293 F.R.D. 682 (S.D.N.Y. 2013) .........................................................................22

*Alpha Cap. Anstalt v. Real Goods Solar, Inc.*,
  311 F. Supp. 3d 623 (S.D.N.Y. 2018).....................................................................8

*Aozora Bank, Ltd. v. Credit Suisse Grp.*,
  144 A.D.3d 437 (N.Y. App. Div. 2016) ..................................................................18

*Austrian Airlines Oesterreichische Lufverkehrs Ag v. UT Fin. Corp.*,
  No. 04 Civ. 3854RCCAJP, 2005 WL 977850 (S.D.N.Y. Apr. 28, 2005) .........................23, 24

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).............................................................................................8

*Clalit Health Servs. v. Isr. Humanitarian Found.*,
  395 F. Supp. 2d 21 (S.D.N.Y. 2005).................................................................13, 14

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...............................................................................................24

*Design Strategy, Inc. v. Davis*,
  469 F.3d 284 (2d Cir. 2006)..............................................................................22, 23

*Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*,
  810 F.3d 861 (2d Cir. 2015)...............................................................................12

*Dreni v. PrinterOn Am. Corp.*,
  486 F. Supp. 3d 712 (S.D.N.Y. 2020)..................................................................9, 10

*Ely-Cruikshank Co. v. Bank of Montreal*,
  81 N.Y.2d 399 (Ct. App. 1993) ...........................................................................18

*ESPN, Inc. v. Off. Comm'r of Baseball*,
  76 F. Supp. 2d 416 (S.D.N.Y. 1999).....................................................................23

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
  639 F.3d 557 (2d Cir. 2011)..............................................................................9, 10

# TABLE OF AUTHORITIES
## (CONTINUED)

**CASES**                                                                      **PAGE(S)**

*Ferguson v. Lion Holding, Inc.*,
   478 F. Supp. 2d 455 (S.D.N.Y. 2007) ............................................................................8

*Fischer & Mandell, LLP v. Citibank, N.A.*,
   632 F.3d 793 (2d Cir. 2011) ...........................................................................................8

*Franconero v. Universal Music Corp.*,
   No. 02 CIV.1963(BSJ), 2011 WL 566794 (S.D.N.Y. Feb. 11, 2011) ..............................24, 25

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
   720 F.3d 84 (2d Cir. 2013) ........................................................................................14, 15

*Goenaga v. Mar. of Dimes Birth Defects Found.*,
   51 F.3d 14 (2d Cir. 1995) ...............................................................................................8

*Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
   767 F. Supp. 1269 (S.D.N.Y. 1991) ................................................................................19

*Higgs v. Columbia Univ.*,
   No. 05 Civ. 2642(DF), 2009 WL 77880 (S.D.N.Y. Jan. 6, 2009) ........................................16

*InspiRx, Inc. v. Lupin Atlantis Holdings SA*,
   554 F. Supp. 3d 542 (S.D.N.Y. 2021) ....................................................................9, 10, 25

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
   29 F.4th 118 (2d Cir. 2022) .....................................................................................11, 12, 13

*Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*,
   77 F. Supp. 2d 446 (S.D.N.Y. 1999) ...............................................................................20

*LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*,
   173 F.3d 454 (2d Cir. 1999) ..................................................................................... *passim*

*M/A-COM Sec. Corp. v. Galesi*,
   904 F.2d 134 (2d Cir. 1990) ..........................................................................................12

*Mathias v. Jacobs*,
   179 F. Supp. 2d 328 (S.D.N.Y. 2002) ............................................................................24

*Medinol Ltd. v. Bos. Sci. Corp.*,
   346 F. Supp. 2d 575 (S.D.N.Y. 2004) ............................................................................18

# TABLE OF AUTHORITIES
### (CONTINUED)

**CASES**        **PAGE(S)**

*N.Y. Racing Ass'n, Inc. v. Meganews, Inc.*,
No. 97 CV 1091(SJ), 2000 WL 307378 (E.D.N.Y Mar. 21, 2000) ........................................17

*Nat'l Westminster Bank, U.S.A v. Ross*,
130 B.R. 656 (S.D.N.Y. 1991) ..................................................................................17, 18

*Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*,
No. 08 Civ. 4341 (RJS), 2009 WL 1054830 (S.D.N.Y. Apr. 17, 2009) ..........................14, 15

*Pal v. N.Y. Univ.*,
No. 06-cv-5892(PAC)(FM), 2008 WL 2627614 (S.D.N.Y. June 30, 2008) .........................20

*Point Prods. A.G. v. Sony Music Ent., Inc.*,
No. 93-cv-4001(NRB), 2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002) ...............................23

*Preston v. Am. Fed'n of Television & Radio Artists Health Fund*,
No. 90 CIV 7094(RJW), 2002 WL 1009458 (S.D.N.Y. May 16, 2002) ...............................18

*Price v. L'Oreal USA, Inc.*,
No. 17 Civ. 614 (LGS), 2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021) ................................24

*Ray Legal Consulting Grp. v. DiJoseph*,
37 F. Supp. 3d 704 (S.D.N.Y. 2014) ..................................................................................12

*Scantibodies Lab'y, Inc. v. Church & Dwight Co.*,
No. 14cv2275 (JGK) (DF), 2016 WL 11271874 (S.D.N.Y. Nov. 4, 2016) ..........................22

*Schweizer v. Sikorsky Aircraft Corp.*,
634 F. App'x 827 (2d Cir. 2015) ........................................................................................15

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*,
769 F.3d 807 (2d Cir. 2014) ..............................................................................................12

*Serdarevic v. Advanced Med. Optics, Inc.*,
No. 06 CIV 7107(DLC), 2007 WL 2774177 (S.D.N.Y. Sept. 25, 2007) ..............................19

*Serin v. N. Leasing Sys., Inc.*,
No. 7:06-CV-1625, 2010 WL 6501664 (S.D.N.Y. Oct. 26, 2010) ......................................22

*Spotnana, Inc. v. Am. Talent Agency, Inc.*,
No. 09 Civ. 3698(LAP), 2010 WL 3341837 (S.D.N.Y. Aug. 17, 2010) ...............................20

*Thompson v. Jamaica Hosp. Med. Ctr.*,
No. 13 Civ. 1896(RWS), 2015 WL 3824254 (S.D.N.Y. June 19, 2015) ...............................20

# TABLE OF AUTHORITIES
### (CONTINUED)

**CASES**                                                                 **PAGE(S)**

*Times Mirror Mags., Inc. v. Field and Stream Licenses Co.*,
    103 F. Supp. 2d 711 (S.D.N.Y. 2000)......................................................................9

*Vanlex Stores, Inc. v. BFP 300 Madison II, LLC*,
    66 A.D.3d 580 (N.Y. 1st Dept. 2009)................................................................14

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000)................................................................................8

*Yaeger v. Nat'l Westminster*,
    962 F.2d 1 (2d Cir. 1992) ................................................................................17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26...........................................................................................20, 22

Fed. R. Civ. P. 37...............................................................................................20

Fed. R. Civ. P. 56.................................................................................................8

N.Y. C.P.L.R. § 213(2) ......................................................................................18

23 Williston on Contracts § 63:22 (4th ed. 2004)..............................................14

## <u>INTRODUCTION</u>

This is a straightforward breach of contract dispute brought by two independent authors who claim that Audible improperly failed to pay them royalties on their audiobooks that customers returned.  But Plaintiffs admit that the contract at issue—the standard distribution agreement for Audible's Audiobook Creation Exchange ("ACX") program—expressly provides that Audible will deduct returns from authors' sales figures when calculating their royalties.  Plaintiffs also admit that they were aware of that contract provision and understood they would not earn royalties on returned audiobooks.  In other words, Plaintiffs are suing Audible for doing precisely what the contract said Audible would do.

