**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GOLDEN UNICORN ENTERPRISES, INC. and
BIG DOG BOOKS, LLC, *on behalf of*
*themselves and all those similarly situated*,

               Plaintiffs,

        v.

AUDIBLE, INC.,

               Defendant.

Case No.  1:21-cv-07059-JMF

**ORAL ARGUMENT REQUESTED**

**DEFENDANT AUDIBLE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO EXCLUDE TESTIMONY OF THAD MCILROY**

## TABLE OF CONTENTS

PAGE

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

I.    The ACX Contract And Plaintiffs' Claims ...............................................2

II.   McIlroy's Opinions .....................................................................................4

      A.    McIlroy's Discussion Of ACX ........................................................4

      B.    McIlroy's Opinions On Authors' "Understanding" Of The Contract .........5

      C.    McIlroy's Discussion Of The Impact Of Return Policies...........................9

ARGUMENT ...................................................................................................................12

I.    Mr. McIlory Has No Expertise In "Authors' Understanding" Or The Financial Impact Of Return Polices. ........................................................................13

II.   The Court Should Exclude McIlroy's Opinions As Unreliable. ............................15

      A.    McIlroy Provides No Reliable Basis For His Opinions About ACX Authors' "Understanding" Of Returns........................................................16

      B.    McIlroy Provides No Reliable Basis For His Opinion On The Impact of Audible's Return Policy On ACX Authors. ...............................................19

III.  McIlroy's Opinions Are Irrelevant, Usurp the Court's Role, And Will Cause Confusion. ...........................................................................................................20

CONCLUSION.................................................................................................................23

# TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*523 IP LLC v. CureMD.Com*,
    48 F. Supp. 3d 600 (S.D.N.Y. 2014)...................................................................14

*Alto v. Sun Pharm. Indus., Inc.*,
    No. 1:19-CV-09758-GHW, 2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021)
    .......................................................................................................13, 18, 19, 20

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)..................................................................15, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)......................................................................12, 20, 22, 23

*Davis v. Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013)...................................................12, 13

*E.E.O.C. v. Bloomberg L.P.*,
    No. 07 Civ. 8383(LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010)................................20

*InspiRx, Inc. v. Lupin Atlantis Holdings SA*,
    554 F. Supp. 3d 542 (S.D.N.Y. 2021)...................................................................21

*Lamoureaux v. Anazaohealth Corp.*,
    No. 3:03cv01382 (WIG), 2009 WL 1162875 (D. Conn. Apr. 30, 2009) ..............................15

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)...................................................13, 22

*Mellon Bank, N.A. v. United Bank Corp. of New York*,
    31 F.3d 113 (2d Cir. 1994)...................................................................21

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)...................................................................21

*R.F.M.A.S., Inc. v. So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010)...................................................14, 16, 18, 22

*Tower 570 Co. LP v. Affiliated FM Ins. Co.*,
    No. 20-CV-0799 (JMF), 2022 WL 1665132 (S.D.N.Y. May 25, 2022) ....................16, 20, 22

OTHER AUTHORITIES

Fed. R. Evid. 403 ...................................................................21

Fed. R. Evid. 702 ...................................................................12, 13, 14

## <u>INTRODUCTION</u>

This case is a contract dispute brought by two authors who claim that Audible improperly failed to pay them royalties on audiobooks that customers returned.  But Plaintiffs' case has a fundamental and obvious problem: Plaintiffs admit that the contract at issue—the standard distribution agreement for Audible's Audiobook Creation Exchange ("ACX") program—made clear that Audible would deduct returns from sales figures when calculating author royalties.  In other words, Plaintiffs are suing Audible for doing precisely what the contract said it would do.

How do Plaintiffs propose to overcome this glaring problem?  Enter Thad McIlroy, publishing consultant.  McIlroy seeks to testify that authors shared a unique understanding of the word "returns" based on "use of the term in the context of consumer goods and in the publishing industry."  And although he is neither an accountant nor an economist, he also seeks to testify that Audible's generous return policy came "at the expense of ACX author earnings."  McIlroy lacks any specialized knowledge or reliable methodology to offer either of these spurious opinions, which his own report repeatedly contradicts.

While he may have some publishing industry experience, McIlroy has no specialized knowledge of "authors' understanding" of the term "returns" in their ACX agreements.  He conducted no survey on the topic, and he has never interviewed an ACX author.  Yet he concludes that all authors are somehow "imbued" with "traditions in the book publishing industry" even if "sometimes they don't even know it."  Based on those supposed "traditions," he seeks to testify that authors share a unique definition of the word "returns" in their ACX agreements.  But when asked to provide that definition, he was unable to do so.  Nor does he identify any "industry standard" that would supposedly inform authors' collective understanding.  Instead, he admits that return policies have "enormous variations," and his discussion of return practices in publishing rests on anecdotal accounts and inconsistent policies from websites he found online—exactly the

type of testimony courts have found lacks any methodology and should be excluded.  And in all events, McIlroy admits that the term "returns" is "neither complex nor nuanced," underscoring that his expert testimony—and other extrinsic evidence—is inadmissible under the parol evidence rule to contradict its unambiguous meaning.

Similarly, McIlroy lacks any specialized knowledge or reliable methodology to opine on the financial impact of Audible's return policy.  He acknowledges that he conducted *no analysis* on the impact of Audible's return policy, nor did he even consider the positive impact of a generous return policy.  This was particularly striking given his reliance on multiple academic papers, all of which describe the *benefits* of a generous return policy in ultimately increasing overall sales, which would benefit Audible and authors alike.  Ignoring that, McIlroy merely *assumes* that the cost of these benefits fell on authors.  McIlroy's opinions, therefore, amount to classic *ipse dixit* statements that courts routinely exclude.

