**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GOLDEN UNICORN ENTERPRISES, INC. and
BIG DOG BOOKS, LLC, *on behalf of*
*themselves and all those similarly situated*,

                    Plaintiffs,

        v.

AUDIBLE, INC.,

                   Defendant.

Case No.  1:21-cv-07059-JMF

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANT AUDIBLE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO EXCLUDE TESTIMONY OF JOSEPH EGAN**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.    The ACX Contract and Plaintiffs' Claims ...............................................2

    II.    Egan's Opinions ...........................................................................................5

        A.    Egan's Assumptions.............................................................................5

        B.    Egan's Methodology ..........................................................................8

ARGUMENT .......................................................................................................................10

    I.    Egan's Opinions Will Not Assist The Trier Of Fact.............................11

        A.    Egan's Opinions Do Not Align With Plaintiffs' Liability Theory. ..........11

        B.    Egan Performs No Analysis That Requires Specialized Expertise............13

    II.    Egan's Methods Are Unreliable.................................................................14

    III.    Egan's Opinions Are Unfairly Prejudicial. ............................................17

CONCLUSION....................................................................................................................18

# TABLE OF AUTHORITIES

**CASES**                                                                                                     **PAGE(S)**

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013).................................................................................................................12, 13

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)............................................................................................... *passim*

*E.E.O.C. v. Bloomberg*,
   No. 07-cv-8383(LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) ...................................15

*Edmondson v. RCI Hosp. Holdings, Inc.*,
   No. 16-CV-2242 (VEC), 2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) ...............................13

*Faulkner v. Arista Recs. LLC*,
   46 F. Supp. 3d 365 (S.D.N.Y. 2014).................................................................................13, 16

*FFP, LLC v. Xaxis US, LLC*,
   No. 14 CV 6172-LTS-AJP, 2017 WL 11456572 (S.D.N.Y. Feb. 13, 2017)..........................14

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   No. 12 CIV. 7372 (AT), 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020)................................12

*In re Elysium Health-ChromaDex Litigation*,
   No. 17-CV-7394 (LJL), 2022 WL 421135 (S.D.N.Y. Feb. 11, 2022)....................................18

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
   77 F. Supp. 2d 446 (S.D.N.Y. 1999)..................................................................................16

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)............................................................................................................15

*Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*,
   No. 3:09-CV-1546 (MRK), 2010 WL 2978289 (D. Conn. Apr. 9, 2010)..............................14

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)................................................................................................17

*Price v. L'Oreal USA, Inc.*,
   No. 17-cv-614 (LGS), 2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021) ...................................12

*Schwartz v. Fortune Mag.*,
   193 F.R.D. 144 (S.D.N.Y. 2000) .........................................................................................14

*Tower 570 Co. LP v. Affiliated FM Ins. Co.*,
   No. 20-CV-0799 (JMF), 2022 WL 1665132 (S.D.N.Y. May 25, 2022) ..........................11, 15

# TABLE OF AUTHORITIES
## (CONTINUED)

**CASES**                                                                **PAGE(S)**

*United States v. Castillo,*
   924 F.2d 1227 (2d Cir. 1991)..................................................................................13

*United States v. Tuzman,*
   No. 15 CR. 536 (PGG), 2017 WL 6527261 (S.D.N.Y. Dec. 18, 2017) ..................................17

*United States v. Williams,*
   506 F.3d 151 (2d Cir. 2007)...................................................................................11

**OTHER AUTHORITIES**

Fed. R. Evid. 403 ..............................................................................................11, 17

Fed. R. Evid. 702 ..........................................................................................11, 13, 15

## **<u>INTRODUCTION</u>**

This is a contract case where Plaintiffs claim that Audible breached the standard ACX Audiobook License and Distribution Agreement (the "Contract") by not paying Plaintiffs royalties on their audiobooks that were returned by Audible listeners.  But, from the day they filed their Complaint, Plaintiffs never claimed that they should earn a royalty on *every* returned audiobook. The way Plaintiffs have articulated their theory has changed over time, but they have always acknowledged that some returns are "legitimate."  Both the Complaint and Plaintiffs' discovery responses contend that "returns"—which the Contract expressly states will be deducted from net sales before Audible calculates royalties—should not encompass "exchanges."  And throughout the discovery process, Plaintiffs stated that they would ultimately advance a damages theory based on the "illegitimate netting out of exchanges."  But when the fact-discovery period closed, Plaintiffs still had not disclosed any calculation of their damages (as required by the rules).

Following fact discovery, Plaintiffs submitted the putative expert report of Joseph Egan. Egan—in his report and later in his deposition—acknowledges and adopts Plaintiffs' allegations and theories.  He acknowledges that, under those theories, some returns are legitimate.  He admits that certain audiobook returns (*e.g.*, returns due to technical defects or user dissatisfaction) should be deducted from net sales under the Contract and should not earn a royalty.  Yet, despite all that, Egan then posits that Plaintiffs' damages are simply the sum of the royalties associated with *all* of their returned titles over the six-year period preceding this lawsuit.  He makes no adjustments, even for returns that, by his own admission, would not bear royalties under the Contract.

