UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                           :

GOLDEN UNICORN ENTERPRISES, INC. et al., *on*   :
*behalf of themselves and all those similarly situated*   :
                                           :

                 Plaintiffs,       :          21-CV-7059 (JMF)
                                           :

        -v-                   :    OPINION AND ORDER
                                         :

AUDIBLE, INC.,                             :

                 Defendant.       :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Plaintiffs Golden Unicorn Enterprises, Inc. and Big Dog Books, LLC (together, "Plaintiffs") are run by independent, self-published authors — Jan Bonthu and Elizabeth Noble, respectively. Both companies contracted with Defendant Audible, Inc. ("Audible"), a leading provider of audiobooks, to license and distribute audiobooks. In October 2020, Plaintiffs (and other self-publishing authors) discovered that Audible was deducting from their royalties audiobooks that customers had returned, including, in some instances, audiobooks returned long after they had been purchased and listened to in full. This lawsuit followed. Discovery is now closed. Two claims remain: a claim for breach of contract and a claim for breach of the implied covenant of good faith and fair dealing.[1] Now pending before the Court are a slew of motions. Audible moves for summary judgement with respect to both of Plaintiffs' claims and three of its affirmative defenses. ECF Nos. 189, 214. Both sides move to preclude the other's expert

---

[1] Plaintiffs also brought an unjust enrichment claim, which the Court previously dismissed. *See* ECF No. 33, at 2.

witnesses.  ECF Nos. 194, 197, 201, 203, 218, 221.  Audible moves for spoliation sanctions.

ECF Nos. 199, 224.  And finally, Plaintiffs move for class certification.  ECF No. 130.

As discussed below, the Court concludes the Audible is entitled to summary judgment

with respect to both Plaintiffs' contract claim (because the parties' contract unambiguously

provides that Plaintiffs were due royalties net of all "returns") and at least one of Plaintiffs' two

theories of liability for breach of the implied covenant (namely, their theory that Audible

"surreptitiously" deducted royalties).  The Court also grants Audible's motion to preclude the

testimony of Plaintiffs' damages expert, which moots Plaintiffs' motion to preclude the

testimony of Audible's rebuttal expert.  For reasons the Court will explain, however, the Court

reserves judgment on the remainder of the parties' motions pending supplemental briefing on

whether Plaintiffs' have a viable theory of damages attributable to Audible's alleged breach of

the implied covenant by encouraging customers to return their audiobooks.

## BACKGROUND

The following facts, taken from admissible materials submitted in connection with the

pending motions, are either undisputed or viewed in the light most favorable to the non-moving

parties.  *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

Audible is a leading provider of audiobook content and offers a program called ACX,

which allows independent authors to produce and publish audiobooks.  ECF No. 263 ("Def.'s

SOF"), ¶¶ 1-2.  Jan Bonthu and Elizabeth Noble are authors who, through their companies,

Golden Unicorn Enterprises and Big Dog Books, LLC, respectively, publish audiobooks on

Audible.  *Id.* ¶¶ 43-44, 65-66.  Both Bonthu and Noble use ACX to produce their titles as

audiobooks, *id.* ¶¶ 44, 66, and both have earned hundreds of thousands of dollars in royalties

through their audiobooks published on ACX, *id.* ¶ 47, 68.

Every time Plaintiffs, and other independent authors, publish a title through ACX, they agree to the ACX Audiobook License and Distribution Agreement (the "Agreement"). *Id.* ¶ 7. At issue in this case is the provision of the Agreement concerning royalties. Specifically, the Agreement provides that authors receive royalties on their "net sales," which are defined as sales net of, most notably, "returns." *Id.* ¶ 8; *see also id.* ¶¶ 10-11 (representatives of both Plaintiffs testified that they understood Plaintiffs should not be paid royalties on returns); ECF No. 267 ("Pls.' Counter SOF"), ¶¶ 119-20; ECF No. 1-1 ("Agreement"), at 6-8. The Agreement further states that Audible would provide authors with a statement of royalties every month on a "net 30 day basis." Agreement 7, 8. That is, authors' royalty statements reflected monthly sales net of returns, Def.'s SOF ¶ 21, although, prior to March 2021, the statements referred to the net sales as "total sales units," Pls.' Counter SOF ¶ 131; ECF No. 263-17.

Beginning in 2012, Audible permitted its customers to return audiobooks within 365 days of purchase, regardless of whether the customer had completed the book. Def.'s SOF ¶¶ 25, 27. Pursuant to this policy, which was known as both "A Great Listen Every Time" or the "Great Listen Guarantee," a customer could send his or her title back to Audible in exchange for either money or "subscriber credits," whichever the customer had used to purchase the title. *Id.* ¶¶ 26, 98. Plaintiffs dispute that they were aware of Audible's return policy, but they do not dispute that Audible advertised on its website and in emails to members, including both Bonthu and Noble, that customers could "exchange any book" and that the company offered "easy exchanges." *Id.* ¶¶ 29-30; *see also* ECF Nos. 216-12, 216-14.