From the day this case was filed, Plaintiffs have struggled to articulate a cohesive theory.  They concede that the contract authorizes Audible to deduct returns before calculating royalties.  They acknowledge that the concept of a return is, to quote Plaintiffs' own putative expert, "neither complex nor nuanced."  Everyone understands that a return entails giving back something you purchased, in exchange for the money or credit you used to purchase it.  And Plaintiffs know that, under the ACX contract, before calculating author royalties on net sales, Audible deducts not *some* returns but *all* returns.  Given those facts, it is inconceivable that Audible breached the contract.

Plaintiffs' real complaint is not that Audible deducts returns from net sales; instead, they object to Audible's generous policy for *allowing* returns.  But Plaintiffs cannot impose their own subjective views of what constitutes a "legitimate" return to alter the plain terms of the contract.  Nor can they claim to be surprised by Audible's return policy, which has been widely known for years, including by Plaintiffs.  They understood that Audible had discretion under the ACX contract to establish a generous return policy, they were aware that in fact Audible did so, and they knowingly and repeatedly signed the contract because they profited as ACX authors on Audible.  For all those reasons, Audible respectfully requests that the Court dismiss Plaintiffs' claims.

Even if Plaintiffs' claims were legally viable, they have a complete failure of proof on damages, for two independent but related reasons.  <u>First</u>, Plaintiffs failed to honor their discovery obligations and timely disclose their damages.  Instead, they sandbagged until after discovery was closed and revealed a new damages approach for the first time in their putative expert report.  That is improper and Plaintiffs should be precluded from asserting that damages theory.  <u>Second</u>, even if the Court were to consider Plaintiffs' tardy theory, it is not competent evidence of their damages. Plaintiffs have always acknowledged that some returns are "legitimate" and should not bear a royalty, but their damages calculation includes *all* returns of Plaintiffs' audiobooks.  A party may not advance a damages theory untethered from the party's claim.

## **BACKGROUND**

### I.    **THE ACX SERVICE AND ACX AGREEMENT**

Since its inception in 1995, Audible has been a leading provider of audio content.  *See* Audible's Statement of Undisputed Material Facts ("SUMF") ¶ 1.  ACX launched in 2011, providing a "one-stop shop" for independent authors looking to produce and publish their works as audiobooks.  *Id.* ¶ 2.  Through ACX, Audible connects authors with narrators and producers, and also provides tools and tutorials for authors, offers personalized support, and handles all aspects of audiobook distribution and customer service.  *Id.* ¶¶ 3-4.  As Plaintiffs' purported industry expert explained, ACX allowed independent authors "with a modest following" to publish their works as audiobooks and offered "royalties significantly higher than can be earned from traditional commercial publishers."  *Id.* ¶¶ 5-6.

Each time they publish an audiobook, ACX authors agree to the terms of the ACX License & Distribution Agreement (the "Contract").  SUMF ¶ 7.  (The Contract is attached as Exhibit A to the Complaint.)  The Contract defines "net sales" of audiobooks as being net of "returns."  *Id.* ¶ 8. As addressed further below, it is undisputed that Plaintiffs always knew they would not earn a

royalty on an audiobook that was returned.  *Id.* ¶¶ 9-11.  In addition, in its online Help Center and its communications with ACX authors, Audible explained that authors' "sale units would decrease each time a unit is returned and refunded."  *Id.* ¶¶ 12-13.  Coleen Barr—a former Audible employee who worked with ACX authors for more than seven years—explained that authors have "always been aware that there are returns and returns are taken out of the [royalty] statement."  *Id.* ¶¶ 14-16 ("I've had conversations about returns and what does it mean and how is it taken out a lot of times.").  Nor does it seem any ACX author found the term "returns" enigmatic.  Ms. Barr, who "had conversations about the contracts with every author that [she] ever spoke with" (including Plaintiffs), testified that "no one has specifically said, Can you define what a return is for me, because that's -- people know what that is, you know."  *Id.* ¶¶  17-19.

Plaintiffs now claim that Audible "systematically withheld" royalties from authors, which they purportedly discovered in October 2020 when a software error in the ACX online dashboard temporarily displayed gross sales figures before returns were deducted.  Compl. ¶¶ 1, 71.  At that point, Plaintiffs say, Audible's "scheme" to deduct "returns and exchanges" became "suddenly obvious."  *Id.* ¶ 71.  Yet Plaintiffs admit that, well before October 2020, they received royalty statements that showed both negative unit sales values and negative royalty values, represented by negative dollar amounts.  SUMF ¶ 22.  And while the Contract allows authors to "object" to their statements within three months of receipt (Contract at 7), prior to October 2020, Plaintiffs never raised any issue with their royalties.  Indeed, as explained below, before October 2020, neither Plaintiff ever asked Audible for any information about their returns, Audible's return policy, or its impact on their royalty statements.  SUMF ¶¶ 23-24.

## II.   AUDIBLE'S RETURN POLICY

The Contract provides that Audible has "sole discretion over all decisions related to its distribution of the Audiobook."  Contract at 4.  Plaintiffs allege that Audible created a policy "[i]n

or around 2016 … that allowed customers and subscribers to exchange an Audiobook [for] as long as 365 days after obtaining access to it."  Compl. ¶ 55.  In fact, that policy—which was first called "A Great Listen Every Time" and later called the "Great Listen Guarantee"—launched in 2012 and *did not change* from its inception through the filing of this lawsuit.  SUMF ¶¶ 25-28.

Audible's return policy was hard to miss.  It was displayed prominently on Audible's website, in its advertising, and in emails to Audible members (some of whom, including Plaintiffs, are also ACX authors).  SUMF ¶¶ 29-31.  Audible's return policy followed the "satisfaction guaranteed" tradition of many successful retailers, which comes with significant benefits. *Id.* ¶ 32.  For example, as Plaintiffs' own putative expert explained, generous return policies increase purchases more than they increase returns. *Id.* ¶¶ 33-37.  Furthermore, and particularly relevant for independent authors, the ability to return a book if they are dissatisfied gives customers the confidence to try new books and authors they might not otherwise, which exposes those authors to new readership. *Id.* ¶ 38.  And ACX authors did in fact benefit from Audible's generous return policy: from 2015 to 2020, not only did *total* ACX royalty payments increase, but so did *per-ACX rights-holder* royalty payments. *Id.* ¶ 39.  A rising tide, as they say, lifts all boats.

Well before October 2020, ACX authors were aware of Audible's return policy and how it operated.  Social media posts show authors discussing Audible's return policy.  For example, in 2018, an "Indie author" wrote on Goodreads that "if you RETURN a book we don't get our 'Sale' & we've lost our code."  SUMF ¶ 40.  In a 2018 Reddit thread, other authors, including an ACX author, discussed returns and one commented that returns are "the cost of doing business, unfortunately," and another replied that the "ACX reports show *net* sales from the various sources." *Id.* ¶ 41.  And, as discussed below, discovery revealed that both Plaintiffs also knew about Audible's return policy—and its potential effect on royalties—before the supposed "dam burst" in October 2020.  Compl. ¶ 71.