McIlroy's baseless conjecture and speculation should not see the inside of a courtroom.  Because his opinions are unreliable, irrelevant, and would result in significant confusion of the issues, the Court should exclude them.

## **BACKGROUND**

### I.   **THE ACX CONTRACT AND PLAINTIFFS' CLAIMS**

Plaintiffs claim that Audible breached its contract with ACX authors, as well as the covenant of good faith and fair dealing, by deducting returns from sales figures to calculate authors' royalty payments.  Compl. ¶ 1.  But there is no dispute that the contract at issue—ACX's Audiobook License and Distribution Agreement (the "Contract")—provides that royalties are paid net of returns.  Plaintiffs admit in the Complaint that "Audible's Contract with each Author provides that royalty payments are calculated after 'returns' and certain other items are netted out." Compl. ¶ 43; *see also id.* ¶ 20.  Plaintiffs admitted the same during discovery.  *See* Ex. 3 (Pls.'

Resp. Audible's Req. for Admission No. 5) ("Plaintiffs admit that, prior to October 2020, it was aware that Audible's adhesion contracts with authors uniformly defined 'net sales' as being net of 'returns.'"); Decl. of Jedediah Wakefield ("Wakefield Decl.") ¶ 4.   In their class certification motion, Plaintiffs admit this again, noting that royalties were a percentage of "net sales receipts" and that "[a]mong other language common to all versions of the Contract, the definition of 'net sales receipts' remained constant: a monetary amount 'less any … returns.'"   ECF No. 132 at 5.

These admissions should end the matter.   But in an attempt to keep their case afloat, Plaintiffs have claimed that "returns" has a "typically understood" meaning, and Audible treated returns inconsistent with that meaning.   In their Complaint, Plaintiffs allege that "the term 'return' in the context of consumer goods is typically understood to mean that a product is returned for a refund because the product was defective or the buyer was otherwise dissatisfied."   Compl. ¶ 44. They claim that "[t]he term does not encompass an exchange and is especially inappropriate where a customer exchanges a product after receiving any appreciable benefit from it."   *Id.*   During their depositions, Plaintiffs acknowledged that, under the Contract, returns would be deducted from net sales, but they offered varying and inconsistent definitions of what constitutes a "legitimate" return.   Elizabeth Noble testified on behalf of Big Dog Books that "legitimate" bases for returns included mistaken purchases, defective products, not liking the narrator, and if a customer "listen[s] to the first chapter and it's not their cup of tea."   Ex. 4 (E. Noble Dep. Tr.), 104:11-107:12; Wakefield Decl. ¶ 5.   Jan Bonthu, testifying on behalf of Golden Unicorn Enterprises, had a more restrictive opinion, claiming that "legitimate" returns were for defective products only.   Ex. 5 (J. Bonthu Dep. Tr.), 127:18-129:7;   Wakefield Decl. ¶ 6.   Then (confusingly), Plaintiffs' purported damages expert offered a report where *all* returns went towards Plaintiffs' damages— even as he acknowledged that the Contract provided that royalty payments were paid net of returns. Ex. 6 (J. Egan Report), ¶¶ 21, 35-52; Wakefield Decl. ¶ 7.

Ultimately, Plaintiffs' opinions on what constitutes a "legitimate" return are related to return *policies* (what returns a seller may, in its discretion, decide to accept)—not to the definition of the term "return," which is unambiguous.  Ms. Bonthu testified that a return means a return of the product in exchange for "[e]ither money or credit in the Audible situation."  Ex. 5 (J. Bonthu Dep. Tr.), 90:23-91:11.  And Ms. Noble, who asked ACX Client Support representative Coleen Barr to define the term "net" when entering into the Contract, had no questions about the meaning of "returns" after Ms. Barr defined net sales as "the balance of gross sales remaining ***after deducting*** trade discounts, ***returned sales***, and sales allowances."  Ex. 7 (2014 ACX Client Support Email) (emphases added); Ex. 8 (C. Barr. Dep. Tr.), 159:17-160:10; Wakefield Decl. ¶¶ 8-9.  Indeed, Ms. Barr, who worked directly with ACX authors for more than seven years, and "had conversations about the contracts with every author that [she] ever spoke with," testified that "no one has specifically said, Can you define what a return is for me, because that's -- people know what that is, you know."  Ex. 8, 28:10-29:4, 29:20- 32:1, 135:1-4, 197:7-10; Ex. 9 (C. Barr. Dep. Ex. 1150); Wakefield Decl. ¶ 10.

## II.   MCILROY'S OPINIONS

McIlroy's opinions are set out in his December 9, 2022 Report.  *See* Ex. 1 (Report); Wakefield Decl. ¶ 2.  Audible took his deposition on January 9, 2023.  Ex. 2 (Dep. Tr.); Wakefield Decl. ¶ 3.

### A.   McIlroy's Discussion Of ACX

McIlroy begins his report by discussing the history of audiobooks and Audible's ACX service.  He explains that audiobooks date back to 1931, but he acknowledges that ACX was a "breakthrough in audiobook publishing."  Report, 3-4.  ACX provided "independent authors" an opportunity to "finally produce and distribute audio versions of their work."  *Id.* at 4.  McIlroy quotes an author saying that ACX "allows [the author] to reach an audience who print doesn't

appeal to." *Id.* Further, he discusses how ACX addressed the challenge independent authors faced of "the significant cost of producing a professional audiobook"—which "was unrealistic for an author with a modest following." *Id.*

McIlroy describes ACX's "more important innovation" as a "program to match authors with narrator/producers." Report, 4. This allowed authors to pay narrators directly or share in the production costs. *Id.* Ultimately, ACX enabled authors to present their work on "par with the top authors from the major publishers." *Id.* And McIlroy concludes that ACX "fostered a community of authors and producers sharing their knowledge and experience to advance their careers within an audiobook industry dominated by the traditional large New York publishers." *Id.* at 4-5.