The Court should exercise its "gatekeeping role" under *Daubert* and exclude Egan's irrelevant, unreliable, and prejudicial opinions.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  <u>First</u>, Egan's opinions cannot help the trier of fact.  That is true, first and foremost, because his opinions are unrelated to Plaintiffs' damages theory, which recognizes some

1

returns as legitimate.  It is axiomatic that an expert cannot proffer views untethered to the facts of the case.  Beyond that, even if his opinions aligned with Plaintiffs' claims, Egan performed no analysis at all; he literally added up the numbers in a single column on two spreadsheets produced by Audible, using Excel's standard summation function.  Courts routinely preclude experts from performing simple arithmetic, which is well within the capabilities of reasonable jurors.

Second, Mr. Egan's methods are unreliable.  He failed to consider facts and evidence— *including Plaintiffs' own testimony*—that directly contradict his views.  As such, his calculations of Plaintiffs' damages are undeniably over-inclusive and speculative.  And Egan did not offer *any* calculation of class-wide damages, claiming he lacked the necessary data; but Egan did almost nothing to confirm whether he had the right data, and he did literally nothing to request or obtain additional data.  Of course, it is now too late.  Contrary to Egan's misguided assumption, discovery is over, and he cannot perform additional work at this late stage.

Third, Egan's opinions are highly prejudicial.  Audible does not question Egan's pedigree or basic qualifications; he is an economist with a long career.  But that is precisely why he cannot testify to a jury.  Allowing an otherwise qualified expert to present unscientific and unreliable arguments gives those arguments an expert "imprimatur" that they do not deserve, and it confuses jurors who traditionally have difficulty parsing and weighing expert testimony.  Federal Rule of Evidence 403 does not permit that risk of confusion and prejudice.  For all these reasons, the Court should exclude Egan's opinions and testimony in their entirety.

## **BACKGROUND**

## I.   THE ACX CONTRACT AND PLAINTIFFS' CLAIMS

Plaintiffs claim that Audible breached the Contract, including the implied covenant of good faith and fair dealing, by maintaining "a secret system of accounting" where Audible supposedly underpaid ACX authors by netting out "exchanges" (which Plaintiffs never define) from authors'

royalties.   Compl. ¶¶ 2, 44-45, 71.   Critically, there is no dispute that the Contract expressly provides that royalties are paid *net of returns*, and Plaintiffs were both well aware of that provision for years before they commenced this lawsuit.   Their Complaint repeatedly alleges that royalties are paid on net sales, which are net of returns.   *See, e.g., id.* ¶¶ 20, 43.   Plaintiffs also admitted as much in response to Audible's requests for admission.   Ex. 3 (Pls.' Resp. Audible's Req. Admission ("RFA") No. 5) ("Plaintiffs admit that, prior to October 2020, [they were] aware that Audible's adhesion contracts with authors uniformly defined 'net sales' as being net of 'returns.'"); Decl. Brian D. Buckley ("Buckley Decl.") ¶ 4.   In their motion for class certification, Plaintiffs explained that royalties are paid on "net sales receipts," *i.e.*, "less any … returns" and that "Plaintiffs have consistently acknowledged that the contract allows 'returns.'"   ECF No. 132 at 5 (Mem. Supp. Class Certification); ECF No. 176 at 5 (Reply Supp. Class Certification).

Given these concessions, Plaintiffs' breach-of-contract theory hinges on the notion that the term "return" has a "typically understood" meaning "in the context of consumer goods," and that Audible somehow acted inconsistently with that meaning.   *See* Compl. ¶ 44.   Plaintiffs allege that "return" is "typically understood to mean that a product is returned for a refund because the product was defective or the buyer was otherwise dissatisfied.   The term does not encompass an exchange and is especially inappropriate where a customer exchanges a product after receiving any appreciable benefit from it."   *Id.*   Aligned with that (legally flawed) theory, Plaintiffs' initial disclosures stated that their eventual damages computation would be based on "the respective numbers of exchanges that Audible allowed" on Plaintiffs' audiobooks pursuant to Audible's return policy.   Ex. 4 (Pls.' Initial Disclosures), 4; Buckley Decl. ¶ 5.   Then, in their interrogatory responses, Plaintiffs described their "central contention in this lawsuit" as Audible paying "them royalties using contractually agreed percentages applied to sales amounts that had been reduced to

reflect ***illegitimate netting out of exchanges***."  Exs. 5-6 (Pls.' Resps. Audible's Interrog. Nos. 3, 6, 7) (emphasis added); Buckley Decl. ¶¶ 6, 7.