In addition, if a customer completed a title and rated it one or two stars, Audible would notify him or her of the option to exchange the title for a different one. ECF No. 263-11, at 3; Pls.' Counter SOF ¶ 123. Customers were permitted to return multiple titles at once. Pls.'

Counter SOF ¶ 124; ECF No. 263-13, at 6; *see also* ECF No. 263-12 ("Eland Tr."), at 43-45 (Audible employee testifying that customers would be prevented from exchanging titles only if they had hit a certain threshold number of returns).  Audible promoted its return policy using the words "exchanges" and "swaps," in addition to "return."  Pls.' Counter SOF ¶ 122; ECF No. 216-12, at 3, 6, 10, 14, 51; *see also* ECF No. 263-11, at 3 (internal Audible email from February 2020 noting that Audible wanted "customers to 'exchange' one book for another instead of returning").  Between 2015 and 2021, Audible refunded over ██████ for ACX titles that were returned — over ██ of the gross revenue from sales of ACX titles.  ECF No. 263-16.

The impetus for this lawsuit arose in October 2020 when, due to a technical glitch, authors' accounts on Audible showed *gross* sales rather than *net* sales.  ECF No. 247 ("Pls.' MSJ Opp'n"), at 1.  Plaintiffs contend that, as a result, they and other authors realized for the first time that Audible deducted a substantial number of returns from their royalties.  Pls.' Counter SOF ¶¶ 135, 138, 143.  Following this glitch, authors and authors' trade guilds contacted Audible expressing their anger and concern over its policy of deducting all returns from authors' royalties.  *See* Pls.' Counter SOF ¶¶ 143, 145-47; ECF Nos. 263-20, 263-21, 263-22.[2]  The director of the ACX program understood that authors were upset because customers could listen to an entire book and then return it.  ECF No. 263-25.  Responding to the outrage from authors, Audible changed its policy for calculating royalties: Beginning November 24, 2020, Audible stopped clawing back royalties on titles that were returned more than seven days after purchase.  Pls.' Counter SOF ¶ 155.  Audible also changed the marketing to customers of its return benefit,

---

[2]     Audible disputes these statements insofar as Plaintiffs did not authenticate the cited documents or verify their contents.  Pls.' Counter SOF ¶¶ 143, 145-47.  The cited materials include emails to and from Audible employees, and presumably Plaintiffs would be able to authenticate them at trial using Audible witnesses.  But the Court need not decide whether it can rely on them here because the cited documents do not bear on the Court's analysis.

no longer describing it as a "swap."  *See* ECF No. 263-28 (Audible employee requesting that an advertisement stating that customers could swap one title for another be removed as part of the "global sweep").  As a result of the change in policy, ACX authors' royalties increased.  ECF No. 263-10 ("Dapito Tr."), at 199.

## DISCUSSION

As noted, Audible moves for summary judgement with respect to both of Plaintiffs' claims and three of its affirmative defenses, both sides move to preclude the other's expert witnesses, Audible moves for spoliation sanctions, and Plaintiffs move for class certification. For reasons that will become clear, the Court will not take the motions in order.  Instead, the Court will address Audible's motion for summary judgment with respect to Plaintiffs' contract claim first, then turn to each side's motions to exclude the other's damages expert, before turning back to the remainder of Audible's motion for summary judgment and the other motions.

## A.  Plaintiffs' Breach of Contract Claim

The Court begins with Audible's motion for summary judgment with respect to Plaintiffs' contract claim.  Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  Such a dispute qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden

will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  Critically, however, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

To make out a claim for breach of contract under New York law — which applies to the Agreement, *see* ECF No. 1 ("Compl."), ¶ 8; Agreement 6 — a plaintiff must show "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021).  Significantly, a court may grant summary judgment "only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *accord Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005).  If the contract is unambiguous, then the Court "should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and it may then award summary judgment." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (cleaned up).  A contract is ambiguous "where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Tr.*

*Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks

omitted).  Conversely, "a contract is unambiguous if the language it uses has a definite and

precise meaning, as to which there is no reasonable basis for a difference of opinion."  *Lockheed*

*Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).  "Whether contract

language is ambiguous is a question of law that is resolved by reference to the contract

alone."  *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58-59 (2d Cir.

1994) (internal quotation marks omitted).