### III.    THE PLAINTIFFS

#### A.    Golden Unicorn Enterprises, Inc.

Jan Bonthu first published through ACX in 2013, writing under the penname J.S. Scott. SUMF ¶ 42.  Ms. Bonthu operates through her company Golden Unicorn, where she is the President and her husband, Srikanth Bonthu, is the Vice President.  *Id.* ¶ 43.  Golden Unicorn began publishing titles through ACX in February 2014.  *Id.* ¶ 44.  Ms. Bonthu testified that joining ACX allowed her to publish her first audiobook.  *Id.* ¶ 45.  Ms. Bonthu has published twenty-six titles through Audible, including two that she published after filing this lawsuit.  *Id.* ¶ 46.  Ms. Bonthu has earned hundreds of thousands of dollars in royalties through ACX over the years, and she continues to publish with ACX to this day because she makes money on the service.  *Id.* ¶¶ 47-48 ("I'm earning quite high royalties on some of my books, and I will not get the same royalties on other venues.").

Ms. Bonthu testified that when she began publishing with ACX, she understood that, under the Contract, royalties were paid on net sales receipts, net sales were "less any returns," and returns meant giving the audiobook back in exchange for either "money or credit in the Audible situation." SUMF ¶ 49.  Ms. Bonthu now claims that she believed "legitimate" returns were only for audiobooks that were "defective."  *Id.* ¶ 50.  Mr. Bonthu—who manages the publishing process for Golden Unicorn and who typically agreed to the ACX Contract on Golden Unicorn's behalf— admitted that he did "not really read" the Contract, but it was his "general understanding" that returns would be deducted from royalties.  *Id.* ¶¶ 52-53.  Mr. Bonthu also assumed that audiobooks could be returned for any reason, and he acknowledged that some of Golden Unicorn's royalty statements had negative sales numbers, though he did not look at them at the time.  *Id.* ¶¶ 54-56.

Ms. Bonthu claims that she first learned about Audible's Great Listen Guarantee around 2016, through Audible's advertising and on its website.  SUMF ¶ 57.  But despite knowing that

returned audiobooks did not earn royalties, neither Bonthu ever asked Audible what "returns" or negative numbers on their royalty statements meant, or how Audible's return policy operated. *Id.* ¶¶ 51, 58-61. This was not because the Bonthus lacked access to ACX or were shy about raising issues. Ms. Bonthu repeatedly expressed other concerns to Audible, including about its cancellation of the promotional "Escape" program (in which she participated) and Audible's categorization of her audiobooks as "erotica" (which she thought might hurt her sales). *Id.* ¶¶ 62-63. As her assistant explained, Ms. Bonthu expressed concerns when she had them. *Id.* ¶ 64.

B.      **Big Dog Books, LLC**

Elizabeth Noble first published through ACX in October 2014, writing under the penname Sawyer Bennett and operating through her company Big Dog Books. SUMF ¶ 65. Ms. Noble testified that joining ACX allowed her to "get her foot into audio" and reach a new, larger audience. *Id.* ¶ 66. Ms. Noble has since distributed more than fifty of her self-published audiobooks through Audible, including ten published after she filed this lawsuit. *Id.* ¶ 67. Ms. Noble has earned hundreds of thousands of dollars in royalties from ACX and continues to publish audiobooks through ACX. *Id.* ¶¶ 68-69. ("I would say that I have great benefit in publishing [through ACX]. I make money.").

Like Ms. Bonthu, Ms. Noble understood that she was "not going to be paid royalties on returns." SUMF ¶ 11. And when she first executed the ACX Contract in 2014, Ms. Noble asked ACX Client Support to "define what NET means for me so I make sure I understand." *Id.* ¶ 70. Coleen Barr from Audible responded that net sales is "the balance of gross sales remaining ***after deducting*** trade discounts, ***returned sales***, and sales allowances." *Id.* ¶ 71 (emphases added). But Ms. Noble did not ask Ms. Barr, and never asked any other Audible representative, what "returns" meant or what Audible's (publicly available) return policy was. *Id.* ¶¶ 72-73. And, before October 2020, Ms. Noble did not ask Audible for her returns numbers because she "assumed [her] work

6

was good enough and nobody was returning it," and because "it was not on [her] reports."  *Id.* ¶ 74.  To the contrary, Big Dog Books' royalty statements *did* show returns deductions (negative numbers).  Big Dog Books' so-called "Chief of Everything Officer," Lisa Kuhne, acknowledged that she saw the negative sales units but never asked Audible about them because she "was not looking at returns; [she] was looking at royalty numbers."  *Id.* ¶¶ 76-77.  Ms. Noble and Ms. Kuhne's decision not to seek more information about returns was *not* because they did not feel free to contact Audible.  In fact, they contacted Audible for a number of other reasons, including to complain about the categorization of Ms. Noble's audiobooks as "erotica," to switch certain titles from exclusive to non-exclusive, to notify Audible if a title went on sale too soon, and generally if they "ran into an issue for some reason."  *Id.* ¶ 78.

Despite knowing that returns did not earn royalties under the Contract, Ms. Noble claims that only some returns are "legitimate."  SUMF ¶ 79.  Notably, she disagrees with Ms. Bonthu on what returns are "legitimate" (see above).  According to Ms. Noble, a return is "legitimate" if the purchase was made by mistake, the audiobook was defective, the customer did not like the narrator, or the customer "listen[s] to the first chapter and it's not their cup of tea."  *Id.* ¶ 80.

With respect to Audible's return policy, Ms. Noble claimed that, before October 2020, she had never heard *anything* about Audible's policy "outside of what [she] agreed to in the contract."  SUMF ¶ 81.  But, as revealed in documents conspicuously produced *after* Ms. Noble's deposition, that testimony was false.  In February 2020, Ms. Noble emailed Ms. Kuhne that "there's a lot of chatter on the author forums about Audible's return policy where they essentially tell customers that you can return an audio book and get another."  *Id.* ¶ 82.  Ms. Noble added that "[a]uthors are of course in an uproar over this.  I am curious … if we distribute to Audible through Findaway does that take away Audible's right to do this?"  *Id.*  Ms. Kuhne agreed that some authors were upset about the return policy *because they understood it could reduce their royalties*.  *Id.* ¶ 83.

That group included Ms. Noble, who specifically asked how to circumvent the return policy. In addition to raising that issue in her email to Ms. Kuhne about the author "chatter" regarding Audible's return policy, Ms. Noble asked in a February 2020 Facebook post whether distributing to Audible through Findaway would "subvert this ability for them to accept returns." *Id.* ¶ 84.

## ARGUMENT

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case … on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Mere denials and conclusory or "unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000); *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

## I.    PLAINTIFFS' BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED.

To prove a breach of contract, a plaintiff must show: "(1) the existence of a contract, (2) the plaintiff's performance thereunder, (3) defendant's breach thereof, and (4) resulting damages." *Alpha Cap. Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp. 3d 623, 628 (S.D.N.Y. 2018). "When interpreting a contract, '[t]he objective … is to determine what is the intention of the parties as derived from the language employed[.]'" *Id.* (alterations in original) (quoting *Lopez v. Fernandito's Antique, Ltd.*, 305 A.D.2d 218, 219 (N.Y. 1st Dep't 2003)). Plaintiffs cannot prove either breach or damages, and their claim fails as a matter of law.