### B.   McIlroy's Opinions On Authors' "Understanding" Of The Contract

McIlroy claims his report "establish[es] that authors reasonably believed that the use of the term 'returns' in their contracts with ACX/Audible was consistent with the ordinary use of the term in the context of consumer goods and in the publishing industry." Report at 2; *see also id.* at 27. But rather than citing any standard in the publishing industry, he turns to Wikipedia. He states that "Wikipedia's definition of a 'product return' conforms to my general understanding of the term, and, I believe, the understanding of authors and publishers with whom I have worked." *Id.* at 9. Relying on Wikipedia's definition, McIlroy also provides a definition for returns of *digital* products (like the audiobooks at issue here): "the process of a customer returning previously purchased digital content back to the retailer, and in turn receiving a refund in the original form of payment, exchange for another item, or a store credit." *Id.*; *see also* Dep. Tr., 25:2-28:19.[1] Acknowledging that digital content is not actually "sent back" to the seller, McIlroy says that "[t]he

---

[1]  Audible does not dispute this commonsense definition of "returns" and believes it supports Audible's summary judgment motion, as the term "returns" is unambiguous and therefore does not need extrinsic evidence for its interpretation.

specific process by which the digital product is returned is immaterial — one way or another the buyer no longer has access to the digital file after the return process is complete."  Report, 9.  He goes on to explain that this ordinary definition of "returns" would apply to book publishing contracts as well: "the essential meaning remains the same: taking previously purchased merchandise back to a retailer for a refund, exchange or credit."  McIlroy adds that, in "the retail industry, whether bricks & mortar or online, returns are a fact of life, and have been for centuries."  *Id.*  Of course, that definition says nothing about the *reasons* for returns and is fatal to Plaintiffs theory that only returns for certain reasons are "legitimate."

At his deposition, McIlroy initially testified that he believed this definition of "returns" is how ACX authors would understand the term in their ACX agreements.  Dep. Tr., 25:2-28:8; *see also id.* at 31:12-24, 32:11-19.  But later in the deposition—after being confronted with the fact that this definition aligns with Audible's position in this litigation—McIlroy tried to distance himself from his own definition.  When asked "isn't that exactly how returns work with Audible?" McIlroy responded that "you're going to have to go back earlier in my report because it's not just that.  Consumer goods and in the publishing industry, that's -- that informed the authors' understanding of returns, not merely consumer goods."  *Id.* at 96:18-97:12.

McIlroy then sought to explain away his definition of "returns" in his report, stating that was somehow just a starting point in the journey to understanding what was in authors' minds.  According to McIlroy, he began "with this Wikipedia entry and then going into the retail industry," he tried to "take it out further."   Dep. Tr., 229:15-23.  He testified that he "started with the Wikipedia definition and made it very clear that it was conditioned by the -- you know, the common understanding plus the specific understanding of people who are, you know, active as authors and book publishers … Those things together constitute their understanding."  *Id.* at 226:8-16.  Despite his admission that "the essential meaning remains the same" (Report, 9), he claimed

that "[c]onsumer goods and in the publishing industry, that -- that informed the authors' understanding of returns, not merely consumer goods."  Dep. Tr., 97:9-12.

McIlroy then claimed that the publishing industry was "an interesting industry in the sense that it's rife with tradition and [lore] and comradeship and that the understanding of any one author is [an] accumulation of -- of a long and, to my mind, quite wonderful tradition in publishing." Dep. Tr., 142:8-13.[2]  Further, he opined that "[t]o understand how authors understood those agreements … it's very helpful to understand the traditions in the book publishing industry."  *Id.* at 142:21-24.

McIlroy acknowledged, however, that he did not interview any authors when working on this case, he did not conduct any surveys or studies about ACX authors, and he had never interviewed any ACX author, for this report or otherwise.  Dep. Tr., 52:13-23, 133:9-11.  So what basis does he have to claim that ACX authors would be aware of these alleged traditions?  McIlroy stated that in his "experience with authors, they are imbued with knowledge of the practices of the industry.  It's almost -- it's incredible how much they know and sometimes they don't even know it*." Id.* at 143:6-10.

Despite McIlroy's discussion about the rich "tradition" of the publishing industry and authors' "imbued" knowledge supposedly informing their understanding of "returns," he could not articulate how ACX authors supposedly understood that word.  When pressed for a definition, McIlroy would refer to his report.  Dep. Tr., 299:17-300:17; *see, e.g.*, *id.* at 300:11 ("The report … speaks for itself.").  Ultimately, when asked whether he could provide "a definition of what an author would have understood returns means in the context of their ACX contract," McIlroy responded, "[n]ot this evening."  *Id.* at 300:19-24.

---

[2] In his testimony,  McIlroy testified using the word "lore," but the transcript erroneously reflects the word "war."

After McIlroy's deposition, in Plaintiffs' Reply in Support of their Motion for Class Certification, Plaintiffs tried to move away from any definition of "returns." They instead relied on McIlroy's report for the supposed "clear standard" in the audiobook industry: "'few if any' returns are expected for digital books, and that 'it would be unreasonable to expect that an author would understand that their royalties would be net of … returns' (made up to 365 days after purchase)." ECF No. 176 at 3 (alteration in original) (quoting McIlroy Report, 13, 19).[3] But McIlroy's report does not support either of these statements.