Discovery revealed that both Plaintiffs understood that they would be paid net of returns, but they had varying (and inconsistent) definitions of what constitutes a "legitimate return."  Jan Bonthu, Golden Unicorn's owner and President, testified that "return" means "a return of the product" in exchange for "[e]ither money or credit in the Audible situation."  Ex. 7 (J. Bonthu Dep. Tr.), 89:9-91:17; Buckley Decl. ¶ 8.  She believes that "legitimate" returns are only for "defective" products.  *Id.* at 127:18-129:7.  Meanwhile, Elizabeth Noble, owner and manager of Big Dog Books, believes that a return is "legitimate" if it is based on a mistaken purchase, the book is defective, the user does not like the narrator, or the user "listen[s] to the first chapter and it's not their cup of tea."  Ex. 8 (Noble Dep. Tr.), 104:11-107:12; Buckley Decl. ¶ 9.  Like Ms. Bonthu, Ms. Noble understood that she was "not going to be paid royalties on returns."  *Id.* at 104:1-4, 71:1-22, 73:13-17.  Furthermore, when entering into the ACX Contract in 2014, Ms. Noble specifically asked ACX Client Support to "define what NET means for me so I make sure I understand."  Ex. 9 (2014 ACX Support Email), 2; Buckley Decl. ¶ 10.  Audible responded that net sales is "the balance of gross sales remaining ***after deducting*** trade discounts, ***returned sales***, and sales allowances."  *Id.* at 1 (emphases added).

During expert discovery, Plaintiffs submitted a report from purported industry expert Thad McIlroy.  McIlroy claims "that authors reasonably believed that the use of the term 'returns' in their contracts with ACX/Audible was consistent with the ordinary use of the term in the context of consumer goods and in the publishing industry."  Ex. 10 (McIlroy Report), 2, 27; Buckley Decl. ¶ 11.  McIlroy provides a definition of "digital product return" that includes "the process of a customer returning previously purchased digital content back to the retailer, and in turn receiving a refund in the original form of payment, ***exchange for another item***, or a store credit."  *Id.* at 9

(emphasis added).  McIlroy's report also reviewed studies discussing the benefits of generous returns policies, including the fact that "leniency increases purchase [sic] more than return[s]."[1] *Id.* at 11-12 (alteration in original) (quoting Narayan Janakiraman, Holly A. Syrdal, and Ryan Freling, *The Effect of Return Policy Leniency on Consumer Purchase and Return Decisions: A Meta-Analytic Review*, 92.2 J. Retailing 226 (2016)).

## II.   EGAN'S OPINIONS

Egan's proffered opinions are set out in the Expert Report of Joseph J. Egan, dated December 15, 2022.  *See* Ex. 1 (Report); Buckley Decl. ¶ 2.  On January 24, 2023, Audible deposed Egan.  Ex. 2 (Dep. Tr.); Buckley Decl. ¶ 3.

### A.   Egan's Assumptions

Egan's report relies on the Complaint's allegations, assumes liability, and assumes that Audible's alleged conduct caused Plaintiffs' harm.  *See* Report ¶¶ 16-23; Dep. Tr., 31:9-15, 31:22-32:11, 46:2-23.  He quotes the Complaint's acknowledgment that Audible's "Contract with each Author provides that royalty payments are to be calculated after 'returns' and certain other items are netted out."  Report ¶ 19 (quoting Compl. ¶ 43).  Regarding "returns," Egan again relies on the Complaint and states that he "understand[s] the Contract and other contractual documents incorporated into it by reference do not explicitly define the term 'returns', but the term 'return' in the context of consumer goods is typically understood to mean that a product is returned for a refund because the product was defective or the buyer was otherwise dissatisfied."  *Id.* ¶ 20 (citing Compl. ¶ 44).  Further, Egan "understand[s] the term 'return' does not encompass an exchange including where a customer exchanges a product after receiving [a] benefit from it."  *Id.* (citing

---

[1] Audible is concurrently moving to exclude McIlroy's opinions and testimony on multiple grounds, including because he has no basis to speculate on unnamed authors' "understandings" of the ACX Contract or "returns," and no basis to opine that Audible's returns policy harmed authors generally or Plaintiffs specifically.

Compl. ¶ 44).   He testified that his understanding of the term "return" came from Plaintiffs' Complaint.  *See* Dep. Tr., 68:17-69:3.  To inform his opinions, Egan reviewed parts of the ACX Contract but not all of it.  *Id.* at 56:11-57:5.