      Applying these standards, the Court concludes that the Agreement is unambiguous and

that Plaintiffs' breach of contract claim fails as a matter of law.  The parties' dispute turns on the

meaning of the term "returns" in the Agreement.  *See* Pls.' MSJ Opp'n 4-8; ECF No. 215

("Def.'s MSJ Mem."), at 9-11.  The Agreement does not explicitly define the term.  But the plain

and ordinary meaning of the term is, as Audible maintains, "to give back a product in exchange

for what one used to acquire it."  Def.'s MSJ Mem. 9; *see also Return*, Webster's Third New

Int'l Dictionary (2002) (defining "return" as "to bring, send or put back to or in a former

position" and "to restore for a former . . . state"); *Return*, Oxford English Dictionary, https://

www.oed.com/view/Entry/164595?rskey=VQshdK&result=1&isAdvanced=false#eid (defining

"return" as "[t]he act of sending . . . a thing back to the . . . owner").  Notably, that definition is

embraced *by Plaintiffs' own industry expert*, Thad McIlroy, who explains that "a digital product

return is the process of a customer returning previously purchased digital content back to the

retailer, and in turn receiving a refund in the original form of payment, exchange for another

item, or a store credit."  ECF No. 263-4 ("McIlroy Report"), at 9.  Thus, every time an Audible

customer gives back an audiobook in exchange for money or store credit, that customer

completes a "return" within the meaning of the Agreement, even if she immediately purchases a

new title with the money or store credit.  *See* Def.'s MSJ Mem. 9-10 & n.2.  It follows that

Audible, which was entitled to deduct all "returns" from Plaintiffs' royalties, did not breach the

Agreement.

In arguing otherwise, Plaintiffs contend that "returns" should include only those instances

in which a customer returns a book "for a technical defect" or because they purchased the title by

mistake.  Pls.' MSJ Opp'n 8.  At a minimum, they assert, returns should not include "exchanges"

or "swaps."  *Id.* at 5-6.  But this reading finds no support whatsoever in the Agreement itself or

in the plain and ordinary meaning of the term "returns."  Thus, Plaintiffs "seek[] to rewrite the

contract to say something other than what it says.  Far from compelling that outcome, New York

law expressly prohibits it.  That is, this Court may not 'by construction add or excise terms, nor

distort the meaning of those used and thereby make a new contract for the parties under the guise

of interpreting the writing.'"  *Wilmington Sav. Fund Soc'y, FSB v. Cash Am. Int'l, Inc.*, No. 15-

CV-5027 (JMF), 2016 WL 5092594, at *5 (S.D.N.Y. Sept. 19, 2016) (quoting *Riverside S.*

*Planning Corp. v. CRP/Extell Riverside, L.P.*, 892 N.Y.S.2d 303, 307 (N.Y. 2009); *see also*

*Grant & Eisenhofer, P.A. v. Bernstein Liebhard, LLP*, No. 14-CV-9839 (JMF), 2016 WL

4098616, at *4 (S.D.N.Y. July 28, 2016) ("[T]he Court's 'fundamental objective is to determine

the intent of the contracting parties *as derived from the language employed in the contract*.'"

(quoting *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 527 (2d Cir. 2005)).

As if to confirm the point, Plaintiffs rely not on the language of the Agreement, but on

their expert's report (which may or may not be admissible), which purportedly shows that

Audible's practice of allowing returns for any reason up to 365 days after purchase is out of step

with industry practice.  Pls.' MSJ Opp'n at 8-9; *see also* McIlroy Report 15-18 (identifying other

companies' return policies for digital goods).  But putting aside the fact that the Court may not

look to extrinsic sources unless the contract is ambiguous, this argument confuses Audible's

return *policy* with the *interpretation* of the contract term "returns."  *See* ECF No. 266 ("Def.'s

Reply"), at 3.  Put simply, the fact that Audible's return policy may be outside the industry norm

does not render ambiguous the Agreement's use of the term "returns."  To be sure, the Court

must interpret the contract from the perspective of ACX authors who are "cognizant of the

customs and terminology as generally understood in the" digital audiobook industry.  *Great*

*Minds v. FedEx Off. & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018) (cleaned up); *see also*

*Roberts v. Cap. One, N.A.*, 719 F. App'x 33, 37 (2d Cir. 2017) (summary order) (holding that to

determine whether a contract provision is ambiguous, the court must consider the defendant's

proposed interpretation from the perspective of the "reasonable consumer").  But Plaintiffs

provide no basis to believe that a reasonable author would understand "returns" to mean anything

other than giving back a product in exchange for the money or credit used to purchase it.  Nor,

for that matter, have they provided any support for reading the scattered and inconsistent return

policies of *other* companies into the Agreement.  *Cf. Glob. Reinsurance Corp. of Am. v. Century*

*Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) ("[P]roof of custom and usage consists of proof that

the language in question is fixed and invariable in the industry in question.").  At bottom,

Plaintiffs seek to limit the definition of "returns" as a matter of policy, not as a matter of contract

interpretation.  But the Court is "not free to alter the contract to reflect its personal notions of

fairness and equity."  *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 467 (cleaned up).