"Summary judgment is appropriate if the terms of the contract are unambiguous." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). The question of whether a contract is unambiguous is "to be decided by the court as a matter of law." *Ferguson v. Lion*

*Holding, Inc.*, 478 F. Supp. 2d 455, 468 (S.D.N.Y. 2007) (quoting *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994)).  In making its decision, "the court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 723 (S.D.N.Y. 2020).  "[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument."  *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 553-54 (S.D.N.Y. 2021) (collecting cases); *see also Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011) ("[I]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and it may then award summary judgment."  (quotation omitted)).

There is no dispute that Audible did what the Contract expressly allows.  In discovery, Plaintiffs admitted that "prior to October 2020, [they were] aware that Audible's adhesion contracts with authors uniformly defined 'net sales' as being net of 'returns.'"  SUMF ¶ 85.  And, for more than six years before this suit, Audible paid Plaintiffs royalties on net sales of their audiobooks, just as the Contract required.  *Id.* ¶ 86.  The Court's inquiry should end there.  *See Times Mirror Mags., Inc. v. Field and Stream Licenses Co.*, 103 F. Supp. 2d 711, 735 (S.D.N.Y. 2000), (granting summary judgment where the conduct complained of was "explicitly permitted by the language of the agreements."), *aff'd*, 294 F.3d 383 (2d Cir.2002).

The word "return" is unambiguous and has a plain meaning.  In the consumer context, it means to give back a product in exchange for what one used to acquire it (typically money or store credit).  Ms. Bonthu agrees.  SUMF ¶ 87.  Ms. Noble agrees.  *Id.* ¶ 88.  And Plaintiffs' purported "industry expert" agrees: "In online retail, a digital product return is the process of a customer returning previously purchased digital content back to the retailer, and in turn receiving a refund

in the original form of payment, exchange for another item, or a store credit." *Id.* ¶ 91.[1]  McIlroy touts this definition as "neither complex nor nuanced," and notes that regardless of the context "the essential meaning [of return] remains the same: taking previously purchased merchandise back to a retailer for a refund, exchange or credit." *Id.* ¶¶ 93-94.  Audible agrees that it is not complex, and its treatment of returns is entirely consistent with that definition: when customers return audiobooks, they receive a refund of the original form of payment, either cash or an Audible credit (and, in either case, could use that currency to buy a different audiobook). *Id.* ¶ 98.[2]

Contrary to the law and common sense, Plaintiffs try to introduce ambiguity with respect to the meaning of returns.  But, as everyone agrees (see above), a return is simply the mechanical process by which a consumer gives back a product and gets back what she paid for it.  Instead, Plaintiffs quibble with the *reasons* that Audible *allows* returns; they claim that certain returns are "legitimate," and others are not.  SUMF¶¶ 50, 79-80, 106.  But the Contract says no such thing. The Contract provides that *all* returns will be deducted from net sales, period. *Id.* ¶¶ 8, 97, 102. Plaintiffs cannot invoke extrinsic evidence, and certainly cannot advance their own subjective views of the "legitimacy" of returns or customer behavior, to alter the plain, undisputed terms of the Contract. *See Dreni*, 486 F. Supp. 3d at 723; *Fed. Ins.*, 639 F.3d at 567; *InspiRx,* 554 F. Supp. 3d at 553-54.

It is also evident that Plaintiffs' shifting and conflicting personal views cannot support a functional legal theory.  In the same pleading, and based on exactly the same allegations, Plaintiffs

---

[1]  Other ACX authors also ostensibly agree.  As Coleen Barr explained, she discussed the Contract with every ACX author she worked with for more than seven years, and *no one* ever asked her to define return, "because -- people know what that is, you know."  SUMF ¶ 19.

[2]  Plaintiffs at times fall over themselves to make some meaningful distinction between returns and exchanges.  But every exchange necessarily involves a return of the first item in exchange for the second.  And, at least in their Complaint, Plaintiffs agreed.  Compl. ¶ 57.  Nor does Audible account for the two things differently.  When a member returns an audiobook and receives a credit back, that is treated as a return.  If that credit is subsequently used to buy another audiobook, that is a new, separate purchase transaction.  SUMF ¶ 99.

claim that Audible breached the Contract to their detriment, but they have widely divergent views on what constitutes a breach.  If an Audible listener returns an audiobook because, after a chapter, "it's not their cup of tea," Ms. Bonthu would claim that she is entitled to a royalty and that, by deducting that transaction from her sales, Audible violates the Contract.  SUMF ¶ 50.  Ms. Noble, however, would agree with Audible that she is *not* entitled to a royalty in that scenario, and that Audible does *not* violate the Contract by excluding that transaction from her net sales.  *Id.* ¶ 80. If, under Plaintiffs' theory, the same conduct can be both a breach and not a breach of the Contract, then they have no theory at all.  And that conceptual muddle is made worse by Plaintiffs' own damages expert, who testified that any returns made because the audiobook was "defective," or because the listener was "otherwise dissatisfied," *would both be properly deducted under the Contract*.  *Id.* ¶ 100.  Ms. Bonthu would disagree with the second premise, and Ms. Noble would need to know more about the listener's specific "dissatisfaction."[3]  *Id.* ¶¶ 50, 80.

In summary, Plaintiffs' breach of contract claim fails as a matter of law.  Plaintiffs and their experts admit that Audible is authorized to deduct all returns under the Contract, and they also agree that "return" has one basic, commonsense meaning.  Plaintiffs object to *why* Audible allows returns, but that cannot alter the Contract and does not constitute a breach.

## II.   PLAINTIFFS' IMPLIED COVENANT CLAIM SHOULD BE DISMISSED.

"Under New York law, 'implicit in every contract is a covenant of good faith and fair dealing … which encompasses any promises that a reasonable promisee would understand to be included.'"  *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022)

---

[3] Plaintiffs' industry expert could not provide an opinion on what "return" would mean to an ACX author.  SUMF ¶ 95.  When confronted with the fact that his "neither complex nor nuanced" definition of return is completely consistent with how Audible treats returns, McIlroy refused to commit to any definition of the term (including his own).  *Id.* ¶ 96.  Concurrently with this motion, Audible has filed a *Daubert* motion to exclude McIlroy's testimony because his report lacks any reasonable methodology, he is not permitted to opine on ACX authors' "understandings," and his testimony is irrelevant and unnecessary.  But McIlroy's report *does* reinforce that Plaintiffs' are urging a breach of contract theory that could never feasibly be applied in the real world.

(alteration in original) (quoting *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018)).  "The covenant 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 723 (S.D.N.Y. 2014) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007)).  The implied covenant, however, "does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (citation omitted).  "The covenant will be breached only in a narrow range of cases."  *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014).