McIlroy's statement that "few if any returns are expected" with digital goods includes quotation marks and cites to a blog post. Report, 13 (quoting Steve Laube, *Many Happy (?) Returns!*, The Steve Laube Agency, Aug. 27, 2018, https://stevelaube.com/many-happy-returns/). But the blog post is about *reserves* for physical returns of books in distribution agreements, and (notwithstanding McIlroy's use of quotation marks), *the words supposedly quoted do not actually appear in the post*. The blog post describes "reserves" as a specific amount of money "withheld from the author … to protect the publisher against paying the author for books that have been *shipped and billed to a store but may eventually be returned to the publisher*." Laube, *Many Happy (?) Returns!* (emphasis added). And, unsurprisingly, the blog post explains that "Ebooks technically do not have returns *since there is no physical inventory on a shelf to handle*." *Id.* (emphasis added). Thus, because ebooks cannot be physically returned by retailers to publishers, there is no need for a reserve: "Consequently there should never be a reserve against returns on e-books." *Id*. But the author acknowledges that *consumers* can return their ebook purchases: "*It can happen if a bunch of people return their ebook purchase*, but it would be rare if it were thousands of copies." *Id.* (emphasis added).

---

[3] The page number corresponds to the pagination at the bottom of the page of the Reply.

When asked about this blog post at his deposition, McIlroy agreed that it discussed *physical* copies of books, that there would be no need to ship back digital content, and that the author of the post acknowledges that customers *could return e-book purchases*. Dep. Tr., 154:2-156:17. In sum, McIlroy's quote that "few if any returns are expected" is ultimately unsupported—it is neither a direct quote nor is the point supported in the single source upon which McIlroy relies.

Similarly, the idea "that 'it would be unreasonable to expect that an author would understand that their royalties would be net of … returns' (made up to 365 days after purchase)" lacks a basis. *See* Pls.' Reply in Support Mot. Class Certification (ECF No. 176) at 3 (alteration in original) (quoting McIlroy Report, 19). In McIlroy's report, he reviews the terms of ACX agreements and writes that "[n]othing in these documents suggests that for up to 365 days after purchase, ACX/Audible customers would be allowed to return audiobooks that they have already listened to for a refund or exchange. In my experience it would be unreasonable to expect that an author would understand that their royalties would be net of *these* returns." Report, 19 (emphasis added).[4] Importantly, McIlroy is referring to a specific type of returns—audiobooks that customers "have already listened to," not all returns made up to 365 days after purchase—and he supports this statement about authors' expectations with nothing other than a vague reference to his "experience." *See id.*

C.    **McIlroy's Discussion Of The Impact Of Return Policies**

McIlroy's report also discusses return policies and their impact on sales. McIlroy writes, "there are enormous variations on how retailers implement and market returnability to their clientele." Report, 9. He then provides examples of return policies of other digital retailers, which

---

[4] In their Class Certification reply brief, Plaintiff's use of the ellipses to conceal the word "these" is misleading and distorts Mr. McIlory's actual testimony. He was not talking about all returns, as Plaintiffs now suggest. Rather, McIlroy acknowledged that in his opinion, authors would expect that "legitimate" returns *would* be deducted in determining net sales to calculate royalties. *See* Dep. Tr., 293:19-295:3.

he testified he found by going to the companies' websites—just as authors could have done with Audible's website over the last decade.  Dep. Tr., 147:1-13.  The policies McIlroy provides demonstrate that return policies do, in fact, vary widely.  Report, 15-18.  For example, some retailers do not accept returns, while others (such as Kobo, which sells e-books and audiobooks) say to contact the company to see if an item is eligible for a refund.  *Id.*  Audiobooks.com, meanwhile, "grants refunds at [their] sole discretion."  *Id.* at 17 (quoting Terms of Use, https://www.audiobooks.com/terms).

McIlroy also provides anecdotal evidence from two individuals at "The Bookstore Training Group" that "[c]ustomer returns policies at independent bookstore businesses differ quite dramatically from Amazon.  At the very minimum, an indie bookseller will require that the book was purchased from them within the last 30 days and is in resalable condition."  Report, 15.  McIlroy states that in his "years working as a bookseller" and in his "role on the board of directors of the People's Co-op Bookstore in Vancouver, Canada," he has not seen "a provision for a customer to return a book because they didn't enjoy it or thought it was poorly written."  *Id.* at 15.  Yet he cites the long history in retail of "satisfaction guaranteed" policies, dating back to 1875.  *Id.* at 9. And he cites return policies of online sellers, including audiobook companies, showing that their return policies varied widely.  *See id.* at 15-18.

As for the impact of return policies, McIlroy states, relying on multiple academic research papers, that "generous returns policies can drive a competitive advantage."  Report, 11.  Each of these cited studies discusses the advantages of a generous return policy.  *Id.* at 11-12.  For example, one study looks to research finding that, for return policies that allow customers "to return almost any product at any time, those customers are more willing to make other purchases."  *Id.* at 11 (citing J. Andrew Petersen and V. Kumar, *Can Product Returns Make You Money*, 51.3 MIT Sloan Mgmt. Rev. 85 (2010)).  Another paper discusses customers' "greater commitment to their order"

as a result of a generous return policy.  *Id.* at 12 (quoting Stacy L. Wood, *Remote Purchase Environments: The Influence of Return Policy Leniency on Two-Stage Decision Processes* , 38.2 J. Mktg. Rsch. 167 (2001)).  And what McIlroy describes as a "meta-analysis" of twenty-one studies concludes that "overall leniency increases purchases more than return[s]."  *Id.* (alteration in original) (quoting Narayan Janakiraman, Holly A. Syrdal, and Ryan Freling, *The Effect of Return Policy Leniency on Consumer Purchase and Return Decisions: A Meta-Analytic Review*, 92.2 J. Retailing 226 (2016)).

Yet McIlroy simultaneously asserts, without pointing to any source, that generous return policies benefit the "retailer" and not the "supplier."  Report, 11.  When asked, McIlroy admitted that he was did not recall any of the studies he reviewed assuming that the retailer passed the cost of returns to the supplier.  Dep. Tr., 122:1-6; *see also id.* at 71:3-8.  Rather, he seemed to arrive at this conclusion because there was no "mention of the supplier" in the articles.  *Id.* at 72:15-19.