At his deposition, Egan refused to provide an "opinion" regarding the definition of "return" or "exchange."  But he testified that "if someone made the conclusion that there is a viable return, then I guess there is a scenario where that first author wouldn't -- wouldn't get a royalty."  Dep. Tr., 82:17-20.  In other words, Egan agreed with Plaintiffs and McIlroy that for legitimate, or "viable," returns, authors would not be due a royalty.  *Id.* at 79:12-15, 82:17-20, 84:3-6, 87:19-88:12.  Egan also claimed to have "no idea" what constitutes a "viable return," but he agreed that "[i]f it's determined that" a defective audiobook "is a return that is allowed and no royalty should be paid, if that determination is made, then, no, a royalty wouldn't be paid."  *Id.* at 82:22-83:17. Importantly, he also agreed that, under the definition of "return" in the Complaint, a return because the book was defective, or because the listener was "otherwise dissatisfied," would *not* earn a royalty under the terms of the Contract.  *Id.* at 70:25-71:20.

Yet, despite acknowledging that not every return is due a royalty, Egan assumed that Plaintiffs' damages would include *all* returns "deducted" by Audible, no matter the reason.  Dep. Tr., 62:22-63:8, 114:3-11; *see also id.* at 140:5-7 ("Q. You didn't exclude any returns or exchanges based on the reason for them.  A. That's correct.").  He said that he would not exclude any returns or exchanges from his calculation "unless the court made some other decision that they need to be excluded."  *Id.* at 133:13-18.  Moreover, notwithstanding Plaintiffs' distinction between returns and exchanges, and their contention that a return does not "encompass an exchange," Egan did not distinguish between the two.  He used "return" and "exchange" "interchangeably."  *See id.* at 92:2-20, 114:12-17.  Egan reviewed portions of Mr. McIlroy's report, but not all of it because it "wasn't relevant" or "needed for purposes of [his] report."  *Id.* at 72:21-25, 86:3-7.  He did review

McIlroy's definitions of "product return" and return "of a digital product" (which, as noted above, includes an "exchange for another item").  *Id*. at 86:3-88:4.  But McIlroy's definition of return apparently did not factor into Egan's opinions or analysis.  *Id*. at 88:5-21.

Egan was under the misimpression, at the times of both his report and deposition, "that discovery is ongoing" in this case.  Report ¶ 25; Dep. Tr., 47:13-49:17, 105:22-106:15, 107:22-109:18.  In fact, fact discovery closed on November 29, 2022.  *See* ECF No. 62.  Egan testified that his "understanding" was that "Audible has not produced all the data that was deemed necessary to calculate the aggregate damages.  They have provided a subset of data that would be necessary."  Dep. Tr., 42:4-10.  While Egan did not *believe* he had the necessary data, he did not try to clarify what data he had been provided, and he did not request any additional data.  *See id.* at 147:11-148:21 (he did not ask if the Audible spreadsheets included data for authors worldwide); 148:14-15 (he did not ask Plaintiffs' counsel for clarification because "they didn't prepare the spreadsheets"); 165:23-167:2 (he did not ask if the Audible spreadsheets included data for narrators or producers); 174:2-175:1 (he did not ask if the Audible spreadsheets included data for royalty earners who do not accept returns); 174:10-13 (he did not ask Audible because he "did not have access to any Audible witnesses or employees").  In other words, Egan strategically *assumed* he had limited data, presumably so he might do additional analysis later.

Egan reviewed the deposition transcripts of six Audible witnesses.  Report, Attach. B.  But, surprisingly, he did not review Plaintiffs' deposition testimony because he "didn't believe it was necessary."  Dep. Tr., 54:3-22.  Egan also did not "recall" asking whether anything in Plaintiffs' testimony contradicted his opinions.  *Id*. at 54:24-55:23.  As a result, he was conveniently unburdened with the knowledge that—*contrary to Egan's opinions*—Plaintiffs themselves do not contend that they are owed royalties on every return.

Finally, despite claiming that he was engaged "on behalf of the class" (Report ¶ 6; Dep. Tr., 38:1-12), Egan did not understand what proposed class he supposedly represents. He acknowledged that the Complaint defines the class to include "[a]ll persons who entered into the Contract." Report ¶ 23; Dep Tr., 94:21-23, 95:5-10. But his report inexplicably assumes that the class includes only "U.S. Authors," which he testifies means authors who live in the U.S. or are U.S. citizens. Report ¶ 24; Dep. Tr., 105:1-21. When pressed on why he believed that was the proposed class, he said that his understanding was based on "discussions with counsel." Dep. Tr., 105:17-21. And, again surprisingly, Egan testified that he had not reviewed Plaintiffs' class certification motion. *Id.* at 181:13-23. As a result, his opinions do not line up with the class Plaintiffs have asked the Court to certify.

## B.     Egan's Methodology

Egan opines that "one can use common methods and formulas to calculate class-wide aggregate damages." Report ¶ 25. He proposes two so-called "proper methods." *Id.* ¶ 26. Egan believes that both methods could be used to calculate damages for Plaintiffs' breach of contract and implied-covenant claims. Dep. Tr., 177:13-178:3. And, notably, he makes no distinction between those claims; in other words, Egan offers one unified damages theory that applies to both of Plaintiffs' surviving claims. *Id.*; *see also* Report ¶¶ 35-57.