　　*Cox v. Spirit Airlines, Inc.*, 341 F.R.D. 349, 356 (E.D.N.Y. 2022), upon which Plaintiffs

place heavy reliance, Pls.' MSJ Opp'n 5-6, does not call for a different conclusion.  In *Cox*, the

plaintiffs purchased tickets on Spirit Airlines.  341 F.R.D. at 354.  When they purchased the

tickets, however, the plaintiffs were not informed that Spirit Airlines charged an additional fee

for carry-on items.  *Id.* at 353-54.  The plaintiffs sued Spirit Airlines for breaching their contract — the airline ticket.  Considering a prior motion, the Second Circuit determined that the contract was ambiguous because it did not make clear what was included in the "price" term.  *Cox v. Spirit Airlines, Inc.* 786 F. App'x 283, 286 (2d Cir. 2019) (summary order).  A reasonable consumer, the Court held, would not necessarily understand the "price" to include the price of only the airline ticket, and not the additional carry-on fee.  *See Cox v. Spirit Airlines, Inc.*, 17-CV-5172 (EK), 2023 WL 1994201, at *7 (E.D.N.Y. Feb. 14, 2023) (amending, in part, the prior summary judgment opinion on reconsideration).  Here, however, the Agreement is clear with respect to "[r]eturns of *what*."  Pls.' MSJ Opp'n 5.  The answer is returns of *audiobooks*.  Def.'s Reply 4.  In other words, *Spirit Airlines* involved ambiguity as to what the "price" term encompassed.  Here, by contrast, there is no ambiguity as to what the "returns" term encompasses; merely a dispute over Audible's business decision to allow a generous return policy.

Plaintiffs' remaining arguments are similarly unavailing.  First, Plaintiffs point to a non-standard ACX contract between Audible and Noble, which specified that Audible would pay royalties on sales "less any . . . *exchanges* and returns."  Pls.' MSJ Opp'n 5-6; Pls.' Counter SOF ¶ 75; ECF No. 261-11, at 4.  Thus, they argue, Audible knew how to use the word "exchanges" when it wanted to deduct those types of transactions, in addition to returns, from an author's net sales.  Pls.' MSJ Opp'n 6.  Second, Plaintiffs point to ACX authors' reactions after allegedly realizing that Audible had been deducting all returns from their royalties, arguing that their shock and outrage demonstrates that they did not understand "net sales," as defined in the Agreement,

to include all returns.  *Id.*[3]  And finally, they point to Audible's change in policy after October

2020 as support for their interpretation of the term "returns."  *Id.* at 6-7.  But all of this is

extrinsic evidence that the Court may not consider because, as discussed above, the relevant term

in the Agreement is unambiguous.  *See Universal Instruments Corp. v. Micro Sys. Eng'g Inc.*,

924 F.3d 32, 41 (2d Cir. 2019) ("The existence of an ambiguity, if any, is to be ascertained from

the face of an agreement without regard to extrinsic evidence." (cleaned up)); *Law Debenture Tr.

Co. of N.Y.*, 595 F.3d at 466 ("[E]xtrinsic evidence of the parties' intent may be considered only

if the agreement is ambiguous." (internal quotation marks omitted)).[4]

In the final analysis, independent authors may well view Audible's return policy as

unfair.  They may not have fully understood the policy or the way it affected their royalties.  But

that does not cast doubt on the meaning of "return" in the Agreement.  And because the contract

makes clear that authors would not earn royalties on returned audiobooks, *see* Def.'s Reply 3,

---

[3]       In the same breath, however, Plaintiffs themselves argue that authors' subjective
understandings of the Agreement are irrelevant because what matters is the reasonable, objective
interpretation of the Agreement.  Pls.' MSJ Opp'n 7-8.  This is, of course, the correct articulation
of the law — a party's personal, subjective intent is not relevant to the interpretation of a
contract.  *See Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, J.)
("A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the
parties."), *aff'd sub nom. Ernst v. Mechanics' & Metals Nat. Bank of City of N.Y.*, 201 F. 664 (2d
Cir. 1912), *aff'd*, 231 U.S. 50 (1913).

[4]       In any event, Audible's policy change in November 2020 undermines, rather than
supports, Plaintiff's arguments.  Audible changed an aspect of its return policy, beginning to
compensate authors for titles returned more than seven days after purchase.  ECF No. 263-23;
Pls.' Counter SOF ¶ 154.  Audible did not change the definition of returns or change the default
rule that returns were deducted from an author's net sales; instead, it imposed an external limit
on how many returns would be deducted from an author's royalties.  In other words, the
definition of "returns" has remained consistent — anytime a customer gives back a title in
exchange for money or store credit.  Thus, the change is consistent with Audible's argument that
its *policy* on returns does not affect the *definition* of returns in Agreement.

Plaintiffs cannot show that Audible breached the Agreement.  Accordingly, Audible's motion for summary judgment with respect to the contract claim must be and is granted.

## B.  The Parties' Damages Experts

Next, the Court turns to each side's motion to preclude the other side's damages expert: Audible's motion to preclude Joseph Egan, *see* ECF No. 222 ("Def.'s Egan Mem."), who provides two sets of damages calculations for the individual Plaintiffs and opines that damages are calculable on a class-wide basis, *see* ECF No. 223-1 ("Egan Report"), at 7, 11-17; and Plaintiffs' motion to preclude Audible's rebuttal expert, Juli Saitz, *see* ECF No. 213 ("Pls.' Saitz Mem.").