### A.      Plaintiffs' Implied Covenant Claim Is Duplicative.

In its motion for partial judgment on the pleadings, Audible argued that recent Second Circuit authority clarified that an implied-covenant claim is duplicative of a breach of contract claim and must be dismissed if a plaintiff alleges a single, unified theory of damage.  *See* Mem. (ECF No. 73) (relying on *JN*, 29 F.4th at 128).  The Court denied Audible's motion without prejudice to renewal of the argument on summary judgment for "further factual development … to determine if Plaintiffs' two claims actually seek the same damages."  *See* ECF No. 88 at 2.  They do and, as such, the implied covenant must now be dismissed.

Under New York law, breach of contract and implied covenant claims "are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'" *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 426 (N.Y. App. Div. 2010)).  In *JN*, the Second Circuit clarified that alleging the same damages *alone* is grounds to dismiss an implied covenant claim, *regardless of whether the two claims are based on the same*

*underlying factual allegations*.  29 F.4th at 128 ("Even accepting JN's arguments that it set out a different factual basis for this claim than the factual basis set out in its breach of contract claim, the damages sought for both claims would be the same: compensation for the lost sale.").

The *JN* ruling defeats Plaintiffs' implied covenant claim.  Fact and expert discovery are now complete, and there is no dispute that Plaintiffs assert just one, undifferentiated damages theory.  As discussed, over the course of the litigation Plaintiffs' factual allegations have varied (at least semantically) between "exchanges," "returns/exchanges," or simply "returns," but their purported measure of damages has stayed the same.  SUMF ¶ 101.  For both their breach of contract and implied covenant claims, Plaintiffs seek unpaid royalties for all of their "exchanged" titles (or some subset of their "returned" titles).  *Id*.  And, as discussed more below, Plaintiffs' putative damages expert offered just one (flawed) methodology applicable to both claims.  Therefore, "[e]ven accepting [Plaintiffs'] arguments that [they] set out a different ***factual*** basis for this claim than the factual basis set out in [their] breach of contract claim, the ***damages*** sought for both claims" are the same.  *JN*, 29 F.4th at 128 (emphases added).  On this basis alone, Plaintiffs' implied covenant claim must be dismissed.

### B.      The Challenged Conduct Is Expressly Permitted Under The Contract.

Even if *JN* did not compel dismissal, Plaintiffs' implied covenant claim fails on the merits. Plaintiffs allege that "Audible breached the covenant of good faith and fair dealing by working in an active yet surreptitious manner to monetize that Author's Work(s) in a way that reduced the payment of royalties based on that Work or those Works."  Compl. ¶ 107.  That is just a convoluted way of saying that Audible reduced Plaintiffs' royalty payments to account for returns, supposedly without Plaintiffs' knowledge.  For many reasons, that cannot be a breach of the implied covenant.

First, and most importantly, the Contract expressly permits the allegedly violative conduct. *See Clalit Health Servs. v. Isr. Humanitarian Found.*, 395 F. Supp. 2d 21, 23 (S.D.N.Y. 2005)

(party cannot complain about conduct specifically allowed by agreement); 23 Williston on Contracts § 63:22 (4th ed. 2004) ("[T]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged[.]"). As discussed above, Plaintiffs and their experts concede that Audible did what the Contract expressly permits, *i.e.*, deducted returns to calculate net sales for royalty purposes.  SUMF ¶¶ 8-11, 85, 97, 102.  Plaintiffs take issue with Audible's policy for *allowing* returns, but do not deny that Audible's conduct was authorized by the explicit, unambiguous terms of the Contract.  Compl. ¶¶ 20, 43; SUMF ¶ 8.  That alone precludes any claim for breach of the implied covenant.  *Clalit Health Servs.*, 395 F. Supp. 2d at 23 (affirming summary judgment on implied covenant claim where the conduct complained of was specifically allowed under the contract).

Second, it is axiomatic that the implied covenant "does *not* 'operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits.'"  *Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08 Civ. 4341 (RJS), 2009 WL 1054830, at *5 (S.D.N.Y. Apr. 17, 2009) (quoting *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y. 1990)); *see also Vanlex Stores, Inc. v. BFP 300 Madison II, LLC*, 66 A.D.3d 580, 581 (N.Y. 1st Dept. 2009).  Nor can the implied covenant be used to "imply an obligation inconsistent with other terms of a contractual relationship."  *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (plaintiff cannot expect defendant to forgo its rights under the express terms of the contract (citation omitted)).  The central theory of this lawsuit is that Audible violated Plaintiffs' (or other authors') "understandings" that are totally outside the Contract and conflict with its terms.  The Contract does not provide that Audible will deduct only *some* returns, such as returns for defective audiobooks, or returns for mistaken purchases, or returns based on narrator dissatisfaction, or returns because the book is not the

listener's "cup of tea"; those are all substantive limitations that Plaintiffs try to engraft on the Contract. Nor is there any genuine argument that Plaintiffs were "denied ***express, explicitly bargained-for benefits***." *Oscar de la Renta*, 2009 WL 1054830, at *5 (emphasis added). Plaintiffs never bargained for returns to be treated in any special way or given any special meaning. To the contrary, Plaintiffs explicitly agreed to have *all* returns deducted from their net sales. SUMF ¶¶ 8, 49, 71-72, 75, 81.

Third, under the Contract, Audible has sole discretion over how it distributes audiobooks. Compl. Ex. A at 4. There is no genuine dispute that Audible had legitimate business reasons to allow returns, and the evidence shows that Audible's generous return policy *benefitted* authors and resulted in *more* ACX royalties overall during the relevant period. The fact that Plaintiffs self-servingly (and belatedly) disagree with Audible's business judgment cannot be the basis for an implied-covenant claim. The Second Circuit has made clear that a contracting party is "entitled to act in its own self-interest … even if such action lessened [another party's] anticipated profits." *Gaia House*, 720 F.3d at 93. That is, if a party has "a genuine and colorable business justification for its decision, then its actions will not have been arbitrary, and thus will not have violated the implied covenant." *Schweizer v. Sikorsky Aircraft Corp.*, 634 F. App'x 827, 830 (2d Cir. 2015) (quoting *Sec. Plans*, 769 F.3d at 820).

Fourth, Audible did not act "surreptitiously," as Plaintiffs claim, and their feigned surprise is not credible. Again, Audible's return policy was a selling point to attract new members, and Audible widely publicized the policy from its launch in 2012. SUMF ¶¶ 29-30. And more to the point, Plaintiffs, both of whom were also Audible customers, were aware of the policy well before October 2020. *Id.* ¶¶ 57, 82.

Fifth, Audible did not engage in "opaque and deficient accounting." Compl. ¶¶ 104-106 (alleging breach of "implied promise" to show "actual, gross numbers."); SUMF ¶ 20 (Plaintiffs'

15

interrogatory responses alleging that the ACX dashboard failed to disclose that sales numbers were net). The Contract required Audible to pay royalties on "net sales receipts" and to provide only a "statement of Royalties" (*i.e.*, the amount of royalties owed on net sales), "together with a check or direct deposit in the amount of any Royalty due." Compl. Ex. A at 7. That is precisely what Audible did. *See, e.g.*, *Higgs v. Columbia Univ.*, No. 05 Civ. 2642(DF), 2009 WL 77880, at *12 (S.D.N.Y. Jan. 6, 2009) (dismissing implied covenant claim on summary judgment where defendant acted as the contract required). Moreover, Plaintiffs knew (or should have known) that their royalty statements reflected returns. Their royalty statements expressly referenced "Net Sales" numbers, and at times showed negative dollar amounts reflecting deductions for returns. SUMF ¶¶ 21-22, 56, 76. If Plaintiffs believed they were entitled to other data, or information in a different format, the Contract gave them three months after each royalty statement to object. Yet, despite having easy access to ACX support, prior to October 2020 neither Plaintiff even inquired about—much less objected to—their statements. SUMF ¶¶ 23-24, 51, 60-61, 74. In short, Audible did not violate any contractual terms or breach any implied promises. For all of these reasons, Audible is entitled to summary judgment dismissing Plaintiffs' implied covenant claim.