With regard to Audible, McIlroy concludes that "the net impact of [its] returns policy on Audible, and on Amazon, was positive," again citing research that "overall, leniency increases purchase[s] more than return[s].'"  Report, 15 (second alteration in original) (quoting Janakiraman).  Logically, if purchases increased more than returns, net sales (and therefore ACX author royalties) would increase too.  But McIlroy irrationally concludes that Audible's return policy came "at the expense of ACX author earnings."  *Id.* at 2, 27; *see also id.* at 15.  This assertion, too, lacks any support.  McIlroy acknowledged that he did not make any calculations to determine what the impact of Audible's return policy was (positive or negative) on author earnings. Dep. Tr., 115:7-15; 117:2-8.

Nor did McIlroy consider (1) whether Audible's return policy led to increased consumer loyalty, Dep. Tr., 122:8-123:25; (2) whether the policy resulted in customers being more willing to try Audible and audiobooks in the first place, *id.* at 124:1-17; or (3) whether Audible's return

11

policy resulted in customers being more willing to try independent authors or an author they had

not heard of previously, *id.* at 126:15-127:3.  Indeed, McIlroy did not know if a customer who had

never tried an audiobook would be more willing to make a purchase if they knew they could return

that book*, id.* at 126:3-14, or whether retailers needed to take additional steps to overcome negative

impressions customers may have of audiobooks, *id.* at 182:10-16.  In other words, McIlroy simply

concluded that Audible's return policy came at the expense of ACX authors, with no basis or

methodology to back up that claim, and without considering any of the benefits to ACX authors

of a generous return policy that his own report discusses.  *See id.* at 117:2-8, 122:8-126:14, 182:10-

16.

## ARGUMENT

If there has ever been a case for a court to exercise its "gatekeeping role" under *Daubert*,

this is it.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Plaintiffs bear the

burden of satisfying *Daubert* and Federal Rule of Evidence 702's requirements, and they must

prove by a preponderance of evidence that a purported expert's evidence is reliable.  *Davis v.

Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013).  Plaintiffs cannot do so here, as McIlroy's

proffered opinions meet none of the criteria set forth by Federal Rule of Evidence 702.

*First*, McIlroy has no "specialized knowledge" that would help the trier of fact evaluate the

issues discussed in his opinions, *i.e.*, authors' "understanding" of their contracts or the financial

impact of Audible's return policy.  Fed. R. Evid. 702(a).  McIlroy is not an "author understanding"

expert, an accountant, or an economist, and he has no background or experience that would support

such opinions.  *Second*, McIlroy's opinions are unreliable.  They are not based on sufficient facts,

data, or reliable methods, Fed. R. Evid. 702(b)-(c), and McIlroy has not "reliably applied" any

"principles and methods to the facts of the case," Fed. R. Evid. 702(d).  McIlroy admitted that he

conducted no author interviews and indeed has never interviewed an ACX author, for this case or

otherwise.  Further, despite offering multiple studies showing that generous return policies lead to increased sales, McIlroy performed no analysis of ACX author earnings under the return policy, or the benefits to ACX authors of a generous return policy.  *Third*, McIlroy's purported opinions are inadmissible, irrelevant, and would confuse the issues.  The meaning of "returns" in the ACX Contract is unambiguous, and therefore McIlroy's view that Audible's return policy financially harmed authors is nothing but an improper lay opinion.  Thus, McIlroy's opinions will not help the trier of fact "understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

## I.   MR. MCILORY HAS NO EXPERTISE IN "AUTHORS' UNDERSTANDING" OR THE FINANCIAL IMPACT OF RETURN POLICES.

"Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702."  *Louis Vuitton Malletier v. Dooney & Bourke, Inc*., 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) (collecting cases).  In other words, "[a]n expert qualified in one subject matter does not thereby become an expert for all purposes."  *Id.*; *see also Davis*, 937 F. Supp. 2d at 413.  Further, where a witness relies solely on his experience and that "'expertise is too general or too deficient,' the Court 'may properly conclude that [he is] insufficiently qualified.'"  *Alto v. Sun Pharm. Indus., Inc.*, No. 1:19-CV-09758-GHW, 2021 WL 4803582, at *2 (S.D.N.Y. Oct. 13, 2021) (alteration in original) (quoting *Stagl v. Delta Air Lines, Inc*., 117 F.3d 76, 81 (2d Cir. 1997)).

McIlroy describes himself as "a consultant and analyst who has served the publishing industry since 1988."  Report, 2.  He says that he has "extensive experience working both with publishing companies and with authors, and am myself a publisher and a published author."  *Id.* at 2-3.  But McIlroy's experiences with the publishing industry do not qualify him to opine on authors' "understanding" of contracts generally, or of term "returns" specifically.  *See* Report, 2, 27.  Nor does it qualify him to assess the impact of generous return policies on authors, with regard to retail sellers in general or Audible in particular.

To start, McIlroy possesses no "specialized knowledge," *see* Fed. R. Evid. 702(a), that would allow him to state how authors—apparently as a monolith—"understand the term [returns] within their publishing contracts," Report, 9.  He has no basis to claim that authors are a uniform group, possessing a singular understanding of a term; McIlroy himself discusses "independent authors" who faced significant challenges publishing their works as audiobooks, and who presumably would have no understanding of supposed "traditions" in the publishing industry. Report, 4.  Even if McIlroy could opine on his own understanding, or even the specific authors with whom he has worked, he lacks any basis to represent the understanding of ACX authors, much less authors in their entirety.  Indeed, McIlroy admitted that he never even interviewed *any* ACX authors, for this report or otherwise.  Dep. Tr., 133:9-11.  He has no expertise or basis for his claim that authors "are imbued with knowledge of the practices of the industry" or his nonsensical claim that "it's incredible how much they know and sometimes they don't even know it." *Id.* at 143:6-10.