In his first method, Egan proposes adding up all the "royalty amount[s] deducted" for all returns of Plaintiffs' titles during the proposed class period. Report ¶ 36. That merely requires summing the royalty amounts in a single column in two Excel spreadsheets produced by Audible, one for Golden Unicorn and one for Big Dog Books. *Id.* ¶¶ 35-46; Dep. Tr., 113:1-116:17, 135:6-136:4. To give his first "method" the appearance of analytical rigor, Egan broke it out into several unnecessary steps. His report suggests (1) taking the aggregate royalty figures for each author,

(2) sorting them by author[2] and year, and then (3) adding them together again. Egan acknowledged that the output of those machinations is the same number directly available from Audible's spreadsheet, and that he was just trying to illustrate how those numbers were derived. Dep. Tr., 124:11-125:8. In fact, to perform Step Three of his method, Egan testified that he simply used the "the Excel function to add a bunch of rows together." *Id*. at 135:6-136:4 ("I used Excel to total them."). To arrive at class-wide damages, Egan's first "proper method" would involve (4) performing the three unnecessary steps above for each author, and then (5) adding all those numbers up. Report ¶ 45.

Egan's second "alternative" "method" merely uses the aggregate data provided by Audible "for sales and royalties for class members' Works at the aggregate level." Report ¶ 47. In other words, Egan's second method drops the pretense of any analytical rigor and simply "uses" the aggregate royalties deducted for all returned titles during the proposed class period. *Id.* Again, that is a task that can be performed using the standard summation function in Excel.

Despite the fact that his damages "methods" require no analysis or calculations at all, Egan conspicuously *does not provide a class-wide damages figure*. He tried to explain that complete failure by claiming that he lacked necessary data. Egan's Report suggests that if certain authors or publishers do not accept returns, he could "exclude[]" those entities from his class-wide calculations because Audible "can determine the amount of royalties that were paid" to those entities. Report ¶¶ 56-57. But Egan made no effort to determine if the data Audible produced included those entities. Dep Tr., 174:2-8. Based on his false understanding that Plaintiffs' proposed class is limited to "U.S. authors," Egan stated that he would need to exclude "global" (*i.e.*, non-U.S.) royalty data and data for non-author rightsholders (*e.g.*, narrators and producers).

---

[2]  At his deposition, Egan admitted that sorting by author in Step Two is unnecessary because the aggregate data in his Step One is author-specific. Dep. Tr., 115:9-20.

Report ¶¶ 50-51, 54-55; Dep. Tr., 146:2-147:10, 168:2-15, 172:18-173:7.  According to Egan, if "Audible were to produce such a file, class-wide damages could be calculated by summing the royalty amounts identified as returns at issue for the class period."  Report ¶ 51.  But, other than looking at the spreadsheets themselves and some deposition transcripts, Egan made no effort to confirm whether the data Audible produced included, and could be sorted for, U.S.-author-specific data.  Dep. Tr., 147:11-151:16  In fact, Egan did not even bother to ask Plaintiffs' counsel if they knew, understood, or could find out what Audible's data reflects.  *Id.* at 151:1-10.[3]  Egan's tactics are transparent: he remained willfully ignorant of the data available to him—and intentionally did not request basic clarification or any additional data—presumably because he hopes to perform some class-wide analysis or calculation later.

Critically, *to this day*, Plaintiffs have *never* informed Audible that it did not produce data necessary for Plaintiffs' damages calculations.  If they believed that Audible's discovery responses were somehow deficient, and particularly if they thought they lacked key data for their expert's work, Plaintiffs had an obligation to raise that *during the discovery period*, meet and confer with Audible on the issue, and seek the Court's intervention if necessary.  The fact that Plaintiffs took none of those steps is telling because the parties engaged in extensive discovery discussions over many months and multiple rounds of discovery motions with the Court.  It is far too late now for Plaintiffs to suggest through their expert that any relevant data is missing.  It is also far too late for Egan to perform any analysis he failed to perform in a diligent, timely way.

## **ARGUMENT**

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v.*

---

[3]  That failure is particularly telling because Egan repeatedly testified that key parts of his assumptions and opinions are based on "discussions with counsel."  Dep. Tr., 105:8-21, 109:7-18, 145:2-13, 168:2-18, 169:9-14.