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").  A court should not "admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Nor should an expert be permitted to "supplant the role of counsel in making argument at trial," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004), or be permitted to merely "construct[] a factual narrative based upon record evidence," *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227 (PAC), 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018).

Measured against these standards, Egan's proposed testimony plainly falls short. First, Egan's calculation of the individual Plaintiffs' damages involves relatively simple arithmetic, not expert analysis. To start, he merely multiplies the price of each returned audiobook by the royalty rate Plaintiffs received to determine the royalty amount deduced from Plaintiffs' earnings for each title returned. *See* Egan Report 11 (describing his process), *id.* at 12; Def.'s Egan Mem. 8-9; ECF No. 222-2 ("Egan Tr."), at 124. That does not involve expertise. But making matters worse, the calculations appear in the Audible document upon which Egan relied. Egan Tr. 124-25. That is, Egan simply replicated calculations that Audible had already done. After that, Egan used the "sum" function on Microsoft Excel to add up the total amount of royalties deducted between 2015 and 2021. *Id.* at 135-36; Def.'s Egan Mem. 9; Egan Report 13. That too involves no expertise; it is simple addition. Courts regularly exclude expert testimony where the expert "engages in arithmetic, not expert analysis." *FPP, LLC v. Xaxis US, LLC*, No. 14-CV-6172 (LTS), 2017 WL 11456572, at *1-2 (S.D.N.Y. Feb. 13, 2017) (excluding expert testimony where the expert calculated damages by taking three figures and conducted "simple arithmetic"); *see also Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452, at *6 (S.D.N.Y. Mar. 30, 2020) (rejecting the damages' expert testimony because, in part, it was based on "a basic mathematical calculation taught in grade school," namely averaging two numbers);

*Luck v. McMahon*, No. 20-CV-00516, 2022 WL 5500934, at *7 (D. Conn. Feb. 11, 2022)

(excluding an expert report that simply conducted "straightforward mathematical calculations of

[the plaintiff's] lost compensation").  The same result is warranted here.

     *Hamza v. Saks Fifth Ave., Inc.*, No. 07-CV-5974 (FPS), 2011 WL 6187078, at *2

(S.D.N.Y. Dec. 5, 2011), upon which Plaintiffs rely, ECF No. 246 ("Pls.' *Daubert* Opp'n), at 24-

25, is inapposite.  There, the damages expert's calculations of future earnings loss "was based

upon a calculation not only of [the plaintiff's] earnings over the three years leading up to her

termination, her statistical work life expectancy, the fringe benefits to which she was entitled at

Saks, and her mitigation earnings . . . ; but also the average earnings growth rate in the United

States labor market, the probability of unemployment, based upon New York area

unemployment statistics, as well as job maintenance expenses for both her job at Saks and her

post-termination employment."  *Hamza*, 2011 6187078, at *2.  That is a far cry from the

relatively simple calculations Egan conducted.  *See* ECF No. 268 ("Def.'s *Daubert* Reply"), at

11.  Similarly, Plaintiffs' argument that the jury cannot be expected to determine damages from

Audible's raw data is misplaced.  To the extent that Plaintiffs' damages calculations are

admissible, Plaintiffs' counsel could create summary charts to present them to the jury.  *See* Fed.

R. Evid. 1006.[5]  And even if Plaintiffs were to introduce evidence of class-wide damages —

---

[5]    Plaintiffs' argument that Egan's testimony could itself come in through Rule 1006, Pls.' *Daubert* Opp'n 26 n.9, is borderline frivolous.  Rule 1006 permits parties to use summaries, charts, or calculations to present voluminous records to a factfinder.  It is not a backdoor for expert testimony, and Plaintiffs provide no case to the contrary.  *See United States v. Lebedev*, 932 F.3d 40, 50 (2d Cir. 2019) (contrasting Rule 702, which permits expert testimony, with Rule 1006), *abrogated on other grounds by Ciminelli v. United States*, 143 S. Ct. 1121 (2023); *see also United States v. Jennings*, 724 F.2d 436, 443 (5th Cir. 1984) (rejecting argument that an expert was necessary to introduce summary charges, and noting that "when a chart does not contain complicated calculations requiring the need of an expert for accuracy, no special expertise is required in presenting the chart").

which, notably, Egan did not attempt to calculate, Def.'s Egan Mem. 9 — they could use Excel

or another tool to do so.  The fact that there may be thousands of class members does not make

the arithmetic more complicated or "unwieldy."  *Cf.* Pls.' *Daubert* Opp'n 24.  And in any event,

because Egan does not calculate class-wide damages, or provide any indication why doing so

would be more complicated than his "calculation" of the individual Plaintiffs' damages, that is

not a basis to admit his testimony.