## III.   PLAINTIFFS' CLAIMS ARE BARRED BY WAIVER, THE STATUTE OF LIMITATIONS, AND LACHES.

Even if Plaintiffs' contract claims were legally viable, they are separately barred for two independent reasons. First, Plaintiffs waived those claims by continuing to renew the Contract and accept its benefits with full knowledge of Audible's policies and practices. Second, Plaintiffs' claims are barred by the statute of limitations. Separately, to the extent Plaintiffs are seeking equitable (injunctive) relief (which is unclear), it is barred by laches.

### A.    Plaintiffs Waived Their Claims.

"It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach." *Nat'l Westminster Bank, U.S.A v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) (citing cases), *aff'd sub nom*, *Yaeger v. Nat'l Westminster*, 962 F.2d 1 (2d Cir. 1992); *see also N.Y. Racing Ass'n, Inc. v. Meganews, Inc.*, No. 97 CV 1091(SJ), 2000 WL 307378, at *7 (E.D.N.Y Mar. 21, 2000) (granting summary judgment on breach of contract claim where plaintiff "twice renewed its contract with [defendant] without ever objecting" to the breach, and "despite an internal belief" regarding the breach "did not notify [defendant] of the alleged breach of contract until [five years later] at the earliest").

As a matter of law, Plaintiffs have waived any breach of contract or implied-covenant claim by repeatedly re-entering the Contract with full knowledge of its terms and Audible's return policy. Even before October 2020—when Plaintiffs claim the "truth" was revealed—both were well aware of Audible's policies.  As addressed above, the Bonthus knew that returns would be deducted from Golden Unicorn's royalties under the Contract, Ms. Bonthu knew about the Great Listen Guarantee since at least 2016, and Mr. Bonthu assumed that audiobooks could be returned for any reason. SUMF ¶¶ 49, 53-54, 57.  For her part, at least by February 2020, Ms. Noble knew about Audible's return policy, and clearly understood its impact on royalties because she was actively soliciting ideas to circumvent it.  *Id.* ¶¶ 82-84.  And both Plaintiffs received monthly royalty statements clearly setting out "Net Sales" (not gross figures). *Id.* ¶ 21.  With that knowledge and information, Golden Unicorn published 26 ACX titles from 2014 to the present (*i.e.*, entered into the Contract 26 separate times).  *Id.* ¶ 46.  And Ms. Noble published 54 ACX titles from 2014 to the present (*i.e.*, entered into the Contract 54 separate times).  *Id.* ¶ 67.  That is waiver.

Even if one were to credit Plaintiffs' false assertion that the October 2020 software error was some sort of "revelation" of Audible's practices, both Plaintiffs continued to publish with ACX after that time.  Golden Unicorn published multiple titles in April 2021 and several more thereafter.  SUMF ¶ 46.  Big Dog Books published a title in July 2021 and several after.  *Id.* ¶ 67. That alone is sufficient to find waiver.  *See Nat'l Westminster Bank, U.S.A*, 130 B.R. at 675.

### B.      Plaintiffs' Claims Are Barred By The Statute Of Limitations.

Plaintiffs' claims are barred in their entirety by New York's statute of limitations.  The statute of limitations for both breach of contract and breach of the implied covenant is six years from the time of breach, not from discovery of the breach.  N.Y. C.P.L.R. § 213(2); *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 403 (Ct. App. 1993) ("statutory period of limitations begins to run from the time when liability for the wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury"); *Aozora Bank, Ltd. v. Credit Suisse Grp.*, 144 A.D.3d 437, 440 (N.Y. App. Div. 2016).  Both Plaintiffs entered into ACX Contracts in 2014. SUMF ¶¶ 44, 65, 67.  Plaintiffs rely on the fact that the contractual terms "are substantially the same in the Contract with each Author."  Compl. ¶ 41.  And, as set forth above, Audible has promoted its return policy since at least 2012, and always reported and paid royalties based on net sales.  Thus, Audible's purported wrongdoing—*i.e.*, generously accepting returns, deducting those returns from Plaintiffs' royalties, and reporting and paying royalties on net rather than gross sales figures—all began well before 2015.  Plaintiffs filed this lawsuit on August 20, 2021; a six-year look-back is August 20, 2015.  By that time, the statute of limitations on Audible's alleged breach of the Contract had long since run.  Plaintiffs' claims are time-barred and must be dismissed.

### C.      Plaintiffs' Equitable Claims (If Any) Are Barred By Laches.

Laches bars a plaintiff's equitable claim when there has been an "unreasonable and inexcusable delay that has resulted in prejudice to the defendant."  *Medinol Ltd. v. Bos. Sci. Corp.*,

346 F. Supp. 2d 575, 609 (S.D.N.Y. 2004) (quoting *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir.1998)). "[T]he laches period begins to run when the plaintiff discovers the facts which create his or her right or cause of action." *Preston v. Am. Fed'n of Television & Radio Artists Health Fund*, No. 90 CIV. 7094(RJW), 2002 WL 1009458, at *3 (S.D.N.Y. May 16, 2002), *aff'd sub nom.*, 63 F. App'x 536 (2d Cir. 2003).

It is unclear whether Plaintiffs are seeking equitable relief. In the Complaint they seek injunctive relief, but in their class certification motion Plaintiffs did *not* request equitable relief or ask the Court to certify an injunctive class under Fed. R. Civ. P. 23(b)(2). In any event, any claim for equitable relief is barred by laches. As addressed at length above, Plaintiffs have known for years that Audible generously accepts returns and deducts those returns from authors' royalties under the Contract, yet Plaintiffs waited until August 2021 to sue and challenge that conduct. That was an unreasonable delay. *Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 767 F. Supp. 1269, 1281 (S.D.N.Y. 1991) (laches barred plaintiff's claim because he received annual notices from defendant, and even if those notices "were of a summary nature," he could have asked for explanations), *aff'd in part, rev'd in part*, 970 F.2d 1138 (2d Cir. 1992), *aff'd*, 510 U.S. 86 (1993). And Plaintiffs' unreasonable delay prejudiced Audible because, during the multi-year intervening period, Audible relied on its contractual right to accept returns for any reason and calculated royalties accordingly. *See Serdarevic v. Advanced Med. Optics, Inc.*, No. 06 CIV 7107(DLC), 2007 WL 2774177, at *5 (S.D.N.Y. Sept. 25, 2007), *aff'd*, 532 F.3d 1352 (Fed. Cir. 2008). Thus, laches bars any claim for equitable relief.