McIlroy is neither a medium nor a mind reader.  He plainly lacks any specialized knowledge of ACX authors' "understanding" of the term "returns" or of how return policies work. *See 523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 647 (S.D.N.Y. 2014) (striking "all portions of [the purported expert's] report touching on areas outside his field of expertise" and explaining that "the Court will not rely on those portions in coming to a decision on any summary judgment motion and [the purported expert] will not be permitted to offer such testimony at trial").

*R.F.M.A.S., Inc. v. So* is instructive.  *See* 748 F. Supp. 2d 244, 282 (S.D.N.Y. 2010).  In that trade dress case, the plaintiff hired two experts to opine on the likelihood that consumers would confuse the plaintiff's and defendants' jewelry.  *Id.* at 278, 280.  One had a background in antique and estate jewelry, while the other was a jewelry appraiser.  *Id.*  The court held that the experts' opinions on whether plaintiff's jewelry line was distinctive and identifiable by consumers

14

was inadmissible because neither expert was qualified to offer opinions on those topics.  *Id.* at 282.

Neither expert had any "specialized knowledge, training, or experience in understanding how the

public perceives jewelry, or even products, generally," nor any knowledge of contemporary

jewelry design like the designs at issue in the case.  *Id.*  Similarly, here, McIlroy is unqualified to

offer opinions on authors' beliefs because he has no specialized knowledge that would allow him

to opine on the understanding of all authors—let alone ACX authors he has never interviewed—

of the term "return."

      Separately, McIlroy lacks any specialized knowledge to support his opinion that Audible's

return policy came at the "expense of ACX author earnings."  Report, 2, 27.  As McIlroy

acknowledged, he is not an economist or an accountant.  Dep. Tr., 101:14-17.  Nor did he rely on

any form of expertise to generate his unsupported conclusion that the "cost" or "expense" of

Audible's return policy fell on authors.  Report, 2, 15, 27.  McIlroy seemingly just assumed that

"authors were incurring substantial losses in their earnings," Dep. Tr., 120:11-15, yet he also

recognized that he did not have "enough information" to conclude whether Audible's return policy

impacted all authors the same way, *id.* at 132:9-14.  In all events, McIlroy's testimony

demonstrated that he lacks *any* specialized knowledge to arrive at his conclusion.  *See Lamoureaux

v. Anazaohealth Corp.*, No. 3:03cv01382 (WIG), 2009 WL 1162875, at *5 (D. Conn. Apr. 30,

2009) (collecting cases in which proposed experts were not qualified to opine on damages because

they lacked expertise calculating damages).

## II.    THE COURT SHOULD EXCLUDE MCILROY'S OPINIONS AS UNRELIABLE.

      In fulfilling their gatekeeping role, courts must determine "whether the proffered testimony

has a sufficiently 'reliable foundation' to permit it to be considered."  *Amorgianos v. Nat'l R.R.

Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Campbell ex rel. Campbell v.

Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d. Cir. 2001)).  In this inquiry, the district

court should consider (1) whether the testimony is grounded on sufficient facts or data; (2) whether the testimony "is the product of reliable principles and methods"; and (3) whether "the witness has applied the principles and methods reliably to the facts of the case." *Id.* (quoting Fed. R. Evid. 702). "In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 265-66 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "Ultimately, 'expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison.'" *Tower 570 Co. LP v. Affiliated FM Ins. Co*., No. 20-CV-0799 (JMF), 2022 WL 1665132, at *2 (S.D.N.Y. May 25, 2022) (quoting *Boucher v. U.S. Suzuki Motor Corp*., 73 F.3d 18, 21 (2d Cir. 1996)). Here, McIlroy's opinions have no reliable foundation or methodology, and instead are based entirely on his say so.

### A. McIlroy Provides No Reliable Basis For His Opinions About ACX Authors' "Understanding" Of Returns.

With regard to his opinions on ACX authors' "understanding" of the term "returns," McIlroy lacks any method or basis from which he could derive a reliable opinion about how ACX authors understood returns. As discussed above, he never interviewed an ACX author, for his report or otherwise; nor did he conduct any sort of statistical analysis or survey that could even potentially give him insight into how authors considered their agreements. Dep. Tr., 52:13-23; 99:14-21; 133:9-11. Because they lack any reliable basis, his opinions about ACX authors' "understanding" must be excluded. *See R.F.M.A.S.*, 748 F. Supp. at 280, 283 (striking plaintiff's expert opinions that the public would be confused by competing jewelry designs because the opinions did not "rest on a sufficiently reliable methodological basis," when, inter alia, one expert

conceded "she had not consulted any vendors or consumers before reaching the conclusion that consumers were undoubtedly confused about the source of defendants' jewelry").

In fact, McIlroy could not even say what *he* believed. When pressed, he would not commit to *any* specific definition of what an author would have understood returns to mean in the context of the ACX contract. Dep. Tr., 300:24 ("Not this evening."). And to the extent Plaintiffs seek to rely on McIlroy's statement that, with digital goods, "few if any returns are expected," McIlroy "quotes" a statement that is *not* in the blog post he cites, and McIlroy admitted that post discusses reserves against returns and that customers *can* return digital purchases. Dep. Tr., 154:2-156:17. In other words, he has no foundation, much less a reliable one, for that opinion.