*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  "The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of the particular case at issue."  *Tower 570 Co. LP v. Affiliated FM Ins. C*o., No. 20-CV-0799 (JMF), 2022 WL 1665132, at *2 (S.D.N.Y. May 25, 2022) (quoting *In re Gen. Motors LLC Ignition Switch Litig*., No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016)).  Relevant evidence may nevertheless be excluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  *See Daubert*, 509 U.S. at 595 (quoting Fed. R. Civ. P. 403).  The burden is on the *proponent* of expert testimony to show, by a "preponderance of proof," that the expert satisfies *Daubert*'s admissibility requirements.  *See id*. at 592 n.10; *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

As addressed below, the Court should exclude Egan's opinions in their entirety.  His views will not assist the trier of fact and are not based on any reliable methodology.  Even if they had some reasonable basis, Egan's opinions will confuse the jury and prejudice Audible because they are weak, unscientific arguments dressed up as "expert testimony."

## I.      EGAN'S OPINIONS WILL NOT ASSIST THE TRIER OF FACT.

Egan's opinions will not assist the trier of fact for two independent reasons: (1) his damages methodology does not align with Plaintiffs' theory of liability; and (2) he performed no analysis that requires specialized expertise.

### A.      Egan's Opinions Do Not Align With Plaintiffs' Liability Theory.

An expert's opinion must be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute."  *Dauber*t, 509 U.S. at 591 (citations omitted).  Specifically, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Id.* at 591-92.  This requirement has been described "as one of 'fit.'"  *Id.* at 591.  As the Supreme Court explained, absent some credible link,

"evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night." *Id.* at 591. With regard to damages, "a model purporting to serve as evidence of damages … ***must measure only those damages attributable to that theory***." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (emphasis added); *accord Price v. L'Oreal USA, Inc.*, No. 17-cv-614 (LGS), 2021 WL 4459115, at *4 (S.D.N.Y. Sept. 29, 2021) (decertifying class "because Plaintiffs have not provided a means of calculating class-wide damages consistent with Plaintiffs' alleged injury").[4]  "The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast*, 569 U.S. at 38 (quoting Fed. Jud. Ctr., Reference Manual on Sci. Evidence 432 (3d ed. 2011)).

Egan's opinions are completely untethered to Plaintiffs' theory of liability. *See Comcast*, 569 U.S. at 36 (*rejecting* the idea that "*any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be"); *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12 CIV. 7372 (AT), 2020 WL 4251229, at *8 (S.D.N.Y. Feb. 19, 2020) (excluding expert testimony on hypothetical losses when the relevant question was "actual pecuniary loss").  There is no dispute (and Egan admits) that, under the Contract, royalties are only paid on sales net of returns; therefore, at least some returns must be legitimate (or "viable," to use Egan's word).  And Plaintiffs have never suggested otherwise; every iteration of their theory has recognized that some returns should *not* earn a royalty.  But Egan's opinion is that the "proper" measure of Plaintiffs' damages is *all* of the royalties that would have been paid on *all* of Plaintiffs' returned titles, without exception.  That opinion is not only unrelated to, but totally inconsistent with, Plaintiffs' liability theory.  As such, that opinion must be excluded.  *See Comcast*, 569 U.S.

---

[4]  These should be familiar concepts for Plaintiffs because the plaintiffs in *Price v. L'Oreal* were also represented by the Milberg Coleman Bryson Phillips Grossman firm.  2021 WL 4459115, *1.

at 37 (plaintiffs cannot satisfy their evidentiary burden by presenting "a methodology that identifies damages that are not the result of the wrong").

**B.      Egan Performs No Analysis That Requires Specialized Expertise.**

"[E]xpert testimony is not helpful if it simply addresses 'lay matters which a jury is capable of understanding and deciding without the expert's help.'" *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014) (quoting *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001)).   The Advisory Notes to Rule 702 explain that "[t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Castillo*, 924 F.2d 1227, 1232-33 (2d Cir. 1991) (alteration in original) (quoting Fed. R. Evid. 702 advisory committee's note).   In other words, a proposed expert's opinions must be excluded when a jury is "entirely capable of understanding the evidence before it and determining the facts in issue without [the expert]'s assistance." *Id.* at 1233.

Egan performs no analysis that the trier of fact would be incapable of performing without his help.  Indeed, his opinions involve no analysis at all.  Egan merely identifies royalty figures in one column of two spreadsheets produced by Audible and adds them up.  *See* Report ¶¶ 35-52.  And he did not even perform that arithmetic himself; he simply used Excel.  Dep. Tr., 135:6-136:4.  Even if Egan's view of the proper measure of damages were viable, the jury could simply be given the Audible spreadsheets.  This is precisely the sort of gratuitous, unhelpful expert testimony that courts regularly exclude.  *See, e.g.*, *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452, at *6 (S.D.N.Y. Mar. 30, 2020) (expert testimony excluded because expert's calculation of averages, "a basic mathematical calculation taught in grade school … is one that the jury could reach with their own 'common knowledge and common sense'") (quoting