This would be enough to exclude Egan's testimony.  But there is more.  Egan's damages

calculations, such as they are, do not correspond to Plaintiffs' sole remaining claim (breach of

the implied covenant of good faith and fair dealing) and, thus, are irrelevant, unreliable, and will

not assist the trier of fact.  *See* Def.'s Egan Mem. 11; *cf. In re Pfizer Inc. Sec. Litig.*, 819 F.3d

642, 660-61 (2d Cir. 2016) (reversing the district court's decision to preclude the plaintiff's

damages expert, concluding that the expert's model fit the plaintiff's theory of liability).

Plaintiffs' theory of damages for their implied covenant claim is based on the number of

"exchanges" of Plaintiffs' audiobooks "pursuant to Audible's 'Great Listen Guarantee.'"  Def.'s

SOF ¶ 104.  That is, Plaintiffs distinguish between exchanges (i.e., when a title is returned and

the customers uses the refund to purchase another title) and returns due to a technical defect or

mistaken purchase.  *See* Pls.' MSJ Opp'n 8.  Egan, however, tallies up the royalties for *all*

returns, regardless of whether the customer "exchanged" the title or returned it due to a technical

defect.  *See* Def.'s Egan Mem. 11-13; Egan Report 11; *cf.* Pl.'s *Daubert* Opp'n 27 (conceding

that Egan did not excluding any returns from his calculations).  It follows that Egan's

calculations do not measure the damages, if any, attributable to Audible's breach of the implied

covenant and must be excluded on that basis.  *See, e.g.*, *In re Payment Card Interchange Fee &*

*Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2022 WL 14863110, at *23 (E.D.N.Y.

Oct. 26, 2022) ("Plaintiffs' experts' damages opinions must correspond to Plaintiffs' theory of liability."); *cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 35-36 (2013) (decertifying a class in an antitrust suit because the petitioners' damages model did not "measure damages resulting from the particular antitrust injury on which petitioners' liability . . . is premised").

*In re Payment Card Fee and Merchant Discount* provides a helpful contrast.  There, the court denied the defendants' motion to preclude the plaintiffs' damages experts.  The damages experts calculated the costs to the plaintiffs from the defendants' alleged anticompetitive conduct and then deducted the discounts that the plaintiffs had received that were specifically tied to the anticompetitive conduct.  2022 WL 14863110, at *22.  The defendants argued that these calculations were unreliable because they did not account for other incentives the defendants provided.  *Id.*  The court concluded, however, that the damages calculations were, more likely than not, "the product of reliable principles and methods and [would] be helpful to the jury" because the calculations deducted the incentives directly tied to the anticompetitive conduct, and the defendants could cross-examine the experts regarding other potential deductions at trial.  *Id.* at *25.  Here, by contrast, Egan did not deduct anything from his calculation of royalties attributable to returns — despite Plaintiffs' express acknowledgment that deductions of returns due to technical defects or mistaken purchase would be appropriate.  Egan's calculations are therefore based on assumptions that are contrary to Plaintiffs' theory of liability.

Plaintiffs argue that it is up to Audible to prove which returns were validly deducted from their earnings.  Pls.' *Daubert* Opp'n 27.  But this misstates the relevant burdens of proof.  As the proponent of Egan's testimony, Plaintiffs have "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020).  Additionally, Plaintiffs' argument ignores the plain

language of the Agreement, which expressly defines "net sales" to exclude "returns."  Indeed, Egan's calculations would render the term "returns" in the Agreement superfluous.  And Plaintiffs appear to recognize this.  They repeatedly define "returns" as titles given back due to technical defects, mistaken purchases, or other reasons shortly after the time of purchase.  *See* Pls.' MSJ Opp'n 8; *see also* ECF No. 148 ("Pls.' Class Cert. Mem."), at 5.  Plaintiffs cannot now say that, in their eyes, every return is illegitimate unless and until Audible, the party that does not bear the burden of proof, proves otherwise.  This dooms Egan's theory.  And even if it did not, Egan fails to indicate how he would incorporate validly deducted returns into his calculations.  Plaintiffs assume that he can do so, Pls.' *Daubert* Opp'n 27, but provide no basis for that assumption.  Accordingly, Plaintiffs have not established that Egan's calculations *could* comport with their theory of damages, let alone that they do so now.  Simply stating that Egan could calculate damages once liability is established is insufficient to show that Egan's methodology is reliable.

Accordingly, Audible's motion to preclude Egan's testimony is granted.  Audible retained Juli Saitz to rebut Egan's damages analysis and opinions.  *See* ECF No. 213-1 ("Saitz Report"), ¶ 1.  In light of the Court's preclusion of Egan's testimony, therefore, Saitz's testimony must also be excluded as irrelevant.  *See Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, No. 11-CV-681 (KBF), 2015 WL 5459662, at *9 (S.D.N.Y. Sept. 16, 2015) (precluding rebuttal experts where the court had already precluded the principal expert).  It follows that Plaintiffs' motion to preclude Saitz's testimony is moot.