## IV.    PLAINTIFFS CANNOT PROVE DAMAGES.

Finally, even if Plaintiffs had viable legal claims, they cannot prove damages. Plaintiffs did not disclose their damages until after discovery was closed (and, even then, not in the proper manner). And Plaintiffs' belated approach to damages does not match their own theories: they

have always acknowledged that at least some returns are "legitimate" and should not earn a royalty, but their damages expert opines that Plaintiffs' damages are measured by *all* returns of *all* of their titles, without exception.  That is not a competent damages theory, and it must be rejected.

### A.    Plaintiffs Did Not Comply With Their Discovery Obligations.

Rule 37 allows the Court to preclude a party from seeking damages when it fails to meet its disclosure obligations under Rules 26(a) and (e) of Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 37(c)(1).  The purpose of that rule is "to prevent the practice of 'sandbagging' an adversary with new evidence," *Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999), and "to alert an opposing party of the need to take discovery of the named witness," *Pal v. N.Y. Univ.*, No. 06-cv-5892(PAC)(FM), 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008).  Plaintiffs plainly failed to meet their Rule 26 obligations, and the Court should preclude any evidence of damages on that basis alone.

Rule 26(a) requires Plaintiffs to provide, "without awaiting a discovery request, … a computation of each category of damages" and the "documents or other evidentiary material … on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii).  This includes "both a dollar amount sought and some analysis explaining how that figure was arrived at."  *Thompson v. Jamaica Hosp. Med. Ctr.*, No. 13 Civ. 1896(RWS), 2015 WL 3824254, at *3 (S.D.N.Y. June 19, 2015).  As a case progresses into discovery, "[m]ore detailed calculation becomes necessary."  *See id*.  Furthermore, Plaintiffs have a duty, under Rule 26(e), to "supplement or correct" their disclosure "in a timely manner" once they learn that "in some material respect the disclosure … is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A).  Failure to provide such a computation warrants preclusion of evidence of damages.  *See Spotnana, Inc. v. Am. Talent Agency, Inc.*, No. 09 Civ. 3698(LAP), 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010) (precluding evidence of alleged damages because of defendant's unexplained failure to disclose computation).

In their initial disclosures, Plaintiffs refused to provide any damages computation, claiming that "[n]either GUE nor BDB is able to make such a computation at this time" because the relevant data is "in the possession and control of Audible and has not yet been disclosed by Audible." SUMF ¶ 103.  The only information Plaintiffs provided was to "anticipate" that the computations would be based on (1) "the respective numbers of exchanges" of Plaintiffs' audiobooks "pursuant to Audible's 'Great Listen Guarantee'"; (2) the price of the audiobooks "exchanged"; and (3) "the 25% or 40% royalty" that Plaintiffs would have earned from these "exchanged" titles.  *Id.* ¶ 104.

In response to Audible's discovery requests, Plaintiffs similarly deflected.  Audible asked Plaintiffs to "[d]escribe completely and in detail the categories and amounts of damages [y]ou claim against Audible, including the appropriate measure of damages, and the logic, methodology, and computation of each and any category of damages."  SUMF ¶ 105.  Again, Plaintiffs failed to specify any category or amount of damages, instead describing their damages generally as "the differences between" what Audible actually paid Plaintiffs and "the proper amounts of royalties," *i.e.*, "the contractually agreed percentages times the value of the Audiobooks that Audible distributed to its customers without netting out these illegitimate exchanges" (plus interest).  *Id.* ¶ 106.  Plaintiffs claimed that "a proper answer can be determined only after Audible provides responses to Plaintiff's discovery requests."  *Id.* ¶ 107.  In other words, Plaintiffs claimed that their damages would be the difference between "legitimate" returns and *all* returns, but they claimed they could not yet calculate that number.

Over many months of discovery, Audible produced extensive data related to damages, including everything responsive to Plaintiffs' requests.  SUMF ¶ 108.  Plaintiffs represented that they would update their discovery responses with respect to damages, as the Rules require.  *Id.* ¶ 109.  But, on November 29, 2022, fact discovery closed, *see* ECF No. 62, and Plaintiffs never updated their initial disclosures or discovery responses to identify their damages (and, to this day,

have not done so), SUMF ¶ 110.  Nor did Plaintiffs ever inform Audible that there was any data missing or seek relief from the Court to obtain additional damages-related information.  *Id.* ¶ 111.

Instead, on December 15, 2022, Plaintiffs served a report from their putative damages expert, Joseph Egan, that, for the first time, identified Plaintiffs' supposed damages.  Egan's report claims that Golden Unicorn and Big Dog Books have total damages of $38,701 and $43,929 respectively.  SUMF ¶ 112.  But it is clear from the report, and Egan confirmed in his deposition, that those figures reflect the royalties that would otherwise have been due on *all* returns of *all* of Plaintiffs' titles from August 20, 2015 through December 31, 2021.  *Id.* ¶¶ 113-114.  The Court should preclude Egan's opinion and reject those damages figures for two reasons.

First, expert testimony cannot stand in for a party's discovery obligations or excuse the party's discovery failures.  *See Serin v. N. Leasing Sys., Inc.*, No. 7:06-CV-1625, 2010 WL 6501664, at *1 (S.D.N.Y. Oct. 26, 2010) (rejecting argument that "Plaintiffs ... complied with the requirements of Rule 26(a)(1)(A)(iii) by providing the expert report of ... Plaintiffs' damages expert").  Disclosure of damages computations must be made "'based on the information then reasonably available to [the disclosing party],' and *is not excused because the disclosing party '**has not fully investigated the case**.'*"  *Scantibodies Lab'y, Inc. v. Church & Dwight Co.*, No. 14cv2275 (JGK) (DF), 2016 WL 11271874, at *16 (S.D.N.Y. Nov. 4, 2016) (alteration in original) (emphasis added) (quoting Fed. R. Civ. P. 26(a)(1)(E)), *report and recommendation adopted*, 2017 WL 605303 (S.D.N.Y. Feb. 15, 2017).  Plaintiffs had an obligation to pursue any necessary data, and to calculate and disclose their damages, *during the discovery period*.  The Court has "wide discretion to impose sanctions, including severe sanctions, under [Rule] 37," *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006), and the burden is on the noncompliant party to show that "its violation was either substantially justified or harmless," *Agence Fr. Presse v. Morel*, 293

F.R.D. 682, 685 (S.D.N.Y. 2013).   The only sufficient sanction for Plaintiffs' inexcusable discovery failures is to preclude their belated damages evidence.

Second, Egan's calculation of Plaintiffs' purported damages reflects an entirely new damages theory that Plaintiffs never previously disclosed.   While Plaintiffs' articulation of their theory has varied a bit over time, they and their experts have always acknowledged that some audiobook returns are legitimate and should not earn a royalty.   Even Plaintiffs' Complaint reflects that fact.   *See* Compl. ¶ 100.   And Plaintiffs acknowledge this again in their class certification motion.   *See* Mem. Supp. Class Certification (ECF No. 132) at 5, 11.   Plaintiffs disagree between themselves about what makes a return "legitimate," but they have never suggested that a royalty should be paid on *every* return.   To the contrary, both testified that they did *not* believe that.   SUMF ¶¶ 50, 80.   Yet Egan's *sui generis* theory makes no distinction between types of returns or "exchanges," or whether they are legitimate or illegitimate.   Instead, he tabulates Plaintiffs' damages based on every return of every kind for any reason.