McIlroy's evasive position on how authors understood returns also renders any opinion he provides particularly unreliable. In his report, McIlroy states that "Wikipedia's definition of a 'product return' ***conforms to [his] general understanding of the term, and, I believe, the understanding of authors and publishers with whom I have worked***. It is neither complex nor nuanced." Report, 9 (emphasis added). This definition includes that "a product return is the process of a customer taking previously purchased merchandise back to the retailer, and in turn receiving a refund in the original form of payment, exchange for another item (identical or different), or a store credit." *Id.* McIlroy states that, whether for consumer goods or in book publishing, "the essential meaning remains the same: taking previously purchased merchandise back to a retailer for a refund, exchange or credit." McIlroy initially stood by this definition, and how it would inform ACX authors' understanding. Dep. Tr., 25:2-28:8. Only when confronted with the fact that this definition supported Audible's position did he seek to disavow it, instead referring vaguely to his report as a whole, "traditions in the publishing industry," and authors' "imbued knowledge," while ultimately never committing to any definition. *Id.* at 97:4-12; 142:8-

13; 142:21-24; 143:6-10; 226:8-16; 229:15-23.   McIlroy's shifting explanation makes any definition he provides even less reliable.

Further, McIlroy's references to the "traditions in the publishing industry" and authors' "imbued knowledge," Dep. Tr. at 142:21-24, 143:6-10, do not provide a reliable method for discerning authors' understanding of the term "returns."   McIlroy gives no explanation or basis for why he believes all authors held such an understanding, or how he can reliably conclude that such "traditions" were known by ACX authors or informed their understanding of the ACX Contract. Thus, McIlroy's opinions on authors' "understanding" of returns in the ACX Contract should be excluded for being inconsistent and unreliable.  *See R.F.M.A.S.*, 48 F. Supp. 2d at 253 ("Expert testimony that is merely 'subjective belief or unsupported speculation' should be excluded." (quoting *Daubert*, 509 U.S. at 590)).

Finally, to the extent McIlroy seeks to rely on his discussion of return policies—both his review of companies' websites and his anecdotal accounts—to describe "authors "understanding," these opinions should also be excluded as lacking any reliable methodology.  *See* Report, 27. McIlroy lists the return policies of various online booksellers, audiobook resellers, and sellers of digital products.  *See id.* at 15-18.  But his seriatim listing of companies and return policies demonstrates the wide variety in return policies: from no returns at all to returns in an audiobook retailer's "sole discretion."  *See id.* at 17.  Summarizing policies without any application of expertise is not a reliable methodology; rather, it "amounts to no methodology at all."  *Alto*, 2021 WL 4803582, at *6-7 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 502 (S.D.N.Y. 2018)) (excluding expert's opinion where he merely summarized documents without describing what the data meant in the context of his expertise).

In *Alto*, a breach of contract case, the court excluded both experts' opinions because they used the same improper methodology of simply summarizing internal emails and documents

without applying any expertise as to what the data meant. 2021 WL 4803582. at *6-9. The court explained that "'[i]n the absence of some recognizable, describable methodology beyond an appeal to [the expert's] qualifications' an opinion based on this methodology 'would be "the essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion" that is properly excluded.'" *Id.* at *7 (alterations in original) (quoting *In re LIBOR*, 299 F. Supp. 3d at 502). So too here, McIlroy's descriptions of return policies and selective anecdotal evidence provides no methodology and should be excluded.

**B.     McIlroy Provides No Reliable Basis For His Opinion On The Impact of Audible's Return Policy On ACX Authors.**

McIlroy's opinion that Audible's return policy came at the "expense of ACX author earnings" (Report, 2, 15, 27) is equally unreliable. To start, McIlroy did not conduct *any* calculation of what the impact of Audible's return policy was on ACX authors, so he lacked any basis to say that ACX author earnings were harmed. *See* Dep. Tr., 115:7-15; 117:2-8. Indeed, the ACX data produced in this litigation (which he apparently did not consider) show that from 2015 to 2020, ACX royalties per-rights holder *increased*. ECF No. 164-26 (2015-2021 financial data); ECF No. 170-46 (Scott Bartel Decl. ¶ 11). Further, even though the academic studies McIlroy discussed explained the *benefits* of generous return policies in increasing overall sales, he somehow concluded this did not apply to suppliers. Dep. Tr., 72:15-19. Nor did McIlroy consider the many ways a generous return policy could benefit ACX authors, including through increased customer loyalty, increased customer willingness to try new authors or audiobooks in general, and increased net sales. Dep. Tr., 122:8-123:25, 124:1-17, 126:15-127:3,182:10-16.

McIlroy's opinion that Audible's return policies came at authors' "expense" is therefore "classic *ipse dixit*." For example, in *Tower 570 Company*, the Court granted the defendant's motion to exclude the plaintiff's expert testimony when the expert's initial report provided

"virtually no analysis on the relevant question," the rebuttal report relied on a YouTube video—that did not in fact support the expert's claims—and the expert could provide no evidence or principle upon which his opinion was based.  2022 WL 1665132, at *3; *see also id.* at *4 ("Nor do the other 'indicia of scientific reliability' support McBride's opinion that the incident here was a combustion explosion." (quoting *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016)).  The Court concluded that "[a]t bottom, the critical step" in the expert's reasoning was "based on nothing more than [his] *ipse dixit*."  *Id.* at *4.

The same reasoning applies here.  McIlroy provides no analysis or basis for his opinion, and he does not even consider the evidence and considerations that go directly against his opinions.  *See E.E.O.C. v. Bloomberg L.P.*, No. 07 Civ. 8383(LAP), 2010 WL 3466370, at *17 (S.D.N.Y. Aug. 31, 2010) ("To ignore contradictory testimony in order to arrive at a desired conclusion highlights the unreliability of [an expert's] methodology.").  The Court should therefore exclude McIlroy's speculative and entirely unsupported conclusion.