13

4 Weinstein's Fed. Evid. § 702.03 (2019)); *Schwartz v. Fortune Mag.*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (accounting expert's testimony properly excluded when it "merely consisted of calculating the commissions plaintiff would have earned" because "this testimony was not generated based on any specialized knowledge, but rather involved basic calculations").  As one court aptly put it when excluding an expert's testimony: "Mr. Koliani's task was a narrow one: add up the numbers Plaintiff's counsel told him to add up, apply the interest rate that Plaintiff's counsel told him to apply, and ignore virtually everything else.  There is nothing that Mr. Koliani was asked to do that a jury of laypeople could not do equally well.  In fact, a jury would probably do a *better* job, as it would at least apply a dose of skepticism to what the attorneys tell it." *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, No. 3:09-CV-1546 (MRK), 2010 WL 2978289, at *5 (D. Conn. Apr. 9, 2010).

*FFP, LLC v. Xaxis US, LLC*, No. 14 CV 6172-LTS-AJP, 2017 WL 11456572 (S.D.N.Y. Feb. 13, 2017), is instructive.  There, the plaintiff proffered an expert report purporting to calculate damages for breach of an agreement and an alternative fraud theory. *Id.* at *1.  The court excluded the expert's opinions, finding that the report "engages in arithmetic, not expert analysis." *Id.* Specifically, the expert used figures provided by the plaintiff's attorneys and "conduct[ed] simple arithmetic to calculate the resulting damages amount." *Id.* The court held that doing simple math, using data that would be in evidence and available to the jury, "is not deploying 'specialized knowledge,'" and that such testimony "is not evidence that would 'help the trier of fact' in any way." *Id.* at *1-2.  That reasoning applies with particular force here, where Egan did not even perform the math but allowed Excel to do the work.  That cannot conceivably help the jury.

## II.     EGAN'S METHODS ARE UNRELIABLE.

To be reliable, expert testimony must rest on "sufficient facts or data," and be "the product of reliable principles and methods" that have been "reliably" applied to the "facts of the case."

Fed. R. Evid. 702.  A district court has broad discretion in determining whether expert testimony is reliable.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  "Ultimately, 'expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison.'"  *Tower 570*, 2022 WL 1665132, at *2 (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).  Egan's "proper methods" are wholly unreliable; he failed to measure what is at actually at issue in this case, failed to consider copious contradictory evidence, and did not even attempt to procure the data he claims to need.

First, Egan's methodology is a quintessential "apples and oranges comparison."  *Tower 570*, 2022 WL 1665132, at *2.  As addressed above, Plaintiffs seek damages only for *certain* returns and exchanges, but Egan posits that Plaintiffs should recover damages for *all* returns and exchanges.  An expert opinion that does not even attempt to measure the alleged harm is, by definition, unreliable.  *See id.*; *see also E.E.O.C. v. Bloomberg*, No. 07-cv-8383(LAP), 2010 WL 3466370, at *18 (S.D.N.Y. Aug. 31, 2010) (precluding expert opinion under Rule 403 when it would "distract the jury's attention from considering the evidence as it applies to" the "causes of action alleged").

Second, Egan ignores without explanation a mountain of facts and evidence that contradicts his methodology.  Again, he measures damages based on all returns, when *everything else* in this case demonstrates that he should do otherwise.  His opinions are directly undermined by Plaintiffs' Complaint, Initial Disclosures, interrogatory responses, responses to requests for admission, deposition testimony, and class certification motion.  And of those highly relevant sources, the only one Egan even bothered to review was the Complaint.  "To ignore contradictory testimony in order to arrive at a desired conclusion highlights the unreliability of [an expert's] methodology." *Bloomberg*, 2010 WL 3466370, at *17.

<u>Third</u>, Egan failed to consider, let alone account for, the benefits of Audible's generous "satisfaction guaranteed" return policy.  Those benefits are neither disputed nor hypothetical.  Plaintiffs' other putative expert, McIlroy, cited multiple studies demonstrating the positive effects of generous return policies, including that they tend to *increase sales more than returns*.  Ex. 10 (McIlroy Report), 11-12.  And there is evidence that is what occurred in this case, because royalty payments to ACX authors *and* per-ACX-author royalty payments *increased* during the period Audible was widely marketing its return policy.  *See* ECF No. 164-26 (2015-2021 financial data); ECF No. 170-46 (Bartel Decl. ¶ 11).  A competent, reliable damages analysis would address those benefits, and analyze whether and how they impacted Plaintiffs' damages.  Like so much else, Egan ignored this issue.