## C.  The Parties' Remaining Motions

As noted, Audible also moves for summary judgment with respect to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.  The covenant of good faith and

fair dealing, which is implied in all contracts, requires that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (cleaned up); *see also Cordero v. Transamerica Annuity Serv. Corp.*, — N.E.3d —, 2023 WL 3061503, at *5 (N.Y. Apr. 25, 2023). More specifically, it encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Manhattan Motorcars, Inc. v. Automobili Lamborghini,* 244 F.R.D. 204, 214 (S.D.N.Y. 2007) (internal quotation marks omitted). Thus, "conduct that while technically not constituting a breach of contract, nevertheless deprives the plaintiff of the benefit of its bargain" can constitute a breach of the implied covenant. *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392 (JPO), 2017 WL 3600427, at *4 (S.D.N.Y. Aug. 18, 2017) (internal quotation marks omitted).

Under New York law, "[p]roof of damages is an essential element of a claim for" breach of the implied covenant of good faith and faith dealing. *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016); *Sec. Plans, Inc. v. Cuna Mut. Ins. Soc'y*, 726 F. App'x 17, 20 n.2 (2d Cir. 2018) (summary order) (citing *RXR WWP Owner LLP v. WWP Sponsor, LLC*, 132 A.D.3d 467, 468 (1st Dep't 2015)). Moreover, damages "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach . . . ." *Tractebel Energy Mktg. Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotation marks and emphasis omitted); *accord Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 448 (S.D.N.Y. 2018) (noting that parties bringing a breach of implied covenant claim "must show that the breach . . . proximately caused their damages" (cleaned up)); *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011 (JMF), 2021

WL 2418225, at *3 (S.D.N.Y. June 14, 2021) (similar, for breach of contract claim).  Where the amount of damages is uncertain, it is the "wrongdoer" who bears "the burden of uncertainty." *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977); *see also Regan v. Conway*, No. 07-CV-3207 (ADS), 2010 WL 11629513, at *13 (E.D.N.Y. May 10, 2010) (explaining the wrongdoer rule in the context of a breach of implied covenant claim).  But this rule applies only "when it is certain that damages have been caused by [the] breach" in the first place. *Tractebel Energy Mktg.*, 487 F.3d at 110 (internal quotation marks omitted).  The burden is on the plaintiff to establish its entitlement to damages for breach of the implied covenant, and a defendant is entitled to summary judgment if it "point[s] to a lack of evidence to go to the trier of fact" as to damages.  *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009); *see also Vaughn v. Consumer Home Mortg. Co.*, 297 F. App'x 23, 27 (2d Cir. 2008) (summary order) ("A defendant does not have to introduce evidence that would negate the possibility of damages in order to move for summary judgment.").

Plaintiffs allege that Audible breached the implied covenant of good faith and fair dealing in two ways: first, by actively encouraging customers to return titles using its Great Listen Guarantee; and second, by "surreptitiously" deducting royalties from Plaintiffs and other authors.  Pls.' MSJ Opp'n 13.  The latter theory is easily rejected.  A breach of implied covenant claim cannot be based on conduct permitted under the contract.  *Clalit Health Servs. v. Israel Humanitarian Found.*, 395 F. Supp. 2d 21, 23 (S.D.N.Y. 2005) (Chin, J.); *see also Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (holding that the defendant did not breach the implied covenant of good faith and fair dealing because, among other things, it "acted consistently with the contract"); *Najjar Grp., LLC v. W. 56th Hotel LLC*, 850 F. App'x 69, 72 (2d Cir. 2021) (summary order) (affirming the district court's conclusion that the

defendant had not breach the implied covenant because it "merely did what the operating agreement required it to do" (internal quotation marks omitted)).  And as Audible points out, Def.'s MSJ Mem. 15-16, the Agreement expressly permitted Audible to report net sales information, rather than gross sales, on authors' royalty statements.  *See* Contract 7, 8.  Plaintiffs contend that, by reporting only net sales, rather than gross sale, Audible masked the large volume of returns that it was deducting from their royalties.  Pls.' MSJ Opp'n 14.  That may be so.  But Audible was permitted to do so under the express terms of the parties' contract.[6]

The Court could probably grant summary judgment to Audible with respect to Plaintiffs' other theory — that the company breached the implied covenant by actively encouraging customers to return titles using its Great Listen Guarantee — as well, but it will reserve judgment pending supplemental briefing.  Audible argues that Plaintiffs have not provided a competent or viable theory of damages for that species of alleged breach.  Def.'s MSJ Mem. 24-25.[7]  There is much force to that argument.  For starters, Plaintiffs rely on Egan's expert report, *see* ECF No. 223-1 ("Egan Report"), ¶¶ 36, 51, and the Court has now excluded it.  But even if the Court had not done so, Egan's calculations, as discussed above, do not fit Plaintiffs' theory of liability, as he calculates the total royalties for *all* returns, not only those returns attributable to breach of the implied covenant through the Great Listen Guarantee.  What is less clear is whether, in the

---

[6]     Plaintiffs also note in their statement of material facts — although, conspicuously, not in their memorandum of law — that the dashboard for ACX authors purported to display "total sales" numbers, even though it actually showed net sales numbers.  Pls. Counter SOF ¶ 131; ECF No. 263-17.  But that does not salvage their claim; Plaintiffs point to no evidence that, by reporting net sales numbers under the heading total sales, Audible somehow deprived them of the benefits of the Agreement.