That is sandbagging at its essence, and the law does not permit it.   A party may not advance a damages theory that was not timely disclosed in its discovery responses or supplemental initial disclosures.   *See Design Strategy*, 469 F.3d at 293 (plaintiff's "lost profits" evidence properly excluded because lost profits was not identified in plaintiff's initial disclosures or at any point during discovery); *24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 566 F. Supp. 2d 305, 318 (S.D.N.Y. 2008) (precluding theories of damages because plaintiff failed to make mandatory initial disclosures); *accord Point Prods. A.G. v. Sony Music Ent., Inc.*, No. 93-cv-4001(NRB), 2002 WL 31856951, at *4 (S.D.N.Y. Dec. 19, 2002) (excluding untimely damages theory); *ESPN, Inc. v. Off. Comm'r of Baseball*, 76 F. Supp. 2d 416, 420 n.3 (S.D.N.Y. 1999) (same).   *Austrian Airlines Oesterreichische Lufverkehrs Ag v. UT Fin. Corp.*, No. 04 Civ. 3854RCCAJP, 2005 WL 977850 (S.D.N.Y. Apr. 28, 2005), is instructive.   There, just two weeks before the close of fact discovery,

the plaintiff amended its Rule 26(a) damage disclosure to include a "currency conversion damage theory." *Id*. at *1. The court precluded the plaintiff from asserting that theory, concluding that the disclosure "[was] not a reasonable amendment or update; it [was] simply too late." *Id*. Here, Plaintiffs' Rule 26 violation is more flagrant because they concealed their new theory until *after* discovery closed (and still have never amended their initial disclosures). As such, the Court should exclude Egan's thirteenth-hour theory and disregard his damages opinion.

### B.    Plaintiffs Have Not Advanced A Competent Or Viable Damages Theory.

Even if Plaintiffs had properly disclosed their damages theory, it still must be excluded because it is totally unconnected to Plaintiffs' legal claims. "To prove damages here, Plaintiff[s] must offer a basis for calculating 'the position [they] would have occupied but for the breach.'" *Franconero v. Universal Music Corp.*, No. 02 CIV.1963(BSJ), 2011 WL 566794, at *4 (S.D.N.Y. Feb. 11, 2011) (quoting *Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 269 (S.D.N.Y. 2005)), *aff'd sub nom.*, *Franconero v. UMG Recordings, Inc.*, 542 F. App'x 14 (2d Cir. 2013). Damages that are "merely speculative, possible, and imaginary" are "unrecoverable." *Accent Delight Int'l Ltd. v. Sotheby's & Sotheby's Inc.*, No. 18-CV-9011 (JMF), 2021 WL 2418225, at *3 (S.D.N.Y. June 14, 2021). Moreover, Plaintiffs must present a damages theory that is consistent with their liability theories. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A]ny model supporting a 'plaintiff's damages case must be consistent with its liability case[.]'" (citation omitted)); *accord Price v. L'Oreal USA, Inc.*, No. 17 Civ. 614 (LGS), 2021 WL 4459115, at *4 (S.D.N.Y. Sept. 29, 2021); *Mathias v. Jacobs*, 179 F. Supp. 2d 328, 328 (S.D.N.Y. 2002).

As discussed above, throughout this case, Plaintiffs have consistently acknowledged that some returns are legitimate and should not earn a royalty. Yet, Egan's purported damages numbers are inconsistent with that reality. He simply added up the royalties associated with every one of Plaintiffs' returned titles. SUMF ¶¶ 113-114. Those figures must be inflated; among Plaintiffs'

thousands of returned books over a six-year period, it is virtually certain that some were returned based on technical defects or mistaken purchases (or, at least for Ms. Noble, because her writing is not some listeners' "cup of tea").  Indeed, the evidence shows that customers returned titles due to technical issues, mistaken purchases, or dissatisfaction with the title after a short listening period.  *Id.* ¶¶ 115-117.  It follows that, at best, Egan's numbers are "speculative" and "possible."  *Accent Delight*, 2021 WL 2418225, at *3.[4]  Under Plaintiffs' own theory of liability, Egan's numbers cannot reflect the position that Plaintiffs would have occupied "but for the breach" of the Contract.  *Franconero*, 2011 WL 566794, at *4.  As such, they are not recoverable.

In summary, Plaintiffs have put forth only "imaginary" damages numbers that, under their own theories, they could never recover.  *Accent Delight*, 2021 WL 2418225, at *3.  And Plaintiffs are out of time.  Fact and expert discovery are closed, and it is far too late for Plaintiffs to attempt a defensible calculation of their alleged harm.  Under New York law, "[t]he failure to prove damages is … fatal to [a] plaintiff's breach of contract cause of action."  *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 465 (2d Cir. 1999) (alterations in original) (quoting *Cramer v. Spada*, 203 A.D.2d 739, 741 (N.Y. 3d Dep't 1994)); *see also InspiRX, Inc.*, 554 F. Supp. 3d at 565 ("speculative nature of damages alone provides an alternative basis for granting summary judgment" dismissing breach of contract claim).

## <u>CONCLUSION</u>

For the foregoing reasons, Audible respectfully requests that the Court grant Audible's motion for summary judgment and dismiss Plaintiffs' claims, and this lawsuit, with prejudice.

---

[4]  Concurrently with this motion, Audible has filed a *Daubert* motion to exclude Egan's opinions because he applied no expertise and did no analysis.  Egan literally took royalty figures from one column in spreadsheets produced by Audible and had Excel add them up.  And, as Audible explained in opposing class certification, Egan did no calculation of class-wide damages at all (apparently under the odd misconception that discovery is ongoing and that he will have a chance to do additional work).  *See* ECF No. 170 at 24.  Thus, just as Plaintiffs lack any competent evidence with respect to their own damages, they have an even more stark failure of proof with respect to class-wide damages.

Dated: March 6, 2023     Respectfully submitted,

            FENWICK & WEST LLP

            By: */s/ Brian D. Buckley*
              Brian D. Buckley

            Brian D. Buckley (admitted *pro hac vice*)
            bbuckley@fenwick.com
            Deena J.G. Feit (admitted *pro hac vice*)
            dfeit@fenwick.com
            Wenbo Zhang (NYC Bar No. 5623186)
            wzhang@fenwick.com
            FENWICK & WEST LLP
            1191 Second Avenue, 10th floor
            Seattle, WA 98101
            Telephone: 206.389.4510

            Kathryn J. Fritz (NYC Bar No. 2078483)
            kfritz@fenwick.com
            Jedediah Wakefield (admitted *pro hac vice*)
            jwakefield@fenwick.com
            Nicholas A. Santos  (admitted *pro hac vice*)
            nsantos@fenwick.com
            FENWICK & WEST LLP
            555 California Street, 12th Floor
            San Francisco, CA 94104
            Telephone: 415.875.2300

            Diana Buck (admitted *pro hac vice*)
            dbuck@fenwick.com
            John M. DiBaise (admitted *pro hac vice*)
            mdibaise@fenwick.com
            FENWICK & WEST LLP
            Silicon Valley Center
            801 California Street
            Mountain View, CA 94041
            Telephone: 650.988.8500

            *Attorneys for Defendant Audible, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served with a copy of this document via CM/ECF per Local Rule CV-5 on March 6, 2023.

*/s/ Brian D. Buckley*
Brian D. Buckley