## III.   MCILROY'S OPINIONS ARE IRRELEVANT, USURP THE COURT'S ROLE, AND WILL CAUSE CONFUSION.

The Federal Rules of Evidence, and in particular Rule 702, assign to the trial judge the task of ensuring that an expert's testimony not only rests on a reliable foundation, but is also "relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  "Weighing whether the expert testimony assists the trier of fact goes primarily to relevance."  *Alto*, 2021 WL 4803582, at *3 (quoting *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014)).  "Expert testimony is not helpful if it 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'"  *Id.* (alteration in original) (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).  Further, "[i]n addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (quoting Fed. R. Evid. 403). Rule 403 plays a "uniquely important role" because of the "unique weight" expert evidence may have in jury deliberations. *Id.* (collecting cases).

As an initial matter, McIlroy's opinions about authors' understanding of returns should be excluded because they are entirely irrelevant and unnecessary to this litigation. "Plaintiffs admit that, prior to October 2020, [they were] aware that Audible's adhesion contracts with authors uniformly defined 'net sales' as being net of 'returns.'" Ex. 3 (Pls.' Resp. to Req. Admis. No. 9); *see also* Compl. ¶¶ 20, 43. And the term "return" is unambiguous and "can fairly be cleaned from the face of the" agreement. *See InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 553-54 (S.D.N.Y. 2021) ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument." (collecting cases)); *see* Audible's Mem. Supp. Summ. J. at pp. 8-9. As Ms. Barr testified about her routine conversations with ACX authors, "no one has specifically said, Can you define what a return is for me, because that's -- people know what that is, you know." Ex. 8 (C. Barr. Dep. Tr.), 28:10-29:4, 29:20- 32:1, 135:1-4, 197:7-10; Ex. 9 (C. Barr. Dep. Ex. 1150). And, as McIlroy himself concedes, the term "returns" is "neither complex nor nuanced." Report, 9. Accordingly, McIlroy's opinions about authors' understanding of "returns" is inadmissible, extrinsic evidence. *See InspiRx*, 554 F. Supp. 3d at 553-54. Moreover, to the extent Plaintiffs hope to rely on McIlroy to suggest that the term "returns" is ambiguous, that would invade the province of the court. *See Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir. 1994) ("The question of whether a contract is clear or ambiguous is to be decided by the court as a matter of law.").

Further, even if McIlroy's opinions had any probative value, they should be excluded under Federal Rule of Evidence 403 because they would confuse the issues and mislead the jury.

McIlroy's ultimate refusal to point to a specific definition of returns ("Not this evening," Dep. Tr., 300:24) is likely to confuse the issues, leaving the trier of fact to guess how "traditions in the book publishing industry" informed authors' understanding, and what that understanding supposedly was.  Dep. Tr., 142:21-24; *see Louis Vuitton*, 525 F. Supp. 2d at 580 ("The Court in *Daubert* emphasized that expert testimony 'can be both powerful and quite misleading because of the difficulty of evaluating it.'" (citing *Daubert*, 509 U.S. at 595)).

McIlroy's discussion of return policies would only further confuse the issues.  At one point in his deposition, McIlroy stated that his discussion of return policies is "not meant to aid in the definitional understanding."  Dep. Tr., 231:14-232:7.  But soon after, McIlroy claimed that the "returns" that "authors are responsible for" are the "ones that [he] described in the report such as one would encounter in a retail bookstore."  *Id.* at 239:3-17.  He further claimed that retail bookstore return policies would somehow inform authors' understanding of their contracts with Audible.  *Id.* at 239:20-21 ("That would start to inform their understanding and what would be expected."); Report, 27 ("I have examined the returns policies that are traditional in the book publishing industry, which would have informed authors' understanding of the use of the term "returns" in a publishing contract.").  In all events, McIlroy's discussion of return *policies* does not bear on a *definition* of returns.  *See Tower 570 Co.*, 2022 WL 1665132, at *2 (court should exclude testimony that is "in essence an apples and oranges comparison" (quoting *Boucher*, 73 F.3d at 21)).

Finally, McIlroy's assertions about the impact of Audible's return policy on ACX authors will also confuse the issues and mislead the jury.  Unsupported "expert" say-so about the supposedly negative impact of Audible's return policies has no probative value.  Such misleading and confusing opinions should be excluded.  *See, e.g.*, *R.F.M.A.S.*, 748 F. Supp. 2d at 269 (excluding plaintiff's experts' testimony on causation because they did not "explain[] their

assumptions with the level of specificity necessary to allow defendants' counsel and the jury to test their conclusions").

## **CONCLUSION**

For these reasons, Audible respectfully requests that the Court exclude the opinions and testimony of Thad McIlroy under the Federal Rules of Evidence and *Daubert*.

Dated:   March 6, 2023

Respectfully submitted,

FENWICK & WEST LLP

By: */s/ Jedediah Wakefield*
        Jedediah Wakefield

Kathryn J. Fritz (NYC Bar No. 2078483)
kfritz@fenwick.com
Jedediah Wakefield (admitted *pro hac vice*)
jwakefield@fenwick.com
Nicholas A. Santos  (admitted *pro hac vice*)
nsantos@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

Brian D. Buckley (admitted pro hac vice)
bbuckley@fenwick.com
Deena J.G. Feit (admitted pro hac vice)
dfeit@fenwick.com
Wenbo Zhang (NYC Bar No. 5623186)
wzhang@fenwick.com
FENWICK & WEST LLP
1191 Second Avenue, 10th floor
Seattle, WA 98101
Telephone: 206.389.4510

Diana Buck (admitted pro hac vice)
dbuck@fenwick.com
John M. DiBaise (admitted pro hac vice)
mdibaise@fenwick.com

FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500

Attorneys for Defendant Audible, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record are being served with a copy of this document via CM/ECF per Local Rule CV-5 on March 6, 2023.

*/s/ Jedediah Wakefield*
Jedediah Wakefield