<u>Fourth</u>, Egan made no genuine effort to obtain the data he supposedly needed to calculate a class-wide damages figure.  Fact discovery spanned nearly a year, with more than seven months between when Audible first produced aggregate ACX data and the close of fact discovery.  Yet at *no point* did Plaintiffs tell Audible (or the Court) that the data Audible produced was insufficient for their damages calculation.  Nor did Plaintiffs or Egan make any supplemental requests during expert discovery.  Instead, they "sandbagged" and waited until Egan's Report and deposition to claim, for the first time, that Audible "has not produced all the data that was deemed necessary to calculate the aggregate damages."  Dep. Tr., 42:3-6.  Federal Rule of Civil Procedure 37 neither permits nor rewards such tactics.  *See, e.g.*, *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999).  More to the point, an expert's inexcusable failure to request or obtain the data necessary to support his expert opinion renders that opinion inherently unreliable.  *See Faulkner*, 46 F. Supp. 3d at 383 (finding expert's methodology unreliable in part because he "did not seek out further documents to verify the Arista records" when he had "every opportunity to locate such '[] documents'").

16

III.     **EGAN'S OPINIONS ARE UNFAIRLY PREJUDICIAL.**

As discussed above, Egan's opinions are unscientific, unhelpful, and unreliable.  But even if there were some modicum of probative value to Egan's views, it would be vastly outweighed by the risk of prejudice if a jury were permitted to hear "expert testimony" about Plaintiffs' damages.

Expert testimony must be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (quoting Fed. R. Evid. 403).  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."  *Daubert*, 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).  Rule 403 therefore plays a "uniquely important role" because of the "unique weight" expert evidence may have in jury deliberations. *Nimely*, 414 F.3d at 397 (collecting cases).

Egan's opinions starkly illustrate the need for Rule 403 in the expert context.  Audible does not challenge Egan's basic qualifications; he has an impressive pedigree and significant experience as a paid expert.  But that is precisely why he cannot be permitted to show the jury how to perform basic math.  Allowing Egan to testify would very likely lead the jury to conclude that Plaintiffs *must* be entitled to damages "because an expert said so."  *See United States v. Tuzman*, No. 15 CR. 536 (PGG), 2017 WL 6527261, at *19 (S.D.N.Y. Dec. 18, 2017) (excluding testimony of damages expert under Rule 403 because "the potential unfair prejudice flowing from the admission of Dr. Lyter's testimony is substantial given the Court's grave concerns with his methodology and the imprimatur of science that accompanies an expert witness such as Dr. Lyter").  That risk of

unwarranted "imprimatur" is particularly acute when the expert's opinions lack any scientific or reliable basis. *Id*.

For example, in *In re Elysium Health-ChromaDex Litigation*, No. 17-CV-7394 (LJL), 2022 WL 421135, at *28 (S.D.N.Y. Feb. 11, 2022), the court found that the putative expert's "indefinite and uncertain opinions [were] too speculative to assist the trier of fact in determining any fact in issue." As the court explained, whatever "little" probative value the opinions had was "far outweighed by the danger that the jury would accord too much weight to such opinions because ***they come from the mouth of a ... professional***." *Id.* (alteration in original) (emphasis added) (quoting *Tchatat v. City of New York*, 315 F.R.D. 441, 447 (S.D.N.Y. 2016)). Here, Egan's opinions have *no* probative value. They involve no expertise or specialized analysis at all and, just as concerning, do not align with Plaintiffs' claims or theories. This is exactly the sort of scenario where the risk of confusion and unfair prejudice is greatest because unhelpful testimony is being offered with the imprimatur of an "expert."

In summary, the Court should exclude Egan's opinions based on their lack of any probative value coupled with the significant risk of substantial prejudice.

## **CONCLUSION**

For these reasons, under the Federal Rules of Evidence and *Daubert*, Audible respectfully requests that the Court exclude entirely the opinions and testimony of Joseph Egan.

Dated:  March 6, 2023                         Respectfully submitted,

                                                          FENWICK & WEST LLP

                                                          By: */s/ Brian D. Buckley*
                                                                  Brian D. Buckley

Brian D. Buckley (admitted *pro hac vice*)
bbuckley@fenwick.com
Deena J.G. Feit (admitted *pro hac vice*)
dfeit@fenwick.com
Wenbo Zhang (NYC Bar No. 5623186)
wzhang@fenwick.com
FENWICK & WEST LLP
1191 Second Avenue, 10th floor
Seattle, WA 98101
Telephone: 206.389.4510

Kathryn J. Fritz (NYC Bar No. 2078483)
kfritz@fenwick.com
Jedediah Wakefield (admitted *pro hac vice*)
jwakefield@fenwick.com
Nicholas A. Santos  (admitted *pro hac vice*)
nsantos@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

Diana Buck (admitted *pro hac vice*)
dbuck@fenwick.com
John M. DiBaise (admitted *pro hac vice*)
mdibaise@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500

*Attorneys for Defendant Audible, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record are being served with a copy of this document via CM/ECF per Local Rule CV-5 on March 6, 2023.

_/s/ Brian D. Buckley_
Brian D. Buckley