[7]     Audible also argues that Plaintiffs' damages evidence must be stricken because Plaintiffs failed to comply with their Rule 26 initial disclosure obligations.  Def.'s MSJ Mem. 20-24.  The Court rejects this argument, substantially for the reasons it articulated in *New York City Transit Authority v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 440 (S.D.N.Y. 2022).

absence of Egan's testimony, Plaintiffs can point to *any* theory of damages that is "not merely speculative, possible, and imaginary." *Tractebel Energy Mktg.*, 487 F.3d at 110.  Because the parties' briefs addressed *both* Plaintiffs' contract claim and their implied covenant claim, Plaintiffs did not focus on that question.  The Court could hold that failure against Plaintiffs; it is, after all, their burden to prove reasonably certain damages attributable to the breach.  But mindful that the Court's ruling with respect to Plaintiffs' contract claim materially alters the landscape of the case, and that there may be evidence in the record that would support a viable theory of damages with respect to Plaintiffs' remaining implied covenant claim, the Court concludes that the fairer course is to give Plaintiffs an opportunity to marshal the evidence, to the extent it exists, showing that they have a viable theory of damages.[8]

The Court also reserves judgment on the parties' other motions: Audible's motion for summary judgment with respect to three of its affirmative defenses; Audible's motion to preclude Thad McIlroy; Audible's motion for spoliation sanctions; Plaintiffs' motion to preclude John Rodzvilla; and Plaintiffs' motion for class certification.  In the case of Plaintiffs' motion for class certification, one of Audible's counterarguments pertains also to proof of damages — namely, that Plaintiffs do not satisfy the predominance requirement of Rule 23(b)(3) of the Federal Rules of Civil Procedure because, among other things, Plaintiffs fail to provide a competent model of class-wide damages.  ECF No. 164 ("Def.'s Class Cert. Opp'n"), at 23-24 (citing *Comcast Corp.*, 569 U.S. at 35).  If it does not moot the class certification motion altogether, the supplemental briefing may well be relevant to that counterargument.  Relatedly,

---

[8]     If it does not moot the issue altogether, that supplemental briefing may also be relevant to Audible's alternative argument for summary judgment on the ground that Plaintiffs' implied covenant claim is duplicative of their contract claim.  *See* Def.'s MSJ Mem. 12-13 (arguing that the implied covenant claim is duplicative because Plaintiffs seek the "same damages").  Accordingly, the Court reserves judgment on that argument too.

the parties should address in their supplemental submissions whether Plaintiffs have standing (specifically, whether they can prove injury in fact traceable to Audible's alleged breach of the implied covenant) and what the common issues are, pursuant to Rule 23(a), specific to the breach of implied covenant claim.  The parties' other motions are less likely to be affected by supplemental briefing on damages.  But it makes sense to await the supplemental briefing, if only to conserve the Court's resources and avoid opining on potentially unnecessary issues of law, some of which are matters of state law.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Audible's motion for summary judgment with respect to Plaintiffs' breach of contract claim and with respect to Plaintiffs' implied covenant claim to the extent it is based on the allegation that Audible "surreptitiously" deducted Plaintiffs' royalties.  In addition, the Court GRANTS Audible's motion to preclude Joseph Egan's testimony and DENIES Plaintiffs' motion to preclude Juli Saitz's testimony as moot. The Court otherwise reserves judgment on Plaintiffs' motions pending supplemental briefing.

In particular, the parties shall submit supplemental briefing on the following issues:

(1) Whether Plaintiffs have a non-speculative basis for calculating damages caused by Audible's alleged breach of the implied covenant by encouraging customers to return titles using its Great Listen Guarantee; and

(2) Whether Plaintiffs can satisfy the predominance requirement of Rule 23(b)(3), the commonality requirement of Rule 23(a), and Article III standing with respect to class certification for their remaining implied covenant claim.

Plaintiffs shall submit their brief, **not to exceed 15 pages, within three weeks of the date of this Opinion and Order**.  Audible shall submit its brief in response, **not to exceed 15 pages, two weeks thereafter.**  For avoidance of doubt: The summary judgment record is closed; the parties should therefore, as appropriate, cite to evidence in the existing record.  If either side believes oral argument would be helpful, it should indicate that in its brief.

The Court will address the parties' many motions to seal when it rules on the outstanding motions. The Clerk of Court is directed to terminate ECF Nos. 197, 203, and 221.

SO ORDERED.

Dated: July 14, 2023
New York, New York

_____
JESSE M. FURMAN
United States District Judge